1
2
3
4                    UNITED STATES DISTRICT COURT
5                    NORTHERN DISTRICT OF CALIFORNIA
6

7    EDD KING, et al.,                        Case No.  15-cv-00313-DMR

8                    Plaintiffs,

9            v.                               **ORDER ON DEFENDANTS' MOTION
                                              TO DISMISS**
10   NATIONAL GENERAL INSURANCE
     COMPANY, et al.,                         Re: Dkt. No. 165
11
                    Defendants.
12
            Plaintiffs[1] bring this putative class action alleging that Defendants[2] unlawfully overcharged

13   Plaintiffs and the Class members for auto insurance premiums in violation of California law.  The

14   court previously granted Defendants' motions to dismiss the first and second amended complaints.

15   *See* Docket Nos. 70 ("Order on First MTD"); 92 ("Order on Second MTD").  After Plaintiffs filed

16   a third amended complaint, the court ordered the case stayed while the Department of Insurance

17   ("DOI") made findings as to some of the issues raised by the parties.  *See* Docket No. 117 ("Stay

18   Order").  The DOI proceedings have now concluded.  As ordered by the court, Plaintiffs filed a

19   fourth amended complaint on January 28, 2021.  [Docket No. 163, Fourth Amended Complaint

20   ("4AC").]  Defendants now move to dismiss the 4AC and well as to strike portions of the 4AC.[3]

21   [Docket Nos. 164 ("MTS"), 165 ("MTD"), 173 ("MTS Reply"), 174 ("MTD Reply").]  Plaintiffs

22   ───────────────────────

23   [1] Plaintiffs are Edd King, Dierdre King, Elmo Sheen, and Sheila Lee.

24   [2] Defendants are National General Insurance Company ("NGIC"), National General Assurance
     Company ("NGAC"), Integon National Insurance Company ("Integon National"), Integon Preferred
25   Insurance Company ("Integon Preferred"), MIC General Insurance Corporation ("MIC"), Personal
     Express Insurance Company ("PEIC"), and Sequoia Insurance Company ("Sequoia").

26   [3] Consumer Watchdog, a "non-profit, non-partisan charitable organization" that advocates against
27   "unfair and abusive insurance rates and policies," filed a motion for leave to file an amicus curiae
     brief addressing some of Defendants' arguments in their motion to dismiss.  *See* Docket No. 177 at
28   1.  The court has reviewed Consumer Watchdog's arguments and finds that they are not necessary
     to decide the issues raised by the motion to dismiss.  The motion is therefore denied.

*United States District Court*
*Northern District of California*

oppose.  [Docket Nos. 169 ("MTD Opp."), 171 ("MTS Opp.").]  The court held a hearing on the motions on April 22, 2021.

For the reasons stated below, Defendants' motion to dismiss is granted in part and denied in part and the motion to strike is denied.

# I.      BACKGROUND

## A.      Good Driver Discounts

Drivers who meet certain criteria are qualified to buy a Good Driver Discount ("GDD") policy from the insurer of their choice.  Cal. Ins. Code §§ 1861.02(b)(1), 1861.025 (listing the criteria to qualify for a GDD policy).  The rate charged for a GDD policy must be "at least 20 percent below the rate the insured would otherwise have been charged for the same coverage."  Cal. Ins. Code § 1861.02(b)(2).  When multiple insurers have common ownership or operate in California under common management or control, California law requires that "[a]n agent or representative representing one or more" of such insurers "shall offer, and the insurer shall sell, a good driver discount policy to a good driver from an insurer within that common ownership, management, or control group, which offers the lowest rates for that coverage."  Cal. Ins. Code § 1861.16(b).  The requirement to cross-offer a policy with the lowest Good Driver rates is known as the "Lowest Rates Rule."  An insurer within a control group is not subject to the Lowest Rates Rule if it meets the eight conditions required for a "Super Group Exemption," as set forth in section 1861(c)(1).  *See* Cal. Ins. Code § 1861.16(c)(1).

## B.      Allegations and Claims

The following facts are alleged in the 4AC.  Defendants are (or, at relevant times, have been) in a control group within the meaning of the Lowest Rates Rule.  4AC ¶ 1.  Each of the named Plaintiffs and Class members held insurance policies issued by one or more of the companies in Defendants' control group.  *Id.* ¶ 5.  All Plaintiffs qualified as "Good Drivers" and were therefore entitled to a GDD policy from an insurer within Defendants' control group that offered the lowest rates for that coverage.  *Id.* ¶ 7.  In violation of the Lowest Rates Rule, Defendants' agents and representatives failed to offer Plaintiffs and Class members the lowest available GDD policy premiums within their control group.  *Id.* ¶ 44.  Specifically, at the time Plaintiffs purchased their policies, PEIC and Sequoia both had GDD policies with lower rates than what Plaintiffs were paying

for substantially similar coverage, but Plaintiffs were never offered those GDD policies.  *Id.* ¶ 44. In addition, Defendants deliberately concealed their wrongful conduct and did not inform policyholders who had been overcharged of their right to be reimbursed for premium overpayments. *Id.* ¶ 49.

Plaintiffs bring claims for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory and injunctive relief; (4) fraud and misrepresentation; and (5) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*

### C.  DOI Investigation

This is the third round of briefing on the pleadings.  One of Defendants' recurring arguments has been that Defendants PEIC and NGAC are entitled to "Super Group" exemptions from the cross-offer requirement.  After the court heard oral argument on Defendants' motion to dismiss the third amended complaint, it ordered supplemental briefing on the question of whether the determination of "Super Group" status is within the exclusive jurisdiction of the DOI.  *See* Docket No. 114.  The court did not hold that Super Group status must be decided by the DOI, but it did find that "such a decision *should* be made by the Insurance Commissioner through application of the primary jurisdiction doctrine."  Docket No. 117 at 6 (emphasis in original).  It accordingly stayed the case pending a decision by the DOI regarding the Super Group status of NGAC and PEIC.  *Id.*

The DOI issued a decision on November 10, 2020.  [Docket No. 163-5 ("DOI Letter").] The DOI made two primary findings.  First, it determined that "NGAC's recreational vehicle program is not subject to the Lowest Rates Rule as a matter of law" because the cross-offer requirement only applies to the auto insurance policies defined in Cal. Ins. Code § 660(a), which does not include policies for recreational vehicles.  *See id.* at 3.  Second, the DOI wrote that it "does not presently find that PEIC NKA Premier is no longer entitled to a Super Group Exemption, but the evidence calls into question Premier's continuing entitlement to the Exemption."  *Id.* at 4.  The parties disagree about the effect of the DOI's decision.

## II.   REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 permits a court to take judicial notice of adjudicative facts. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is

United States District Court
Northern District of California

1   generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

2   determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.

3   "[A] court may take judicial notice of 'matters of public record,'" *Lee v. City of Los Angeles*, 250

4   F.3d 668, 689 (9th Cir. 2001) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.

5   1986)), and the court need not accept as true allegations that contradict facts that are judicially

6   noticed.  *See Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

7       Plaintiffs and Defendants filed respective RJNs with numerous exhibits.  *See* Docket Nos.

8   166, 170 ("Pltf. RJN"), 175.  The court grants Plaintiffs' RJN with respect to portions of Exhibit 1,

9   as noted below.  The remaining exhibits are unnecessary to decide the issues raised in Defendants'

10  two motions.  Therefore, both RJNs are otherwise denied as moot.

## III.    MOTION TO DISMISS

### A.      Legal Standard for Rule 12(B)(6) Motions

13      A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

14  the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  When

15  reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the

16  factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

17  curiam) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory"

18  or there is an absence of "sufficient factual matter to state a facially plausible claim to relief."

19  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft

20  v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001))

21  (quotation marks omitted).  A claim has facial plausibility when a plaintiff "pleads factual content

22  that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

23  alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).   In other words, the facts alleged must

24  demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause

25  of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v.

26  Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001),

27  overruled on other grounds by *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

28      As a general rule, a court may not consider "any material beyond the pleadings" when ruling

United States District Court
Northern District of California

on a Rule 12(b)(6) motion.  *Lee*, 250 F.3d at 688 (citation and quotation marks omitted).  However, "a court may take judicial notice of 'matters of public record,'" *id*. at 689 (citing *Mack v. S. Bay Beer Distrib*., 798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment.  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith*, 307 F.3d at 1125-26.

### B.     Discussion

Defendants raise a host of arguments attacking the 4AC, including that (1) PEIC and NGAC should be dismissed because the DOI found that those Defendants are exempt from the Lowest Rates Rule; (2) Plaintiffs have not adequately alleged that Defendant insurers are liable for any violations of section 1861.16(b) committed by their agents/representatives; (3) Plaintiffs have not adequately pleaded that all Plaintiffs and putative Class members would be eligible for the lower rate policies or would have accepted such policies even if they were eligible; (4) Plaintiffs do not allege that any Defendants refused to sell a lower rate policy; (5) Defendants that did not allegedly have lower rates to offer should be dismissed; (6) NGIC, Integon National, and MIC should be dismissed because they were prohibited from cross-offering by virtue of their "affinity group" plans; and (7) none of Plaintiffs' claims are adequately pleaded.

### 1.     Super Group Exemptions

According to Defendants, the DOI found that NGAC and PEIC were at all relevant times entitled to the Super Group Exemption from the Lowest Rates Rule.  MTD at 6.  They assert that these two Defendants should therefore be dismissed.  *Id.* at 8.

The DOI's decision is somewhat more complicated than Defendants suggest.  With respect to NGAC, the DOI stated:

> Plaintiffs allege NGAC should have cross-offered insurance rates from its recreational vehicle insurance program, but the Commissioner finds that NGAC's recreational vehicle program is not subject to the Lowest Rates Rule as a matter of law.

DOI Letter at 3.  The DOI explained that the Lowest Rates Rule applies only when an insurance

United States District Court
Northern District of California

1   program issues policies that meet the definition of an "automobile insurance policy" under Cal. Ins.

2   Code § 660(a).  It concluded that NGAC does not issue any such policies through its RV program

3   and so the Lowest Rates Rule does not apply to NGAC's RV program.  *Id.*

4   Plaintiffs asserted in their papers and at the hearing that its allegations never involved

5   NGAC's RV program and so the DOI's finding with respect to that point is irrelevant.  MTD Opp.

6   at 6.  Defendants respond that the DOI did not just find that the Lowest Rates Rule is inapplicable

7   to NGAC's RV program; it also determined that NGAC received a Super Group Exemption for its

8   (non-RV) private passenger automobile insurance program—a program for which NGAC partnered

9   with MetroMile.  MTD Mot. at 7; MTD Reply at 4; *see* DOI Letter at 3 (stating that the DOI granted

10  NGAC a Super Group Exemption with respect to the MetroMile program on June 2, 2014).  The

11  DOI declined to make any findings "as to whether there are legal violations arising from NGAC's

12  operation of this PPA program" because Plaintiffs represented that they "have no issue with the

13  MetroMile Program."  DOI Letter at 4 n. 12.

14  At the hearing, the court asked if Plaintiffs were making any allegations as to MetroMile.

15  Plaintiffs represented that the MetroMile program is still at issue.  They point to a letter they wrote

16  to the DOI in which they explained that "[t]he issue with NGAC is not MetroMile but the way

17  Defendants use their approved rates as an excuse to violate California law."  Docket No. 152-1 at

18  27.[4]  Plaintiffs asserted at the hearing that the DOI misunderstood their contention about MetroMile

19  and since the DOI did not make specific findings about MetroMile, their claims as to MetroMile

20  survive the DOI's findings.  This argument is not compelling.  As an initial matter, the parties were

21  before the DOI for almost four years.  It is not credible that in that time, given the extent of the

22  investigation and the parties' presentations to the DOI, that Plaintiffs had no opportunity to clarify

23  their position on MetroMile.  Additionally, Defendants pointed out the DOI's language as to

24  MetroMile in their opening brief and Plaintiffs did not respond on that point.  *See* MTD Mot. at 2-

25  7.  Plaintiffs' contention that the DOI somehow misunderstood their argument was raised for the

26

27  ───────────────
[4] The court references the page numbers as generated by ECF given that this exhibit has multiple
28  filings with different numbering.

first time at the hearing, and only upon the court's prompting.  Further, in making the argument, Plaintiffs relied on documents they filed in November 2020 in connection with their motion to lift the stay in this case.  *See* Docket No. 152.  They did not attach these exhibits to the 4AC or their opposition.  The court finds that Plaintiffs' repeated failure to raise issues relating to MetroMile constitutes waiver of the argument.

However, Plaintiffs assert that NGAC did not apply for its Super Group Exemption until October 28, 2013, even though it allegedly has been part of the control group since at least the beginning of the class period.  MTD Opp. at 6.  They argue that the DOI did not make any findings with respect NGAC's past failures to comply with the Lowest Rates Rule.[5]  *Id.*  Plaintiffs are correct that the DOI findings with respect to NGAC only relate to its RV program and its current entitlement to Super Group status.  Therefore, Plaintiffs' claims against NGAC survive insofar as they are based on NGAC's conduct before it achieved Super Group status.

For PEIC, the DOI noted that it had approved PEIC's request for a Super Group Exemption on July 18, 2014.[6]  DOI Letter at 5.  After it completed its investigation, the DOI stated:

> The Commissioner does not presently find that PEIC NKA Premier is no longer entitled to a Super Group Exemption, but the evidence calls into question Premier's continuing entitlement to the Exemption.

*Id.* at 4.  The DOI reviewed how PEIC's operation has changed since it first applied for the Exemption and determined that while "[t]here is no evidence reviewed by the Department in this investigation that establishes Premier has operated in a manner inconsistent with the Super Group Exemption criteria," it also "cannot rule out the possibility that the way in which Premier has conducted itself over the last several years may have crossed any line that would affect Premier's entitlement to the Super Group Exemption."  *Id.* at 7-8.  The DOI stated that it "will continue to monitor and assess whether Premier continues to qualify for a Super Group Exemption," although

---

[5] The opposition also refers to "future" violations, but as explained below with respect to PEIC, any allegation that NGAC is no longer entitled to Super Group status is purely speculative.

[6] In their opposition, Plaintiffs wrote that PEIC made a "delayed application for [the Super Group Exemption] on May 5, 2015."  MTD Opp. at 7.  Plaintiffs clarified at the hearing that this was a typo and PEIC applied for the Super Group Exemption on May 5, 2014.

United States District Court
Northern District of California

United States District Court
Northern District of California

it noted that "any further administrative action will likely be limited to Premier's current and future practices with respect to GGD policies." *Id.* at 8.  The Commissioner invited the court to invoke the primary jurisdiction doctrine again in the future if the court "makes additional evidentiary findings regarding the factual nature of [PEIC]'s past practices with respect to the Super Group Exemption." *Id.*

Defendants argue that the DOI's findings conclusively establish that PEIC was and still is entitled to the Super Group Exemption and so therefore the claims against PEIC should be dismissed.  MTD at 2.  Plaintiffs assert that the DOI's findings were equivocal, since it explicitly left open the possibility that PEIC may have, at some point, "crossed [a] line that would affect Premier's entitlement to the Super Group Exemption." DOI Letter at 7-8.  Plaintiffs argue that since the DOI did not make a definitive determination that PEIC has been compliant with the Super Group Exemption criteria, PEIC's entitlement to the exemption is now an evidentiary dispute unsuitable for resolution on a motion to dismiss.  MTD Opp. at 13.

The court disagrees with Plaintiffs' position.  The DOI conducted a years-long investigation into PEIC's entitlement to the Exemption and uncovered no evidence that PEIC had operated in a manner inconsistent with the Exemption's criteria.  While the DOI recognized the theoretical possibility that PEIC may have, at some point, fallen out of compliance, Plaintiffs do not identify any evidence or arguments that the DOI did not already consider during its investigation.  Thus, Plaintiffs' allegation that PEIC is no longer entitled to Super Group status is purely speculative.  *See Twombly*, 550 U.S. at 555.  However, it is undisputed that PEIC's application for the Exemption was approved on July 18, 2014.  PEIC allegedly joined the control group in April 2013.[7]  4AC ¶ 55.  Therefore, there was just over a year during which PEIC was a member of the control group and not

---

[7] At the hearing, Defendants asserted that PEIC did not join the control group until April 2014, which they said the DOI confirmed during its investigation.  This argument is not convincing.  While the DOI wrote that "Integon National completed its acquisition of PEIC" in April 2014, it is not clear that PEIC only became part of the control group by virtue of its acquisition by Integon National.  Further, this statement appears to be background information that is not material to the DOI's findings with respect to PEIC's Super Group status.  Defendants did not brief the issue of whether such background "facts" in a DOI letter are subject to judicial notice or fall within the ambit of the DOI's primary jurisdiction.  Therefore, the court does not credit Defendants' argument that the DOI Letter conclusively establishes when PEIC became a member of the control group.

entitled to the Super Group Exemption.  Defendants do not explain why PEIC would not be liable for conduct that pre-dated the DOI's approval of its Super Group status.  Accordingly, while the court declines to reconsider the DOI's findings as to PEIC's Super Group status, the Super Group Exemption is only relevant to part of the timeframe at issue in this case.  The court therefore does not dismiss PEIC on the basis that it later acquired a Super Group Exemption.

In sum, the DOI found that NGAC and PEIC both acquired Super Group status in 2014. This is precisely the issue for which this court invoked the primary jurisdiction doctrine, and Plaintiffs did not offer convincing reasons to second guess the DOI's findings.  Accordingly, the court holds that NGAC and PEIC were not subject to the cross-offer obligation after their respective applications for a Super Group Exemption were approved by the DOI.[8]  However, the DOI did not make any findings as to whether NGAC and PEIC were subject to the Lowest Rates Rule prior to achieving Super Group status.  The court therefore denies Defendants' motion to dismiss these Defendants, but Plaintiffs' claims against NGAC and PEIC survive only to the extent that they allege that these Defendants violated the Lowest Rates Rule before they received a Super Group Exemption.

### 2.    Agents/Representatives

Plaintiffs' first amended complaint alleged that Defendants "improperly included overcharges and did not include the lowest available Good Driver rate among companies in their Control Group that they were entitled to receive" and "failed to provide the lowest Good Driver rates that were legally required under applicable law . . . ."  [Docket No. 28 ¶¶ 27, 33.]  Similarly, Plaintiffs' corrected second amended complaint alleged that Defendants "did not offer to sell a policy from either Defendants Personal Express Insurance Company or Sequoia Insurance Company that was available to be sold to Plaintiffs at a lower premium rate with the same or substantially similar coverages."  [Docket No. 90 ¶¶ 29-31.]  In granting Defendants' motions to dismiss those prior versions of the complaint, the court noted that the plain language of the Lowest Rates Rule

---

[8] At the hearing, Plaintiffs acknowledged that if the court found that the DOI confirmed NGAC and PEIC's entitlement to the Super Group Exemption, that their claims would be limited to challenging unlawful conduct by these defendants prior to the time they acquired Super Group status.

places the duty to cross-offer on "an *agent or representative* representing one or more insurers" within a control group, and not on insurers themselves.  Cal. Ins. Code § 1861.16(b) (emphasis added); *see* Order on First MTD at 13; Order on Second MTD at 13.  Because Plaintiffs only alleged actions taken by Defendant insurers, and not actions taken by their agents or representatives, the court determined that Plaintiffs' pleadings "place[d] the cross-offer requirement on the wrong actors."   Order on Second MTD at 13 ("Here, Plaintiffs do not challenge any agents' or representatives' failure to cross-offer discounted policies. Instead, they bring suit only against the Defendant insurers themselves.").

The 4AC lays out more allegations about Defendants' agents and representatives.  Plaintiffs allege generally that "Plaintiffs and the Class were not offered and sold policies, through Defendants' agents and representatives representing one or more Defendant companies as set forth in Cal. Ins. Code Section 1861.16(b), and whom Defendants controlled, that had the lowest Good Driver rates available from the companies in their Control Group . . . ."  4AC ¶ 37.  The 4AC specifically alleges that each of the four named Plaintiffs were issued policies that were offered by Defendants' "(non-broker) agents and representatives."  *See* 4AC ¶¶ 39 (Edd and Deirdre King), 41 (Elmo Sheen), 43 (Sheila Lee).  Defendants argue that the 4AC still inappropriately attempts to hold Defendants liable for their agents' and representatives' alleged failure to cross-offer.  MTD at 8.  They point out that the 4AC does not name the agents or representatives who allegedly failed to cross-offer.  *Id.* at 9.  They also assert that duty of their agents and representatives to cross-offer cannot be imputed to Defendant insurers in this context.  *Id.* at 10.

Defendants misconstrue the court's prior rulings.  In its order on Defendants' second motion to dismiss, court explained that Plaintiffs "completely fail to address whether they purchased their policies through brokers."  Order on Second MTD at 14.  This pleading defect was fatal since "[u]nlike insurance agents and representatives, an insurance broker is not an agent of, and cannot bind the insurer.  Conversely, the insurer is not liable for the broker's acts or omissions."  *Id.*  In other words, brokers do not have a duty to cross-offer and so if Plaintiffs purchased their policies through brokers, there would be no way to impute liability to Defendant insurers.  The 4AC addresses this part of the court's concern since it explicitly alleges that Plaintiffs and Class members

purchased their policies through Defendants' agents and representatives rather than through brokers.

Defendants next argue that the actions of their agents/representatives cannot be imputed to them, citing *Shultz Steel Co. v. Hartford Accident & Indem. Co.*, 187 Cal. App. 3d 513 (1986). *Shultz* dealt with the fiduciary duty owed by insurers to their insured. The duty to cross-offer under section 1861.16(b) is a statutory duty, not a fiduciary duty, and so the reasoning of *Shultz* does not apply here. Further, the legislative history of section 1861.16(b) makes clear that the statute was intended to regulate insurers through their agents/representatives, not just impose liability on individual agents/representatives:

> This bill, an urgency measure, requires, with specified exceptions, automobile *insurers* to: [m]ake available for eligible good drivers automobile liability coverage which meets the state's minimum financial responsibility requirements, and to offer such coverage at the lowest rate available from the insurers or their subsidiaries.

Pltf. RJN, Ex. 1 at 105 (Assembly policy committee analysis of Assembly Bill No. 2737[9]) (emphasis added).[10]  Accordingly, while Plaintiffs must plead that the failure to cross-offer came through Defendants' agents or representatives, there is no authority supporting Defendants' position that insurers are not liable for the actions of their agents/representatives.

The court previously addressed another issue with Plaintiffs' earlier pleadings. The court noted that Plaintiffs' allegations problematically "hide[] who is responsible for what," and provided the following example:

> Let's say that there's a cross offer obligation. There's a number of defendants that have been named here. Let's say that a particular plaintiff is not offered the lowest rate for that coverage by a member of the controlled common group. Let's say that one of the defendants is not the defendant with the lowest rate; is that defendant responsible? How so? How do we assess damages? Who is responsible? How do we peg that to the complaint?

---

[9] The court takes judicial notice of this document as the legislative history of a state statute. *See Louis v. McCormick & Schmick Rest. Corp.*, 460 F. Supp. 2d 1153, 1155 n. 4 (C.D. Cal. 2006) ("Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice of the records of state courts, the legislative history of state statutes, and the records of state administrative agencies.").

[10] Exhibit 1 to Plaintiffs' RJN contains different documents with various page numbers and so the court cites the page numbers generated by ECF.

United States District Court
Northern District of California

[Docket No. 91, Transcript of Proceedings held on February 11, 2016 at 17:13-25.]  With respect to this concern, it would not be sufficient to allege generally that Plaintiffs purchased their policies through Defendants' agents and representatives because it would still not explain how each named Defendant is liable for the actions of some unidentified agent/representative who is not alleged to represent that particular Defendant.  However, the 4AC adds additional allegations on this point.  Specifically, Plaintiffs claim that "as a Control Group, Defendants implemented a secret scheme to circumvent the statutory mandates by concealing and intentionally not disclosing to their agents, representatives and brokers the applicability of the requirements of Cal. Ins. Code Section 1861.16(b) to their Control Group . . . ."  4AC ¶ 50.  Under this theory, Defendants acted in concert to ensure that none of their agents/representatives were aware of their duty to cross-offer, which resulted in the agents/representatives failing to meet their statutory duties and caused Plaintiffs' injuries.

Plaintiffs' theory that Defendants acted in concert as a control group to prevent any of their agents/representatives from cross-offering within the control group adequately explains how each Defendant is liable for Plaintiffs' injuries.  Whether these allegations have merit is not a question that can be resolved at the pleadings stage.  Accordingly, the court finds that Plaintiffs have adequately alleged that Defendants' agents and representatives failed to cross-offer in violation of their statutory duties; that such failure can be imputed to Defendant insurers through an agency relationship; and that each Defendant is liable for Plaintiffs' injuries.

### 3.      Eligibility and Acceptance

Defendants argue that Plaintiffs have failed to allege a violation of section 1861.16(b) because they have not adequately alleged that all Plaintiffs and putative Class members were eligible for lower rate GDD policies within the control group or that they would have accepted the lower rate policies for which they are eligible.

Defendants' arguments are not compelling.  With respect to eligibility, the named Plaintiffs explicitly allege that they "have taken all actions necessary to obtain legally compliant policies from Defendants and to qualify for and obtain the applicable Good Driver coverage at the lowest rate offered by Defendants' Control Group companies, through their agents and representatives, that

they were eligible for . . . ." 4AC ¶ 27. Although Defendants assert that Plaintiffs have not made similar allegations for the putative Class members, the Class by definition only includes individuals that qualified for a GDD policy. *Id.* ¶ 3. In any case, the 4AC does actually allege that putative Class members qualified for lower rate GDD policies. *See id.* ¶ 37. Defendants' argument that it is "speculative" that each Plaintiff or class member actually would have qualified for a specific policy, and that such an inquiry is too individualized for class treatment, goes to the propriety of class certification and not to the adequacy of Plaintiffs' pleading. With respect to whether each Plaintiff and Class member would have accepted a lower rate policy, there is nothing in the statutory language that says or implies that a violation of section 1861.16(b) only occurs when an insured would have accepted a lower rate policy. Thus, although whether any given Class member would have accepted a lower rate policy may be relevant to their entitlement to damages, there is no indication that Plaintiffs are required to allege acceptance in order to plead a violation of section 1861.16(b).

### 4. Refusal to Sell

Section 1861.16(b) states that "[a]n agent or representative representing one or more insurers [in a control group] *shall offer*, and the insurer *shall sell*, a good driver discount policy to a good driver from an insurer within that [control group." Cal. Ins. Code § 1861.16(b) (emphasis added).

Defendants argue that Plaintiffs do not adequately plead that any insurer refused to sell a lower rate policy. MTD at 14. This is nonsensical. Plaintiffs allege that they were never offered a lower rate policy, so by extension, Defendants never had the opportunity to refuse to sell such a policy. Under Defendants' construction of section 1861.16(b), an insurer would only be liable for a violation of section 1861.16(b) if its agents/representatives actually did offer a lower rate policy and the insurer then refused to sell it. As explained above, Plaintiffs adequately plead that Defendants, through their agents/representatives, violated section 1861.16(b) by failing to offer lower rate policies in the first place. Accordingly, they do not have to plead that Defendants failed to sell policies that Plaintiffs were never offered.

### 5. Defendants Without Lower Rate Policies

The 4AC alleges that, during the relevant time period, Defendants PEIC and Sequoia had lower rate GDD policies for which Plaintiffs were eligible and yet Defendants'

agents/representatives failed to offer these lower-rate policies.  *See* 4AC ¶ 40.  Defendants argue that these allegations mean that the "remaining five Defendant insurers . . . did not have a lower rate to cross-offer, thus did nothing wrong, and thus, must be dismissed."  MTD at 14.

Defendants' argument is disingenuous.  The plain language of section 1861.16(b) indicates that duty to cross-offer falls on the agents/representatives of *all* insurers within a control group.  Cal. Ins. Code § 1861.16(b).  Thus, the agents or representatives of every Defendant were obligated to "offer . . . a good driver discount policy to a good driver from an insurer within" the control group. *See id.*  Whether or not those Defendants themselves had lower rates is immaterial.

The court therefore declines to dismiss any Defendants on the basis that they did not have a lower rate GDD policy.

### 6.     Group Plans

Under California law, insurers are permitted to "issue any insurance coverage on a group plan, without restriction as to the purpose of the group, occupation or type of group."  Cal. Ins. Code § 1861.12.  Defendants refer to these group insurance plans as "affinity group" plans and represent that such plans are sold only to individuals who fall within a specific group, such as the employees of a single employer.  MTD at 17.  According to Defendants, Integon National, NGIC, and MIC offered group PPA plans that were only available to certain groups.  MTD at 17.  Because only members of a group are eligible to receive coverage under that group's plan, Defendants assert that Integon National, NGIC, and MIC had no obligation to (and in fact were legally prohibited from) offering their group plans to individuals outside the group.  *Id.*

This argument fails.  Defendants cite no authority that supports the position that group policies are wholly exempted from the obligation to cross-offer.  Nor is such a position logically compelled by the language or purpose of section 1861.16(b).  For example, the 4AC explicitly alleges that these three Defendants had "available Good Driver rates (with materially different rules and/or rating factors and resulting materially different premiums for Group Drivers) for which the Class Members were eligible."[11]  4AC ¶ 34.  Defendants do not explain why they would not be

---

[11] To the extent Defendants disagree with the truth of Plaintiffs' allegations that they and/or other Class members were eligible for their plans, there is a dispute of fact that cannot be resolve at the

United States District Court
Northern District of California

obligated to cross-offer available rates for which Plaintiffs are eligible just because they are group policies.  Additionally, Plaintiffs assert that Integon National, NGIC, and MIC had non-group "open to all" rates for insuring individuals not within a group.  MTD Opp. at 11.  It is unclear whether Defendants dispute this allegation, but in any case, it is neither necessary nor appropriate to resolve that factual question on a motion to dismiss. Because Defendants have failed to offer authority to support their arguments with respect to group insurance plans, the court declines to dismiss Integon National, NGIC, and MIC on the basis that they offered group plans.

### 7.     Adequacy of Claims

#### a.     Breach of Contract

The elements for a breach of contract action under California law are: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach.  *Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014) (citing *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008)).

Plaintiffs' first claim alleges that Defendants breached the insurance contracts between the parties.  4AC ¶¶ 84-103.  Specifically, Plaintiffs allege that each of their contracts included express terms requiring Defendants to "comply with the law":

> FINANCIAL RESPONSIBILITY
> When this policy is certified as future proof of financial responsibility, this policy shall comply with the law to the extent required.

4AC, Ex. A at 4 (Policy for Edd and Dierdre King).

> CONFORMITY WITH FINANCIAL RESPONSIBILITY LAWS
> When we certify this policy as proof of financial responsibility, it will comply with the law to the extent of the coverage required.

4AC, Ex. B at 13-14 (Policy for Elmo Sheen).

> FINANCIAL RESPONSIBILITY REQUIRED
> When this policy is certified as proof of financial responsibility, this policy will comply with the law to the extent required.  **You** must

pleadings stage.

reimburse **us** if **we** make a payment that **we** would not have made if this policy was not certified as proof of financial responsibility.

4AC, Ex. C at 8 (Policy for Sheila Lee).  Defendants allegedly breached these provisions by failing to comply with the Lowest Rates Rule.  4AC ¶ 95.

In moving to dismiss this claim, Defendants first argue that their alleged failure to comply with section 1861.16(b) occurred prior to the formation of the contracts and any pre-formation conduct cannot be construed as a breach of contract.  MTD at 20-21.  This argument is addressed below in connection with Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.  Defendants next argue that the terms cited by Plaintiffs clearly certify conformity with California's financial responsibility laws that require drivers to carry minimum coverage.  *Id.* at 21; *see* California Vehicle Code §§ 16000 *et seq.*  Defendants assert that these terms cannot reasonably be read to certify compliance with the law generally or with section 1861.16(b) specifically.  Plaintiffs respond that a typical, nonlawyer insured would reasonably interpret the language of those terms to mean that Defendants will comply with *all* applicable laws and that the parties' reasonable expectations are controlling.  MTD Opp. at 17-18.

Plaintiffs' argument fails.  Even assuming that a typical layman would not understand the reference to California's financial responsibility laws, the plain language of the terms makes clear that Defendants' duty to comply with applicable laws is contingent and not absolute (e.g, "*When we* certify this policy . . . .").  Further, those terms appear in the sections of the policies that discuss the terms of Defendants' liability coverage, including the kind of injuries covered by the policies, exclusions, and limits of liability.  *See* 4AC, Ex. A at 2-4; *id.*, Ex. B at 7-14; *id.*, Ex. C at 3-8.  It strains credulity to think an insured would not understand that the terms in those sections address terms specific to coverage, especially since each contract contains a separate section addressing general rights and duties.  *See* 4AC, Ex. A at 24-27; *id.*, Ex. B at 43-50; *id.*, Ex. C. at 24-27.

Plaintiffs' authority on this point does not compel a different result.  They cite *Bank of the W. v. Superior Ct.* for the general proposition that "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties."  2 Cal. 4th 1254, 1264 (1992).  That court went on to explain that "[t]his rule [of contract interpretation], as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, the

16

objectively reasonable expectations of the insured." *Id.* at 1265 (cleaned up). *Bank of the West* actually cuts against Plaintiffs' position. There, the California Supreme Court examined whether an insurer reasonably expected a policy that covered "damages" for "advertising injury" caused by "unfair competition" to cover conduct prohibited by California's Unfair Competition Law. The court acknowledged that the term "unfair competition" on its own was ambiguous since it could refer to statutory claims as well as the common law tort of unfair competition. *Id.* at 1264-65. However, the court then ruled *against* the insured because the insured's argument "disregard[ed] the context" in which the term "unfair competition" appeared. *Id.* at 1265. Specifically, that term appeared in connection with the term "damages," which are not available under the UCL. *Id.* Similarly, in this case, Defendants' agreement to "comply with the law" must be read in context. As explained above, the context of the policies as a whole makes clear that the disputed terms are contingent rather than absolute. It is also clear from the context that the terms relate to Defendants' coverage responsibilities rather than their general duties under the contract.

 *Jauregui v. Mid-Century Ins. Co.* also does not support Plaintiffs' position. 1 Cal. App. 4th 1544 (1991). While that case recognized that the phrase "Financial Responsibility Law" was "too vague to meet the stringent obligation of an insurer to limit coverage in plain and clear language," the court was specifically examining whether an insured could reasonably be expected to know that the reference to financial responsibility laws was in fact a limitation on the coverage provided for permissive drivers—i.e., persons other than the named policyholder who used the car. *See id.* at 1547-49. Relevant to the court's decision, the limitation appeared in the section on "Other Insurance" even though it "ha[d] nothing to do with insurance from any other source." *Id.* at 1549. The limiting language "d[id] not appear in either of the two sections where an insured would be likely to look," such as "Exclusions" or "Limits on Liability." *Id.* In this case, by contrast, the references to California's financial responsibility laws appear in the sections addressing Defendants' liability coverage. An insured could reasonably be expected to understand that terms appearing in that section relate to liability coverage specifically rather than Defendants' general obligations under the contract, particularly given that general obligations are covered in a separate section. Thus, *Jauregui* provides support for the proposition that terms must be examined in context. Plaintiffs'

1    reading that "comply with the law" can be examined apart from the rest of the contract is not backed

2    up by the caselaw.

3        In sum, Plaintiffs' breach of contract claim relies on excising the phrase "comply with the

4    law" from the context in which it appears.  The contracts cannot reasonably be read to represent that

5    Defendants will comply with *all* applicable laws.  Accordingly, Plaintiffs fail to plausibly plead that

6    the contracts contained an express term that Defendants breached by not complying with the Lowest

7    Rates Rule.  Plaintiffs' claim for breach of contract is therefore dismissed.

8            **b.      Breach of the Implied Covenant of Good Faith and Fair Dealing**

9        Under California law, "[e]very contract imposes on each party a duty of good faith and fair

10   dealing in each performance and its enforcement."  *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 473

11   (N.D. Cal. 2014) (quoting *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012)).  In order

12   to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must

13   allege the following elements: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his

14   obligations under the contract; (3) any conditions precedent to the defendant's performance

15   occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of

16   the contract; and (5) the plaintiff was harmed by the defendant's conduct."  *Rosenfeld v. JPMorgan*

17   *Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).  Courts turn to the duty of good faith

18   to "fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific

19   contract language."  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988) (quoting Summers,

20   *The General Duty of Good Faith—Its Recognition and Conceptualization*, 67 Cornell L. Rev. 810,

21   812 (1982)).  In evaluating an implied covenant claim, the court must consider whether a party's

22   conduct, though not prohibited by the express terms of the contract, is "nevertheless contrary to the

23   contract's purposes and the parties' legitimate expectations."  *Carma Developers (Cal.), Inc. v.*

24   *Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373 (1992).  However, the covenant may not be

25   read to contradict the express terms of an agreement.  *Id.* at 374.

26       Plaintiffs allege that Defendants breached the covenant of good faith and fair dealing by (1)

27   failing to offer, through their agents/representatives, "policies from the correct Defendant

28   companies within the Control Group having the lowest available Good Driver rates and premiums";

United States District Court
Northern District of California

(2) "overcharging the Class by not selling the policy with the lowest rate for the coverages available from the Defendant companies in their Control Group"; (3) "failing to disclose and/or actively concealing material information concerning the rates charged to Plaintiffs and the Class"; and/or (4) "breaching their duties to Plaintiffs."  4AC ¶ 107.  Defendants argue that this claim fails because the alleged wrongful conduct preceded the formation of the contract and because Plaintiffs have not alleged breach of any express term of the contracts.

Defendants' first argument fails.  Critically, section 1861.16(b) does not address the issue of timing.  In other words, it is not clear from the language of the statute when the duty to cross-offer terminates.  Defendants do not point to other authorities, such as legislative documents, that indicate whether the Lowest Rates Rule *only* applies before an insured enters into an insurance contract or whether insurers have an ongoing obligation to offer their insureds the lowest rate GDD policies within their control group.  Plaintiffs explicitly allege that Defendants' illegal conduct is "continuous and ongoing" and addressed this point in their opposition.  *See* 4AC ¶ 114, MTD Opp. at 20 ("Defendants engaged in ongoing wrongdoing throughout the life of the policies, by continuing to collect inflated, illegally charged premium amounts, including conduct during renewals while the insurance agreements were operative.").  The reply does not respond to this argument.  In addition, it is particularly unclear when the duty to cross offer terminates in the context of insurance contracts that renew.  Accordingly, Defendants have not persuasively argued that a breach of covenant claim is precluded because the alleged wrongful conduct occurred prior to the formation of the contract.

Defendants also assert that the breach of covenant claim fails because Plaintiffs have not adequately alleged that they breached any express term of the insurance policy contracts.  MTD at 22.  This argument misses the point of a breach of covenant claim, which is explicitly *not* predicated breaching an express contract term.  *Brehm v. 21st Century Ins. Co.*, 166 Cal. App. 4th 1225, 1236, (2008), *as modified* (Oct. 6, 2008) ("[B]reach of a specific provision of the contract is not a necessary prerequisite to an action for breach of the implied covenant of good faith; were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." (quoting *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373 (1992)) (cleaned up)).  Because Plaintiffs' claim for breach of covenant

United States District Court
Northern District of California

1    need not rely on a separate breach of contract claim, Defendants' argument fails.

2          Defendants' motion to dismiss Plaintiffs' second claim is denied.

3                         **c.    Declaratory and Injunctive Relief**

4          Defendants argue that Plaintiffs' third claim for declaratory and injunctive relief fail because

5    Plaintiffs have not adequately pleaded a violation of section 1861.16(b).  The court found above that

6    Plaintiffs have plausibly alleged that Defendants' agents/representatives failed to comply with the

7    Lowest Rates Rule.  Accordingly, the court declines to dismiss this claim.

8                         **d.    Fraudulent Misrepresentation**

9          In order to state a claim for fraudulent misrepresentation, a plaintiff must allege "(1) the

10   defendant represented to the plaintiff that an important fact was true; (2) that representation was

11   false; (3) the defendant knew that the representation was false when the defendant made it, or the

12   defendant made the representation recklessly and without regard for its truth; (4) the defendant

13   intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the

14   representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's

15   representation was a substantial factor in causing that harm to the plaintiff." *Damner v. Facebook

16   Inc.*, No. 20-cv-05177-JCS, 2020 WL 7862706, at *8 (N.D. Cal. Dec. 31, 2020) (citation omitted).

17   A party alleging fraud must "state with particularity the circumstances constituting fraud or

18   mistake." Federal Rule of Civil Procedure Rule 9(b).  Rule 9(b) requires "particularized allegations

19   of the circumstances constituting fraud, including identifying the statements at issue and setting

20   forth what is false or misleading about the statement[s] and why the statements were false or

21   misleading at the time they were made." *In re Rigel Pharm, Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th

22   Cir. 2012).  *See also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106-07 (9th Cir. 2003) (court

23   may dismiss a claim grounded in fraud when its allegations fail to satisfy Rule 9(b) by alleging "the

24   who, what, when, where, and how" of the fraud).  "The purpose of Rule 9(b) is to give defendants

25   adequate notice of the charges being brought so they can defend against them, and to deter the filing

26   of frivolous charges related to fraud." *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,

27   967 F. Supp. 2d 1347, 1365 (N.D. Cal. 2013) (citing *In re Stac Electronics Securities Litigation*, 89

28   F.3d 1399, 1405 (9th Cir. 1996)).

          Although it is not obvious from their briefing, Plaintiffs clarified in the hearing that their

United States District Court
Northern District of California

fraud claim relates solely to Defendants' rate filings with the DOI.  They argued that NGAC and PEIC knowingly misrepresented to the DOI that they were entitled to a Super Group Exemption when they in fact were not.  For several reasons, these allegations are not sufficient to support a fraud claim.  Plaintiffs did not identify any specific misrepresentations Defendants made in their rate filings.  Plaintiffs' argument also runs headlong into the DOI's findings that NGAC and PEIC are entitled to Super Group Exemptions.  As explained above, the court will not allow the parties to re-litigate the same issues it referred to the DOI under the primary jurisdiction doctrine.  Finally, Plaintiffs' theory does not explain why they are entitled to bring a fraud claim against Defendants based on Defendants' alleged false statements to the DOI.  For example, there are no allegations that Plaintiffs knew about Defendants' representations to the DOI about their entitlement to Super Group status, much less that Plaintiffs relied on those representations.

Accordingly, Plaintiffs fail to state a claim for fraudulent misrepresentation.

### e.    UCL

Plaintiffs' fifth through seventh claims allege violations of the UCL.  The UCL prohibits unfair competition, which is defined as, inter alia, "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. Prof. Code § 17200.  Because section 17200 "is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent . . . ."  *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999).  In order to state a claim under the unlawful prong, a plaintiff must allege facts that show that a defendant's business practice—or conduct which can be characterized as a business practice—violates the law, meaning any civil or criminal, federal, state or municipal, statutory, regulatory, or court-made law.  *California v. McKale*, 25 Cal.3d 626, 632 (1979).  Conduct is "fraudulent" if it is likely to deceive any member of the public.  *Weinstat v. Dentsply Int'l., Inc.*, 180 Cal. App. 4th 1213 n. 8 (2010).  Whether a business practice is "unfair" requires an analysis of whether (i) there exists substantial consumer injury, (ii) the injury is not outweighed by countervailing benefits to consumers or competition, and (iii) the injury was not reasonably avoidable by the consumer.  *Camacho v. Auto. Club of So. Cal.*, 142 Cal. App. 4th 1294, 1403 (2006).

1    Defendants' only argument about the UCL claims is that they are "predicated solely on the

2    defectively plead [*sic*] § 1861.16(b) violation and thus, fail to properly plead the predicate

3    underlying violation for any UCL claims."   MTD at 24.   Since the court finds that Plaintiffs

4    adequately alleged that Defendants violated section 1861.16(b), this argument fails.

5    However, Plaintiffs' seventh claim for fraudulent business practices relies on the same

6    allegations of fraud that the court previously found insufficient.   Accordingly, that claim is

7    dismissed.

8    **C.   Conclusion**

9    For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in

10   part.   Plaintiffs' claims against NGAC and PEIC are dismissed to the extent that they allege wrongful

11   conduct after the DOI approved those Defendants' Super Group Exemptions.   Plaintiffs' claims for

12   breach of contract, fraud, and fraudulent business practices are dismissed as inadequately pleaded.

13   Given that Plaintiffs have had two prior opportunities to amend their complaint following dismissal,

14   these claims are dismissed with prejudice.   Defendants' motion to dismiss is otherwise denied.

15   **IV.   MOTION TO STRIKE**

16   **A.   Legal Standard for Motions to Strike**

17   Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an

18   insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."   A matter is

19   "immaterial" when it "has no essential or important relationship to the claim for relief or the defenses

20   being pleaded, while '[i]mpertinent' matter consists of statements that do not pertain, and are not

21   necessary, to the issues in question."   *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993),

22   *rev'd on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).   The function of a Rule

23   12(f) motion to strike is to avoid the expenditure of time and money that arises from litigating

24   spurious issues by dispensing of those issues before trial, and such a motion may be appropriate

25   where it will streamline the ultimate resolution of the action.   *Fantasy*, 984 F.2d at 1527–28.   "A

26   motion to strike should be granted if it will eliminate serious risks of prejudice to the moving party,

27   delay, or confusion of issues."   *Lee v. Hertz Corp.*, 330 F.R.D. 557, 560 (N.D. Cal. 2019) (citing

28   *Fantasy*, 984 F.2d at 1528).   "Motions to strike are regarded with disfavor [ ] because of the limited

United States District Court
Northern District of California

22

United States District Court
Northern District of California

importance of pleadings in federal practice and because they are often used solely to delay proceedings." *Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014) (quotation omitted).  In most cases, a motion to strike should not be granted unless "the matter to be stricken clearly could have no possible bearing on the subject of the litigation."  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).  "The grounds for a motion to strike must appear on the face of the pleading under attack," and "the Court must view the pleading under attack in the light more favorable to the pleader when ruling upon a motion to strike."  *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 301 F.R.D. 487, 489 (C.D. Cal. 2014) (citations omitted).

### B.    Discussion

Defendants argue that several portions of the 4AC should be stricken under Rule 12(f), including (1) Exhibit D to the 4AC and all references thereto; (2) Plaintiffs' class definition; (3) all class allegations; and (4) the Class period.[12]

### 1.    Exhibit D

Attached to the 4AC as Exhibit D is an email dated October 6, 2015 from Joel Laucher, the Deputy Commissioner for the Rate Regulation Branch at the DOI.  *See* 4AC, Ex. D.  Plaintiffs allege that the exhibit contains critical information about the DOI's position on group insurance plans, Super Group Exemptions, and the Lowest Rates Rule.  *Id.* ¶ 32.  Relevant here, Laucher makes the following statements:

> There is no "affinity group exception" or "affinity group exemption" from the requirements imposed upon an insurer to comply with Section 1861.16.

> All insurers writing affinity group insurance plans must also write a separate, non-group rate that is used for insuring insureds who are not in the affinity group. That is, an insurer with a group rate or rates must include a rate that is "open to all" (in particular persons who are not part of the affinity group), and both rates are subject to the requirements of California Insurance Code section 1861.16. . . .

> Exhibit 19 is a form that must be included in a filing by an insurance

---

[12] Defendants also argue that the court should strike NGAC and PEIC from the 4AC because of the DOI's determination on Super Group status.  The court addressed this argument with respect to Defendants' MTD, above.

company to assert such facts as the insurer represents will qualify the insurer for the so-called "Super Group Exemption" from the restrictions of Section 1861.16 that are placed upon an insurer that operates within a Control Group (one of multiple companies having common ownership or operating in California under common management or control). The filing of an Exhibit 19 is not a certification that an insurer actually qualifies for the so-called "Super Group Exemption," it is just an assertion by the insurer. . . .

4AC, Ex. D.  Plaintiffs appear to rely on Exhibit D to support their arguments regarding group policies and Defendants' entitlement (or lack thereof) to Super Group Exemptions.  *Id.* ¶ 33.  They "specifically allege [that] the statements contained" in Laucher's email are true.  *Id.*  Defendants move to strike the exhibit on the basis that the statements contained therein are an incomplete representation of the DOI's position on the identified issues since it omits other emails in the email chain.  MTS at 4-7.

Laucher's email contains few factual statements.  Instead, the email lays out various legal conclusions about the operation of the Lowest Rates Rule.  To the extent that Plaintiffs purport to allege the "truth" of these legal statements, the court is not obligated to credit legal conclusions pleaded in a complaint.  *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  Thus, the court does not rely on Laucher's email to render any legal decision about section 1861.16(b).  Defendants' concern that the email contains inaccurate statements of the law is therefore moot.  The motion to strike Exhibit D is denied on that basis.

### 2. Class Definition

The 4AC defines the putative class as follows:

> All of Defendants' current and former policyholders qualified under California law to purchase a Good Driver Discount policy who, from January 1, 2008 through the present (the "Class Period"), paid premiums for Defendants' automobile policies containing Good Driver Discounts (as defined in Cal. Ins. Code section 660), in excess of the lowest rate Good Driver discount policy available for that coverage from another insurance company within Defendants' California-licensed common ownership, management or control (hereafter "Control Group").

4AC ¶ 3.  Defendants move to strike the class definition on the basis that it defines an impermissible "fail-safe" class.  MTS at 8.

A fail-safe class is "defined in a way that precludes membership unless the liability of the

United States District Court
Northern District of California

defendant is established."  *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010). When a class is defined to only include individuals who will prevail against a defendant, "obvious problems" arise, including the inability to determine who should be sent a Class notice.  *See id.*  Defendants argue that the class definition in the 4AC is a "classic example of an impermissible fail safe class" because "[m]embership in the class can only be determined based upon who wins or loses the question on the merits of whether they paid premiums 'in excess of the lowest rate Good Driver discount' from amongst the subject carriers in the 'control group.'"  MTS at 10.

The court disagrees.  While the class is defined to only include individuals who were qualified for a lower rate policy within Defendants' control group and were not offered one, liability in this case does not solely depend on whether Defendants violated section 1861.16(b).  Plaintiffs are not directly bringing a claim under that statute, which has no private right of action.  Instead, Plaintiffs' surviving claims allege breach of the covenant of good faith and fair dealing and violations of the UCL.  *See supra.*  These claims require Plaintiffs to establish elements that are not contained in the class definition.  Therefore, class membership does not rely on Defendants' liability.  Further, Defendants do not point out any issues in identifying class members for the purpose of sending class notices.

Accordingly, the court denies Defendants' motion to strike the class definition.

### 3.    Class Allegations

"While a court has the authority to grant a motion to strike class claims at the pleading stage, such motions are rarely successful."  *Lee*, 330 F.R.D. at 562.  Numerous courts within this district have determined that motions to strike class allegations "are disfavored because a motion for class certification is a more appropriate vehicle for arguments about class propriety."  *Covillo v. Specialtys Café*, No. 11-cv-00594-DMR, 2011 WL 6748514, at *6 (N.D. Cal. Dec. 22, 2011) (quoting *Hibbs-Rines v. Seagate Tech., LLC*, No. 08-cv-5430-SI, 2009 WL 513496, at *3 (N.D. Cal. Mar. 2, 2009) (quotation omitted)); *see also Astiana v. Ben & Jerry's Homemade, Inc.*, Nos. 10-cv-4387-PJH, 10-cv-4937-PJH, 2011 WL 2111796, at *14 (N.D. Cal. May 26, 2011) (stating that a motion to strike class allegations "appears to allow a determination of the suitability of proceeding as a class action without actually considering a motion for class certification"); *Tasion Commc'ns,*

*Inc. v. Ubiquiti Networks, Inc.*, No. 13-cv-1803-EMC, 2014 WL 1048710, at *3 (N.D. Cal. Mar. 14, 2014) (denying motion to strike class allegations on the basis that Rule 12(f) is not the proper vehicle to dismiss class allegations).  Courts that have permitted such motions "have held that a motion to strike class claims based only on the pleadings is proper only if the court is 'convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed.'" *Parducci v. Overland Sols., Inc.*, No. 18-cv-07162-WHO, 2019 WL 3220282, at *4 (N.D. Cal. July 17, 2019) (quoting *In re iPad Unlimited Data Plan Litig.*, No. 10-cv-2553-RMW 2012 WL 2428248, at *2 (N.D. Cal. June 26, 2012)).

Despite the overwhelmingly negative view of such motions in this district, Defendants argue that it is appropriate to strike Plaintiffs' class allegations prior to the completion of discovery because Plaintiffs' claims "will require very specific allegations to track the language of the statute that cannot be established on a class wide basis."  MTS at 12.  Defendants assert that this case involves highly individualized inquiries that are inappropriate for a class action, including whether (1) each class member interacted with one of Defendants' agents or representatives rather than a broker; (2) Defendants agent/representatives failed to cross-offer a GDD policy with lower rates to every class member; (3) each class member was qualified for a lower rate policy; (4) each class member would have accepted a lower rate policy; (5) each Defendant refused to sell each class member a lower rate policy; and (6) lower rate policies were actually available for each class member.  MTS Reply at 5.

This court recently examined the propriety of striking class allegations at the pleadings stage. *See Mason v. Ashbritt, Inc.*, No. 18-cv-07181-DMR, 2020 WL 789570 (N.D. Cal. Feb. 17, 2020). *Mason* recognized that "[e]ven if the issues in this case would or will require individual examinations that are inappropriate for a class action, it is still necessary to establish whether this analysis should be undertaken in a Rule 12(f) motion rather than at class certification."  *Id.* at *9. The court extensively reviewed the caselaw on this matter and determined that "the weight of the authority in this district leans against striking class allegations on a Rule 12(f) motion."  *Id.* at *10. One court in this district has went so far as to say that the sufficiency of class allegations should be adjudicated at the certification stage even when the plaintiffs' class allegations "are suspicious and

may in fact be improper." *In re Wal-Mart Stores, Inc. Wage and Hour Litigation*, 505 F. Supp. 2d 609 (N.D. Cal. 2007) (Armstrong, J.). *Mason* also specifically addressed the contrary caselaw Defendants rely on here and found that those decisions were perfunctory and did not adequately explain why the existence of individualized inquiries should be addressed through a motion to strike rather than at class certification. *See* 2020 WL 789570 at *9 (examining *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009) and *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1134 (N.D. Cal. 2010)). Defendants' failure to cite or distinguish a recent opinion from this court on the exact topic at issue is a conspicuous omission, particularly given that Plaintiffs cited *Mason* in their opposition. *See* MTS Opp. at 7 n. 1.

Accordingly, Defendants' motion to strike Plaintiffs' class allegations is denied.

### 4.      Class Period

The 4AC defines a class period from January 1, 2008 to the present.  4AC ¶ 3.  Defendants raise several arguments that the alleged class period is improper.  First, they assert that the class period should be limited to "April 19, 2013 through the present" on the grounds that Plaintiffs only allege that PEIC and Sequoia had lower rates that could have been offered but these two entities were not members of the control group until April 2013.  MTS at 17-19.  Second, they argue that the class period is improper because the maximum statute of limitations for any of Plaintiffs' claims is four years.  *Id.* at 19.  Finally, Defendants contend that Plaintiffs are not entitled to argue that the statute of limitations for any of their claims has been tolled due to the discovery rule.  *Id.* at 19-23.

The court declines to reach any of these arguments.  The purpose of Rule 12(f) is to permit a court to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f); *see also Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (holding district court erred in striking damages claim under Rule 12(f) because "none of the five categories covers the allegations in the pleading sought to be stricken by [defendant]").  Defendants do not explain how any of the matters pleaded with respect to the class period are "redundant, immaterial, impertinent, or scandalous."  None of the cases they cite address these issues on a motion to strike.

Accordingly, Defendants' request to narrow the class period is denied.  Defendants may raise

United States District Court
Northern District of California

27

1   their arguments at an appropriate stage of the litigation.

2   **C.**     **Conclusion**

3   For the reasons stated above, Defendants' motion to strike is denied in its entirety.

4   **V.     CONCLUSION**

5   Defendants' motion to dismiss is granted insofar as Plaintiffs allege that NGAC and PEIC

6   violated the Lowest Rates Rule after they received Super Group Exemptions.  It is also granted as

7   to Plaintiffs' claims for breach of contract, fraud, and fraudulent business practices under the UCL.

8   The motion is otherwise denied.  Defendants' motion to strike is denied.  Defendants shall answer

9   the 4AC as to Plaintiffs' surviving claims by July 2, 2021.  The discovery stay is lifted.

10   The court will hold a further case management conference on August 4, 2021 at 1:30 p.m.

11   The parties shall file an updated case management statement by July 28, 2021.

13   **IT IS SO ORDERED.**

14   Dated: June 11, 2021



_____
Donna M. Ryu
United States Magistrate Judge