UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDD KING, et al.,

               Plaintiffs,

    v.

NATIONAL GENERAL INSURANCE
COMPANY, et al.,

           Defendants.

Case No.  15-cv-00313-DMR

**ORDER ON SUPPLEMENTAL
BRIEFING**

Plaintiffs Edd King, Dierdre King and Sheila Lee bring this putative class action on behalf of themselves and similarly situated qualified good drivers.  They allege that Defendants[1] unlawfully overcharged them for auto insurance premiums in violation of California Insurance Code ("CIC") section 1861.16(b).  That statute provides that: "An agent or representative representing one or more insurers having common ownership or operating in California under common management or control shall offer, and the insurer shall sell, a good driver discount policy to a good driver from an insurer within that common ownership, management, or control group, which offers the lowest rates for that coverage."

After reviewing the parties' Rule 23 briefing, the court determined that it needed to rule on several as-yet unbriefed core legal issues in order to analyze Defendants' challenge to Plaintiffs' standing.  [Docket No. 403 ("Order for Supplemental Briefing").]  The court ordered supplemental briefing on the following statutory interpretation questions related to section 1861.16(b): 1) the

---

[1] Defendants are National General Insurance Company ("NGIC"), Integon National Insurance Company ("Integon National"), Integon Preferred Insurance Company ("Integon Preferred"), MIC General Insurance Corporation ("MIC"), and Personal Express Insurance Company ("PEIC").  On December 22, 2023, the court granted summary judgment in favor of Defendant Sequoia Insurance Company ("Sequoia").  [Docket No. 401 ("MSJ Order").]

United States District Court
Northern District of California

1  meaning of "control group" under the statute; 2) how the duty to cross-offer operates under the

2  statute; 3) the meaning of "that coverage" as used in the statute; 4) whether insurers in a control

3  group have a duty to cross-offer coverage from a so-called affinity group plan; and 5) whether

4  insurers in a control group are jointly liable for each other's failure to cross-offer. *Id.*

5      This order rules on these questions to the extent necessary to determine standing for the

6  three plaintiffs who are proffered as class representatives.[2]  *See Melendres v. Arpaio*, 784 F.3d

7  1254, 1261–62 (9th Cir. 2015) (explaining that at least one named plaintiff must "demonstrate[ ]

8  her individual standing to bring a claim" before "the court proceeds to consider whether the Rule

9  23(a) prerequisites for class certification have been met" ).  The remaining questions regarding the

10  duty to cross offer will be determined in the context of renewed Rule 23 briefing.

11  **I.     BACKGROUND**

12      **A.  California Insurance Code § 1861.16(b)**

13      In 1988, California voters passed Proposition 103 which made numerous fundamental

14  changes in the regulation of automobile insurance rates.    Insurance Rates, Regulation,

15  Commissioner, 1988 Cal. Legis. Serv. Prop. 103 (codified as amended at CIC §§ 1861.01-16).

16  Under the statutory scheme, drivers who meet certain criteria are qualified to buy a Good Driver

17  Discount ("GDD") automobile insurance policy from the insurer of their choice, and insurers cannot

18  refuse to offer or sell GDD policies.  CIC §§ 1861.02(b)(1), 1861.025 (listing criteria for a driver to

19  qualify for a GDD policy).  The rate charged for a GDD policy must be "at least 20 percent below

20  the rate the insured would otherwise have been charged for the same coverage."  CIC §

21  1861.02(b)(2).

22      In 1990, the California legislature passed AB 2737, which added sections 1861.15 and

23  1861.16 to the statutory scheme.  Section 1861.16(b) is at the heart of this case.  It says:

24          An agent or representative representing one or more insurers having
           common  ownership  or  operating  in  California  under  common

25  _____

26  [2] Plaintiff Elmo Sheen is no longer offered as a class representative.  [Docket No. 309 (Motion for
   Class Certification) at 3 n.2.]  In addition, the court does not address the parties' arguments
27  regarding Sequoia because it is no longer a Defendant and Plaintiffs make no further arguments
   regarding Sequoia's relevance to this case.  For example, Plaintiffs abandoned their claim that
28  Sequoia was part of the control group.  *See* Plfs. Resp. 1

United States District Court
Northern District of California

> management or control shall offer, and the insurer shall sell, a good driver discount policy to a good driver from an insurer within that common ownership, management, or control group, which offers the lowest rates for that coverage. This requirement applies notwithstanding the underwriting guidelines of any of those insurers or the underwriting guidelines of the common ownership, management, or control group. Nothing in this subdivision shall require an insurer to offer and sell a good driver discount policy that the insurer would otherwise not be required to offer and sell in accordance with paragraph (3) of subdivision (b) of Section 1861.02. As used in this subdivision, "representative" means any person who offers or prepares premium quotations on behalf of either an insurer or any entity acting directly or indirectly on behalf of an insurer.

CIC § 1861.16(b) (as amended Jan. 1, 2005). Insurers sharing "common ownership, management, or control" are also referred to as a "control group." The requirement to offer the policy with the lowest Good Driver rates in a control group is known as the "Lowest Rates Rule."[3]

## B.    The Class Allegations and Class Representative Claims

Plaintiffs seek class certification of two claims: violation of the California Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code § 17200 and breach of the implied covenant of good faith and fair dealing. [Docket No. 309 (Motion for Class Certification, "Mot.") at 2.] The court previously summarized Plaintiffs' operative allegations as follows.[4] Plaintiffs allege that Defendants are in a control group within the meaning of the Lowest Rates Rule. [Docket No. 163 (Fourth Amended Complaint ("4AC") ¶ 1.] Plaintiffs and class members held insurance policies issued by one or more of the companies in Defendants' control group. *Id.* at ¶ 5. All Plaintiffs qualified as good drivers and were therefore entitled to a GDD policy from an insurer within Defendants' control group that offered the lowest rates for that coverage. *Id.* at ¶ 7. In violation of the Lowest Rates Rule, Defendants' agents and representatives failed to offer Plaintiffs and class members the lowest available GDD policy rates within their control group. *Id.* at ¶ 44.

Plaintiffs assert that at the time they purchased their policies, certain Defendants within the same control group had GDD policies with lower rates than what Plaintiffs paid for substantially similar coverage, but Plaintiffs were never offered those lower rate policies. *Id.* at ¶ 44.

---

[3] An insurer within a control group is not subject to the Lowest Rates Rule if it meets the eight conditions required for a "Super Group Exemption," as set forth in section 1861(c)(1). *See* CIC § 1861.16(c)(1).

[4] *See* MSJ Order at 2-3.

United States District Court
Northern District of California

Specifically, Plaintiff Sheila Lee purchased a GDD policy from Defendant Integon Preferred on May 26, 2013, and chose not to renew that policy after a year. [Docket No. 309-5 (Sheila Lee Decl., July 5, 2023) ¶¶ 3-4.] She contends that lower premiums were available within the control group at the time she purchased her policy and at the time she received her renewal quote, but these lower premiums were not offered to her. *Id.* She would have purchased the lower premium policy and would have accepted a renewal of that policy. *Id.* Plaintiffs Edd and Diedre King purchased their policy from Defendant NGIC through an agent of NGIC on June 2, 2012. [Docket Nos. 309-3 (Edd King Decl., July 3, 2023) ¶¶ 3-4; 309-4 (Diedre King Decl., July 3, 2023) ¶¶ 3-4.] An agent of NGIC also sold them their renewal policy on June 2, 2013. *Id.* The Kings contend that lower premiums were available from other insurers within the same control group at the time of their purchase and renewal, but they were not offered these lower premium policies. *Id.* They would have purchased the lower premium policies if offered. *Id.* As evidence of the availability of lower premiums, Plaintiffs point to a chart prepared by Plaintiffs' expert Scott Brown based on Defendants' internal system data, which they argue identifies insurance policies within Defendants' control group which had lower premiums at the relevant times. [Docket Nos. 304 (Declaration of Scott Brown, July 6, 2023) ¶ 25; 304-5 (Brown Decl. Ex. E).][5]

In opposition, Defendants argue that each Plaintiff lacks Article III standing to pursue their claims because they have not established an injury-in-fact. [Docket No. 348 ("Opp'n") at 1-2 n.1.] Specifically, they argue that 1) PEIC had no duty to offer policies to Lee and the Kings because PEIC was not in the same control group as NGIC and Integon Preferred at the time of their policy purchases, 2) MIC had no duty to offer a policy to the Kings because the Kings did not qualify for

---

[5] With regard to standing, Plaintiffs rely on the Brown Declaration as evidence that lower-rate policies existed among the Defendants at the time Plaintiffs purchased or renewed their insurance policies. Defendants challenge the conclusions drawn by Brown when he extended his damages model to encompass Plaintiffs' proposed class; they do not challenge the underlying facts as applied to Lee and the Kings. To analyze the issue of standing, this order relies on Brown's declaration for facts regarding which lower-rate policies existed among Defendants when Lee and the Kings purchased or renewed their insurance policies. The court denies the motion to strike as moot. Defendants may renew their *Daubert* challenge later in the context of renewed class certification briefing.

4

the lower-premium MIC "affinity group" policy, 3) Lee cannot establish liability because she purchased her policy from a broker and not an agent, and 4) Plaintiffs lack standing for injunctive relief because they are not now insureds.  *Id.* at 8-14.  Defendants also argue that Plaintiffs lack standing because "the lower rate policies they contend they should have been offered had different coverages than they actually purchased," in contravention of section 1861.16(b), which requires a cross-offer "from an insurer within [the control group] which offers the lowest rates for *that* coverage" (emphasis added).  *Id.* at 1-2 n.1.

## II.   LEGAL STANDARDS

### A.  Principles of Statutory Interpretation

Core questions of statutory interpretation of section 1861.16(b) have yet to be decided by this court or others.  When a federal court interprets a California statute on an issue that the California Supreme Court has not addressed, the federal court must "predict how the highest state court would decide the issue."  *Walker v. City of Lakewood*, 272 F.3d 1114, 1125 (9th Cir. 2001).  Therefore, the court looks to California principles of statutory construction.  *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1126 (9th Cir. 2005).  These principles require the court to "'ascertain the intent of the Legislature so as to effectuate the purpose of the law' by looking first to the words of the statute."  *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Garamendi*, 32 Cal. 4th 1029, 1043 (2004)).  "We utilize the ordinary meaning of words in a statute unless the Legislature has defined the terms. . . . [I]n the interpretation of a statute where the language is clear, its plain meaning should be followed."  *Id.* (citations omitted).

"But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. . . . [W]ords must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible."  *Lungren v. Deukmejian*, 45 Cal. 3d 727, 735 (1988).  "A court is not required to follow the plain meaning of a statute when to do so would frustrate the manifest purpose of the legislation as a whole or otherwise lead to absurd results."  *Switzer v. Wood*, 35 Cal. App. 5th 116, 129 (2019).  "If . . . the statutory terms are ambiguous, then we may resort to extrinsic sources,

United States District Court
Northern District of California

1  including the ostensible objects to be achieved and the legislative history." *Day v. City of*

2  *Fontana*, 25 Cal. 4th 268, 272 (2001).  A court must "select the construction that comports most

3  closely with the apparent intent of the Legislature, with a view to promoting rather than defeating

4  the general purpose of the statute, and avoid an interpretation that would lead to absurd

5  consequences." *Id.* (citations omitted).  "These rules apply equally in construing statutes enacted

6  through the initiative process." *Id.*

7  **B.    Standing**

8  To satisfy the Article III standing requirement, Plaintiffs must show: (1) an "injury in fact"

9  that is concrete and particularized, as well as actual or imminent, and not conjectural or

10  hypothetical; (2) that the injury is fairly traceable to Defendants' challenged conduct; and (3) that

11  it is likely, as opposed to merely speculative, that a favorable decision will redress the injury.

12  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "[E]ach element [of standing] must

13  be supported in the same way as any other matter on which the plaintiff bears the burden of proof,

14  i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

15  at 561.

16  "Neither the Supreme Court nor the Ninth Circuit has identified the precise evidentiary

17  burden a putative class representative must satisfy to establish her standing at the class

18  certification stage." *Guzman v. Chipotle Mexican Grill, Inc.*, No. 17-CV-02606-HSG, 2020 WL

19  227567, at *5 (N.D. Cal. Jan. 15, 2020).  Courts in this district have held that the plaintiff "must

20  demonstrate, not merely allege, that they have suffered an injury-in-fact to establish Article III

21  standing to bring the claims asserted on behalf of the [class]." *Id.* (quoting *Evans v. Linden Rsch.,*

22  *Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at *6 (N.D. Cal. Nov. 20, 2012)).  The court must

23  examine standing at the class certification stage "rigorously," but "the standard of review cannot

24  be more rigorous than it would [be] on a Rule 56 motion for summary judgment." *Torres v. Air to*

25  *Ground Servs., Inc.*, 300 F.R.D. 386, 397 (C.D. Cal. 2014).  In short, the amount of evidence

26  required is more than at the pleadings stage, but not more than what would be required on a

27  motion for summary judgment. *See, e.g., B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967

28  (9th Cir. 2019) (finding standing where plaintiff presented evidence that she did not receive

adequate medical care in the past as well as evidence that statewide policies and practices exposed her to a risk of similar future harms); *Evans*, 2012 WL 5877579, at *7 (finding that standing was not met where plaintiff "did not offer a shred of evidence in support of the existence of [the alleged] economic injury"); *Torres*, 300 F.R.D. at 397 (accepting plaintiffs' version of disputed facts as true in finding standing).

III.    **REQUEST FOR JUDICIAL NOTICE**

Plaintiffs filed an unopposed request for judicial notice of two exhibits in connection with their supplemental brief. [Docket No. 406 ("Supp. RJN").] They are excerpts of legislative history reports prepared by Legislative Research & Intent, LLC at Plaintiffs' counsel's request. [Docket No. 406-1 (Michael Ram Decl., Jan. 10, 2024) ¶¶ 2-7.] Exhibit A relates to California Statutes of 1985, Chapter 2737, Assembly Bill 2737. Ram Decl. ¶ 2; [Docket No. 406-2 ("AB 2737 History")]. Exhibit B relates to California Statutes of 1999, Chapter 309, Senate Bill 1022. Ram Decl. ¶ 5; [Docket No. 406-3 ("SB 1022 History")]. The court takes judicial notice of both exhibits as legislative history of a state statute. *See Louis v. McCormick & Schmick Rest. Corp.*, 460 F. Supp. 2d 1153, 1155 n.4 (C.D. Cal. 2006) ("Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice of the records of state courts, the legislative history of state statutes, and the records of state administrative agencies.").

The court also takes judicial notice of the exhibits in the declaration by Marc Jacobs supporting Defendants' supplemental brief because they also constitute legislative history of a state statute and the record of a state administrative agency. [Docket No. 404-1 (Marc Jacobs Decl. Jan. 10, 2024) ¶¶ 2-3.] Exhibit A of Jacobs's declaration relates to AB 2737. [Docket No. 404-2 ("Selected AB 2737 History").] Exhibit B contains excerpts from the Final Statement of Reasons in the rulemaking record of the California Insurance Commissioner in adopting 10 CCR sections 2360.0 through 2360.8. [Docket No. 404-3 ("RH-329 Record").]

IV.    **DISCUSSION**

The court addresses the legal issues that bear on Plaintiffs' standing before applying those rulings to determine whether each Plaintiff has provided sufficient evidence to demonstrate Article III standing for Rule 23 purposes.

A.      **Agent or Broker**

The parties agree that Lee does not have standing if she purchased her policy from a broker.  Opp'n 13-14; [Docket No. 365 (Reply) 6-7].  Defendants argue that Lee lacks standing because she purchased her policy from a broker instead of an insurance agent or representative.

Plaintiffs do not dispute that Lee purchased her Integon Preferred policy in 2013 and that she was offered a renewal in 2014 through a company called Omni Safe Insurance Agency ("Omni Safe").  [Docket Nos. 348-1 (Rakesh Patel Decl., Sept. 8, 2023) ¶¶ 53-55; 348-9 (Lee 2013 Offer); 348-10 (Lee 2014 Offer).]  The parties dispute whether Omni Safe was acting as an agent or broker.  To demonstrate standing at the class certification stage, Plaintiffs must offer sufficient evidence for a reasonable factfinder to conclude that Omni Safe was acting as an agent of Integon Preferred when Lee purchased her policy.  *See Evans*, 2012 WL 5877579, at *6.

The court begins by addressing the distinction between a broker and an agent.  As the court has previously held, a broker does not act on behalf of the insurer, and the insurer is not liable for a broker's acts or omissions.  [Docket No. 92 (Order on Second Motion to Dismiss) at 14.] "Persons or entities that solicit, sell, or negotiate insurance contracts are known generically as 'producers.' Producers fall into two broad classifications: insurance agents and insurance brokers. . . . An 'insurance broker' is one who acts as a middleman between the insured and the insurer, soliciting insurance from the public under no employment from any special company, and, upon securing an order, placing it with a company selected by the insured or with a company selected by himself or herself; whereas an 'insurance agent' is one who represents an insurer under an employment by it. A broker is, in essence, employed in each instance as a special agent for a single purpose, while the very definition of agent indicates an ongoing and continuous relationship." *Douglas v. Fid. Nat'l Ins. Co.*, 229 Cal. App. 4th 392, 410 (2014) (citing *Krumme v. Mercury Ins. Co.*, 123 Cal. App. 4th 924, 929 (2004)).  "Generally, some hallmarks of an insurance agent (as opposed to a broker) are licensure, notice of appointment as an agent and the power to bind the insurer. . . . Of course, these labels [of broker or agent] alone are not determinative of the relationship, and the specific facts of each transaction must be reviewed.  The general laws of agency inform any such review." *Id.* at 411 (internal citations omitted).

United States District Court
Northern District of California

"An agency is either actual or ostensible." *Preis v. Am. Indem. Co.*, 220 Cal. App. 3d 752, 761 (Ct. App. 1990) (citing Cal. Civ. Code § 2298).  An agency is actual when the agent is employed by the principal.  Cal. Civ. Code § 2299.  An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not actually employed by him.  Cal. Civ. Code § 2300.  "To establish ostensible authority in an agent, it must be shown the principal, intentionally or by want of ordinary care, has caused or allowed a third person to believe the agent possesses such authority." *Preis*, 220 Cal. App. 3d at 761.  "Liability of the principal for the acts of an ostensible agent rests on the doctrine of 'estoppel,' whose essential elements are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury." *Id.* "Ostensible authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent.  However . . . where the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability." *Id.*

Plaintiffs do not provide evidence that Omni Safe was an actual agent of Integon Preferred. Instead, they grasp at straws.  Plaintiffs point to Defendants' policy administration system, called the NPS System, which lists Omni Safe as an "Agency" under a column titled "DistributionChannel."  Brown Decl. ¶ 26; *see also* [Docket No. 356-9 (Excerpt of NPS System Data Production produced by Defendants)].  Plaintiffs also present testimony from Daniel Wolfram, Director of Data Services, who stated that the NPS System could "identify the separate groups of company agents, brokers, direct written business and managing general agent business." [Docket Nos. 368 (Decl. Shelby Serig, October 26, 2023) at ¶ 20; No. 368-19 (Deposition of Daniel Wolfram, "Wolfram Dep.") at 123:4-11.]  Plaintiffs argue that this demonstrates that Defendants' own data system categorizes Omni Safe as an agent.  Reply 7.  Upon closer examination, Wolfram's testimony does not support Plaintiffs; he does not testify how the NPS System distinguishes between agents and brokers, if at all.  Plaintiffs simply ask the court to jump to the conclusion that the "DistributionChannel" column in the NPS System reflects whether a producer is an agent or a broker.  Defendants present unrebutted evidence that this column does

United States District Court
Northern District of California

1   not categorize producers into agents or brokers.  Patel Decl. ¶ 33.  Rather, Patel testifies that the

2   only categories under "Distribution Channel" are (1) "Direct," meaning agents directly employed

3   by Defendants; (2) "Agent," meaning an external producer; and (3) "Internet," meaning a sale

4   made through Defendants' websites.  *Id.*  Plaintiffs do not refute this.  The fact that Omni Safe is

5   listed as an "Agency" in the NPS System appears to indicate that Omni Safe was an external

6   producer, and not a direct agent.[6]

7        Defendants offer additional unrefuted evidence that Omni Safe was not an actual agent.

8   The March 30, 2009 Broker Agreement entered into between Omni Safe and Defendants ("Omni

9   Safe Agreement") explicitly states that Omni Safe is a broker "and not an agent or employee of"

10  Defendants, and Defendants present evidence that this agreement was in effect when Lee

11  purchased her policy from Integon Preferred.  [Docket Nos. 348-21 (Tory Conroy Decl., Sept. 8,

12  2023) at ¶¶ 11-14; 348-23 (Omni Safe Agreement) at § 2.1.]  Plaintiffs do not dispute that the

13  Omni Safe Agreement was valid and in effect when Lee purchased her policy.  This evidence

14  supports that Omni Safe was a broker, not an agent.

15       Plaintiffs' only remaining avenue is to argue that Omni Safe was an ostensible agent.

16  Plaintiffs attempt to do so through two pieces of evidence: Lee's deposition testimony and Lee's

17  insurance policy.  Reply 4, 6.  In her deposition, Lee denied that Omni Safe was acting as an

18  insurance broker.  Serig Decl. ¶ 19; [Docket No. 368-18 (Deposition of Sheila Lee, "Lee Dep.") at

19  105:12-16.]  But a few moments later, Lee also admitted that she had no idea whether Omni Safe

20  was acting as an insurance broker or not.  Lee Dep. 105:16-24.  Such equivocal and speculative

21  statements cannot support standing on a motion for class certification.  Finally, Lee's insurance

22  policy lists Omni Safe under the heading, "Your Agent."  Lee 2013 Offer; Lee 2014 Offer.

23  Plaintiffs do not explain why this would demonstrate ostensible agency.  For example, Plaintiffs

24  do not argue that Lee justifiably relied on the insurance policy in her belief that Omni Safe was

25  _____

26  [6] Plaintiffs cites *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666 (N.D. Cal. 2011) and *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284 (D. Conn. 2009) as standing for the proposition
27  that Plaintiffs are entitled to rely on Defendants' records, even if those records are incomplete or inaccurate.  Reply 7.  However, those cases are distinguishable because the defendants actually
28  maintained records designed to keep track of the data at issue.  *Herrera*, 274 F.R.D. at 676.  Here, Plaintiffs have not even shown that much.

1    acting as an agent of Integon Preferred.  *Preis*, 220 Cal. App. 3d at 761.

2         Plaintiffs fail to present sufficient evidence to reasonably support a conclusion that Omni

3    Safe was acting as an agent rather than a broker when Lee purchased and considered renewing her

4    policy from it.  Therefore, Lee does not have standing and the Kings are the only remaining

5    representative plaintiffs.

6    **B.    Plaintiffs' "Control Group" Theory of Liability**

7         In its Order for Supplemental Briefing, the court instructed the parties to address the

8    statutory meaning of "control group."  This is important to the Kings' standing, which turns in part

9    on whether PEIC was part of a control group with the other Defendants during a particular

10   temporal window.

11        The parties do not dispute that NGIC, Integon National, Integon Preferred, and MIC

12   (collectively the "NG Defendants") were in the same control group during all relevant times.

13   [Docket No. 409 (Defs. Resp.) at 4.]  They also agree that PEIC was a member of that control

14   group in April 2014.  *Id.* at 4 n.7.  Plaintiffs argue that PEIC joined the control group one year

15   earlier on April 19, 2013 when AmTrust Financial Services, Inc. ("AmTrust") purchased PEIC.

16   Plaintiffs assert that at that point, PEIC and the NG Defendants were all part of the same control

17   group with AmTrust.  Mot. 8-9.  Defendants contend that the NG Defendants were never in the

18   AmTrust control group, and that PEIC did not become part of the NG Defendants' control group

19   until April 1, 2014 when PEIC was acquired by Integon National.  Opp'n 9-11.

20        The Kings purchased their GDD policy from NGIC on June 2, 2012 and renewed it on

21   June 2, 2013.  Brown Decl. Ex. E.  They assert they were not offered lower-premium policies

22   despite the fact that in June 2012, MIC had a similar GDD policy with a lower premium, and in

23   June 2013, PEIC had a similar GDD policy with a lower premium.  Mot. 14.  As to MIC,

24   Defendants do not dispute that NGIC and MIC were in the same control group in June 2012.

25   Opp'n 11-13.[7]  To establish standing with respect to their June 2013 policy purchase, the Kings

26

27   ───────────────
     [7] However, as discussed below, the parties dispute whether the Kings were eligible for the lower
     premium MIC policy because it was only available to members of a particular affinity group.
28   Opp'n 11.

1    must provide sufficient evidence from which a reasonable fact finder could determine that NGIC

2    and PEIC were in the same control group at that time.

3            In its Order for Supplemental Briefing, the court instructed the parties to provide a

4    statutory interpretation of "control group" as it is used in section 1861.16(b).

### 1.   Meaning of "Control Group" in Section 1861.16(b)

6            Section 1861.16(b) states that "[a]n agent or representative representing one or more

7    insurers having common ownership or operating in California under common management or

8    control shall offer, and the insurer shall sell, a good driver discount policy to a good driver from

9    an insurer within that common ownership, management or control group."  Plaintiffs assert that

10   this language is unambiguous; they argue that the court need only look to the plain meaning of

11   "common ownership," "operated under common management," and "operated under common

12   control" to apply the statute.  Plfs. Supp. 6-7.  To the extent it is unclear whether PEIC and the NG

13   Defendants were in the same control group during the relevant time period, Plaintiffs argue the

14   issue should be resolved by the jury at the fact-finding stage.  *Id.*

15           Defendants disagree.  They posit that under section 1861.16(b), insurers are only part of a

16   control group if they are "acting in concert together with respect to ratemaking, underwriting, etc."

17   [Docket No. 404 (Defs. Supp.) 2.]  Defendants point to CIC section 1853.5 and a provision in the

18   California Code of Regulations, arguing that both are related to section 1861.16(b) and

19   demonstrate that the legislature intended that a control group only includes insurers that "act in

20   concert" with respect to ratemaking.  *Id.*  Defendants further argue that the legislative history of

21   AB 2737 supports their interpretation because section 1861.16(b) was written to target corporate

22   groups that were working together to manipulate the GDD insurance market and was not aimed at

23   groups of insurers in general.  *Id.* at 2-3.

24           Under California statutory interpretation rules, the court must first determine if the

25   language of the statute is clear, in which case its plain meaning should be followed.  *See*

26   *Grunwald*, 400 F.3d at 1126.  The language of a statute is ambiguous if "there [is] more than one

27   construction in issue which is semantically permissible, i.e., more than one usage which makes

28   sense of the statutory language given the context and applicable rules of usage."  *Siskiyou Cnty.*

United States District Court
Northern District of California

12

*Farm Bureau v. Dep't of Fish & Wildlife*, 237 Cal. App. 4th 411, 432 (2015).  "An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence. . . . A claim of latent ambiguity requires a provisional examination of extrinsic matters to make the judgment whether the claim is tenable."  *Id.* at 433 (citing *Alameda Cnty. Flood Control & Water Conservation Dist. v. Dep't of Water Res.*, 213 Cal. App. 4th 1163, 1180 (2013)).  The use of "control group" in section 1861.16(b) is not ambiguous on its face.  Therefore, Defendants raise a claim of latent ambiguity.  Following *Siskiyou*, the court starts with a provisional examination of extrinsic matters to determine if Defendants' proposed interpretation of the statute is an "equally plausible candidate of meaning" which shows that the statute is ambiguous.  *See id.* at 431.

The court may consider how the Legislature has used the term "control group" in related contexts.  *See id.* at 437.  Defendants cite CIC section 1853.5, which states: "With respect to any matters pertaining to the making of rates or rating systems . . . two or more admitted insurers having a common ownership or operating in this State under common management or control, are hereby authorized to act in concert between or among themselves the same as if they constituted a single insurer."  CIC § 1853.5.  Defendants argue that section 1853.5 supports their interpretation because it uses the same key language as section 1861.16(b) ("insurers having a common ownership or operating in this State under common management or control").  The court determines that section 1853.5 does not support Defendants' position.  That statute authorizes insurers in a control group to "act in concert between or among themselves" for ratemaking purposes, but it does not define "control group."  At most, section 1853.5 states that acting in concert for ratemaking purposes is something that a control group is authorized to do, but it does not define a control group.  Moreover, section 1853.5 was passed in 1947, decades before the passage of section 1861.16; there is no indication that the Legislature intended language in section 1861.16(b) to be defined by section 1853.5.

Next, Defendants attempt to make a tenuous connection between sections 1835.5 and 1861.16(b) by pointing to the rulemaking record of the California Insurance Commissioner in adopting 10 CCR sections 2360.0 through 2360.8.  Defs. Supp. 3.  The CCR states: "Any two or more insurers which are members of an insurer group . . . shall place the insured with the company

13

United States District Court
Northern District of California

in the group which would charge the insured the lowest Premium." 10 CCR § 2360.5. The CCR defines the term "insurer group" as "any two or more insurers which exercise any authority granted in CIC Section 1853.5." 10 CCR § 2360.0. According to Defendants, the "insurer group" regulations are meant to interpret "control group" in section 1861.16(b), tying together sections 1853.5 and 1861.16(b). *Id.* But Defendants offer no evidence that CCR section 2360.5 was meant to interpret "control group" in CIC section 1861.16(b). In fact, the Final Statement of Reasons in the rulemaking record from October 31, 1995 (RH-329) states: "The purpose of the proposed regulations is to implement, interpret, and make specific provisions of California Insurance Code (CIC) Sections 1857, 1861.05, 1861.135(a), 1861.137(b)," and several other statutes. RH-329 Record 8. Section 1861.16(b) is not on the list of statutes being interpreted by those regulations. *Id.* Rather, the rulemaking record for CCR section 2360.5 repeatedly references CIC section 1861.05(a), which prohibits "unfairly discriminatory" rates. *Id.* at 10. It is clear from the rulemaking record that 10 CCR section 2360.5 was intended to implement CIC section 1861.05(a), not 1861.16(b). Thus, the CCR regulations cited by Defendants do not aid in the interpretation of section 1861.16(b) and are irrelevant to determining the definition of "control group."[8]

Defendants also argue that a single committee report that is part of the legislative history of AB 2737 supports their interpretation of "control group" as only including insurers that act "in concert" with respect to ratemaking, underwriting and similar activities. Defs. Supp. 2. This argument warrants skepticism. "[I]t is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors'

---

[8] Defendants make much of the fact that section 1861.16(b) is included in the Updated Informative Digest attached to RH-329 as an "existing law" related to the proposed regulations. Selected RH-329 Record 13. This single passing reference to section 1861.16(b) does not advance their thesis.

14

statements, legislative counsel digests and other documents which make up a statute's 'legislative history.'" *Siskiyou*, 237 Cal. App. 4th at 439 (citing *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*, 6 Cal. App. 4th 1233, 1238 (1992)). "In light of these factors, the wisest course is to rely on legislative history only when that history itself is unambiguous." *J.A. Jones Construction Co. v. Superior Court*, 27 Cal. App. 4th 1568, 1578 (1994).

Defendants single out one paragraph in the Senate Insurance, Claims and Corporations Committee background analysis of AB 2737 as amended on August 6, 1990. Selected AB 2737 History 4. The paragraph explains that the Committee's concerns about large automobile insurance companies placing good drivers in their higher-risk, higher-priced subsidiary companies, allowing these insurers to gather increased premiums from good driver applicants. *Id.* This is far from an unambiguous indication that the California Legislature's definition of "control group" includes an "acting in concert" requirement. Defendants do not explain why this single Committee analysis of the August 6, 1990 draft of AB 2737 can speak to the intent of the entire Legislature regarding the final bill. Nor does the analysis say anything about an "acting in concert" requirement for members of a control group. This selected morsel of legislative history does not support Defendants' argument of latent ambiguity.

Having made a provisional examination of the extrinsic matters proffered by the defense, the court determines that Defendants failed to demonstrate a latent ambiguity in the statute. Therefore, the statute is unambiguous, and plain meaning controls. *See Grunwald*, 400 F.3d at 1126. As Plaintiffs indicate, section 1861.16(b) defines "control group" as a group of insurers with "common ownership," "operated under common management," or "operated under common control." Plfs. Supp. 7. A logical and plain reading defines "control group" as a group of insurers having common ownership or operating in California under common management or common control.

### 2.    "Control Group" Applied to Plaintiffs' Facts Regarding Standing

To establish standing with respect to their June 2013 policy, the Kings must show that PEIC had common ownership, management, or control with the NG Defendants as of that date. The parties do not dispute that PEIC was acquired by AmTrust on April 19, 2013, and then

acquired by Integon National on April 1, 2014.  They also do not dispute that PEIC entered the same control group as Integon National (and the other NG Defendants) after it became Integon National's subsidiary on April 1, 2014.  Defs. Reply 4 n.7.  The key dispute is whether the April 19, 2013 acquisition of PEIC by AmTrust caused PEIC to join the NG Defendants' control group. If PEIC did not join the control group until April 1, 2014, then the Kings do not have standing with respect to their June 2013 policy purchase.  At the class certification stage, Plaintiffs must demonstrate some evidence from which a reasonable juror could determine that PEIC was in the control group to establish standing.  *See Evans*, 2012 WL 5877579, at *6.

In their motion for class certification, Plaintiffs argue that PEIC and the NG Defendants became part of the same control group on April 19, 2013 when AmTrust purchased PEIC.  Mot. 8-9.  They cite declarations by Larry LaStofka and Jeffrey Nash as well as an NAIC Group Code. *Id.*[9]  The National Association of Insurance Commissioners (NAIC) describes itself as "the authoritative source for insurance industry information."  [Docket Nos. 413-1 (John Hurst Decl., Sept. 25, 2023) ¶ 26; 413-26 (Exhibit 83, "NAIC List").]  The NAIC publishes a *Listing of Companies Summary* which lists "all active status domestic (United States) companies with their NAIC company code, group code, statement type, company status and state of domicile."  NAIC List.  In the section titled "NAIC Numeric List of Groups," there is a group named "AMTRUST NGH GRP" with the group number 2538.  *Id.*  Listed under group number 2538 are dozens of company names, including PEIC (under its other name "National General Premier") and the NG Defendants.  *Id.*  In reply to Sequoia's opposition to class certification, Plaintiffs also cites another declaration by LaStofka, a declaration by Joel Laucher, an email from Mike Weiner, and AmTrust's 2014 Annual Report.  [Docket No. 366 (Reply to Sequoia) at 3.][10]

---

[9] Plaintiffs also cite three agreements that PEIC entered into with AmTrust on April 19, 2013. Mot. 8-9; Hurst Decl. ¶¶ 27-29; [Docket Nos. 413-27 (Exhibit 109); 413-28 (Exhibit 110); 413-29 (Exhibit 111) 27.  While the agreements may show a relationship between AmTrust and PEIC, they do not indicate anything about a common control group between PEIC and the NG Defendants.  The court does not consider these agreements because they are irrelevant to the question of common ownership, management or control.

[10] Although Sequoia is no longer a party and these additional pieces of evidence were not included in Plaintiffs' reply to Defendants' opposition to class certification, in the interest of fairness the court considers the evidence as part of the record on the control group issue.

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendants argue that PEIC and the NG Defendants were not in the same control group in June 2013. Opp'n 9-11. They offer the following evidence. In 2013, the NG Defendants (but not PEIC) were subsidiaries of National General Holdings Corp. (NGHC). [Docket No. 348-1 (Declaration of Rakesh Patel) ¶ 17.] NGHC was a publicly traded company, and AmTrust was a separate publicly traded company. *Id.* at ¶¶ 21-22. According to Defendants, this suggests that NGHC and AmTrust were independent from each other, and that PEIC did not join the same control group as the NG Defendants simply because PEIC was acquired by AmTrust. Defendants also argue that the NAIC Group Code is not relevant to a determination of common control under section 1861.16(b). Opp'n 9-11. They offer the testimony of E. Benjamin Nelson, a former CEO of NAIC, who states that NAIC employees assign group codes based on "relatedness between companies," which can include factors other than ownership, management, or control. [Docket No. 348-42 (E. Benjamin Nelson Decl., Sept. 8, 2023) ¶ 14.][11]

The court now turns to Plaintiffs' evidence, starting with Plaintiffs' expert opinions. Larry LaStofka is a former Bureau Chief for the Rate Regulation Bureau of the California Department of Insurance (CDI). [Docket No. 306-2 (Larry LaStofka Decl., May 18, 2023) ¶ 2.] He worked at the CDI for 23 years before retiring in 2020. *Id.* Relevant to this motion, LaStofka reviewed official records maintained by the CDI for Defendants from 2006 to 2023. *Id.* at ¶¶ 3-4. He states that all Defendants were part of the same "NAIC AmTrust/NGH Control Group Number 2538" from April 19, 2013 until approximately 2017, at which point Defendants separated from AmTrust and changed their common control group affiliation. *Id.* at ¶ 4. LaStofka equates sharing an NAIC Group Code with being part of the same control group under section 1861.16(b). *Id.* Defendants move to strike the LaStofka declaration cited in Plaintiffs' motion under Rule 702 as being "no opinion at all," but merely a narrative of information found in publicly available documents. [Docket No. 349 (MTS) 17-19.] They also argue that LaStofka's opinion lacks

---

[11] Plaintiffs move to strike Nelson's opinion because he has "no experience in the California insurance industry, nor any experience in drafting, interpreting or enforcing California insurance regulations." [Docket No. 377 at 2.] Such experience is not necessary for Nelson's testimony regarding how the NAIC assigns its group codes. The court admits Nelson's declaration solely for his factual testimony regarding NAIC group codes and denies Plaintiffs' motion to strike.

1    foundation.  *Id.*

2        LaStofka's declarations are a mixed bag.  Contrary to Defendants' assertion, he goes

3    beyond simply providing a narrative of public information.  Portions of his declaration synthesize

4    and interpret technical documents (Defendants' rate, rules, and new programs filings submitted to

5    the CDI) using his knowledge as former chief of the Rate Regulation Bureau.  May LaStofka

6    Decl. ¶¶ 3-4.  This is sufficient to meet the requirements of expert testimony under Rule 702.  To

7    the extent Defendants argue LaStofka lacks foundation or expertise regarding the meaning of

8    NAIC group codes, this is mooted by LaStofka's second declaration which provides a foundation.

9    [Docket No. 368-5 (Larry LaStofka Decl., Oct. 12, 2023).]  According to LaStofka, "CDI common

10   usage of the term 'Control Group' (and the CDI's and my interpretation of that term while I was

11   there) is based off of the NAIC Group Code—denoting a unique number assigned to identify the

12   companies [sic] part of a larger (and common) group of insurance companies."  *Id.* at ¶ 18.

13       However, the court admits portions of the LaStofka declarations only for the following

14   limited purposes: as evidence of the time period during which Defendants all shared NAIC Group

15   Code 2538 in CDI records, and as evidence regarding industry standard usage of the NAIC Group

16   Code.  Such evidence is not improper because it constitutes facts rather than legal conclusions in

17   support of Plaintiffs' position that Defendants were in the same control group as of June 2013.

18   *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (finding that

19   expert testimony was not improper where it stated that defendants failed to comport with industry

20   standards, as long as testimony did not reach a legal conclusion or embrace an ultimate issue to be

21   decided by the trier of fact); *see also Allstate Indem. Co. v. Lindquist*, No. C20-1508JLR, 2022

22   WL 2192868, at *5 (W.D. Wash. June 17, 2022) (cabining expert testimony where it fails to make

23   clear that expert's conclusion relates only to insurance industry standards).  The court excludes

24   LaStofka's testimony to the extent he makes legal conclusions that Defendants were in the same

25   control group during the relevant time period, that sharing an NAIC Group Code is legally

26   equivalent to being in the same control group, or that the CDI's use of the same NAIC Group

27   Code is conclusive legal proof that Defendants were in the same control group.  At this juncture,

28   the court makes no finding that the testimony would ultimately be admissible at trial.  The court

United States District Court
Northern District of California

18

considers the declarations only for the issue of standing at class certification.

Defendants also move to strike Jeffrey Nash's declaration. MTS 19-23. Nash's declaration discusses the control group issue only with relation to Sequoia, not PEIC, and therefore is not relevant to the present motion. [Docket No. 306-4 (Jeffrey Nash Decl., June 7, 2023).] The motion to strike is denied as moot.

Defendants had no opportunity to move to strike Joel Laucher's October 2023 declaration, as it was only filed in Plaintiffs' reply to Sequoia's motion for summary judgment. The court independently evaluates whether it can consider Laucher's declaration. Laucher was formerly employed as a Deputy Commissioner for the Rate Regulation Branch of the CDI. [Docket No. 368-6 (Joel Laucher Decl., Oct. 13, 2023) ¶ 2.] He worked in the CDI for a total of 35 years before retiring in 2020. *Id.* at ¶ 3. His declaration states: "As Deputy Commissioner Bureau Chief for the Rate Regulation Bureau and during my tenure, the CDI and I considered that the NAIC Group Code 2538 was a Control Group of commonly owned, managed or controlled companies." *Id.* at ¶ 8. Unlike LaStofka, however, Laucher provides no factual basis for this conclusory statement. For example, LaStofka describes the documents he reviewed to reach his conclusion and he refers to CDI "common usage" of terms. May LaStofka Decl. ¶¶ 3-4; Oct. LaStofka Decl. ¶ 18. Laucher simply jumps straight to an ultimate issue to be decided by the trier of fact: that all companies in the NAIC Group Code 2538, including Defendants, were in the same control group. Oct. Laucher Decl. ¶ 8. The court does not consider Laucher's declaration on this point because it consists solely of impermissible legal conclusions and ultimate issues.[12] *See Hangarter*, 373 F.3d at 1016.

---

[12] In support of Plaintiffs' supplemental brief, Laucher submitted a supplemental declaration. [Docket No. 408 (Supp. Joel Laucher Decl., Jan. 3, 2024).] Plaintiffs' expert witness disclosure deadline was October 16, 2023. [Docket No. 293.] A supplemental report submitted after the expert disclosure deadline which "attempts to strengthen or deepen opinions 'in light of [the] opponent's challenges to the analysis and conclusions therein' . . . is the exact type of supplemental report that the Ninth Circuit and courts across this Circuit have held should be excluded or struck under [Fed. R. Civ. P.] 37(c)." *Rovid v. Graco Children's Prod. Inc*., No. 17-CV-01506-PJH, 2018 WL 5906075, at *11 (N.D. Cal. Nov. 9, 2018) (citing *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 499–500 (9th Cir. 2009)). Laucher's late declaration merely attempts to strengthen his previous opinions after Defendants had already moved to strike his prior declaration. The court does not consider it.

United States District Court
Northern District of California

1    The last two pieces of Plaintiffs' evidence are the AmTrust 2014 Annual Report [Docket

2    Nos. 367 (Ram Decl., Oct. 26, 2023); 367-1 (AmTrust Annual Report)], and an email from the

3    Chief Financial Officer of NGHC, Mike Weiner [Docket Nos. 368 (Shelby Serig Decl., Oct. 26,

4    2023) ¶ 26; 368-25 (NGHC Email)].

5    The Annual Report states that, at some point in 2014, AmTrust had a 13.2% ownership

6    interest in NGHC and had "the ability to exert significant influence on NGHC's operations."

7    AmTrust Annual Report 10.  AmTrust also provided NGHC and its affiliates "information

8    technology development services in connection with the development and licensing of a policy

9    management system," and managed the assets of NGHC and certain of its subsidiaries.  *Id.*

10   NGHC's largest stockholder and chairman of its board of directors, Michael Karfunkel, was also

11   the chairman of AmTrust's board of directors and the father in law of Barry D. Zyskind,

12   AmTrust's CEO.  *Id.*  The court accords little weight to this evidence because it is unclear whether

13   the information was true during the relevant time period (June 2, 2013).

14   With respect to the NGHC email, on March 7, 2016, a fellow employee emailed Mike

15   Weiner, Chief Financial Officer of NGHC, asking him why NGHC was grouped with AmTrust

16   under the NAIC Group Code 2538.  NGHC Email.  Weiner replied, "Ultimate control."  *Id.*

17   Again, the court gives little weight to this evidence because it is unclear whether the offered

18   statement was true during the relevant time period, and Plaintiffs did not point the court to any

19   context regarding the email.

20   When evaluating standing at the class certification stage, the court cannot require more

21   evidence than what would be required on a motion for summary judgment, and it must accept

22   Plaintiffs' version of the disputed facts as true.  *See Torres*, 300 F.R.D. at 397.  It is a close

23   question in the Kings' case; but ultimately, the court finds that Plaintiffs have provided enough

24   evidence to satisfy the standing requirement at this stage.  The LaStofka declarations combined

25   with the other pieces of evidence create a sufficient factual basis from which a reasonable juror

26   could decide to accept Plaintiffs' assertion that PEIC and the NG Defendants were in the same

27   control group as of June 2013.

28

### C.   Eligibility for "Affinity Group" Policies

Plaintiffs state that on June 2, 2012, the Kings should have been offered a GDD policy from MIC with a lower premium than the policy they purchased from NGIC.  Mot. 14. Defendants argue that the Kings were not eligible for coverage under the MIC policy because it is an "affinity group" policy that is only open to members of the "GM Employee Group or GM's business partners/accounts, the Hughes Employee Group, or the Raytheon Employee Group." Opp'n 12.  As the Kings were not affiliated with GM, they were not eligible for the MIC policy and Defendants had no duty to cross-offer that policy to them.  *Id.*

Plaintiffs argue that based on Defendants' own data, the MIC policy was also open to "Other Employee Groups," which is such a broad definition that it renders the entire affinity group invalid.  Mot. 17.  According to Plaintiffs, the MIC policy was therefore open to all applicants, and Plaintiffs were eligible.  *Id.*  Defendants acknowledge that the MIC affinity group plan includes a reference to "Other Employee Groups," but argue that Plaintiffs misinterpret this language.  Opp'n 11-12.

The Kings only have standing as to their June 2012 policy purchase if they can show that the MIC affinity group policy should have been cross-offered to them pursuant to section 1861.16(b).

### 1.   Cross-Offer Obligation for "Affinity Group" Plans

Under California law, "[a]ny insurer may issue any insurance coverage on a group plan, without restriction as to the purpose of the group, occupation or type of group."  CIC § 1861.12. The parties agree that Defendants offer various group plans designed for people with specific needs, affiliations, or memberships, and which are restricted to insureds who meet certain eligibility requirements.  Opp'n 4; Plfs. Supp. 12.  The parties also agree that "affinity groups" are group plans that Defendants purportedly sell only to individuals who meet the group eligibility criteria.  Plfs. Supp. 12.  The parties also acknowledge that under the Lowest Rates Rule, there is a duty to cross-offer affinity group plans for which the good driver applicant is eligible, and no duty to cross-offer affinity group plans for which the good driver applicant is not eligible.  *See* Defs. Resp. at 8; Plfs. Resp. 7-8.

1   But Plaintiffs go further.  They argue that an affinity group is a "sham" if its membership

2   is based solely on the payment of a fee or is too broadly defined to establish "mutually exclusive

3   eligibility."  Mot. 14-17; Plfs. Reply 7-8.  Plaintiffs also appear argue that a "sham" affinity group

4   rate is, in fact, an "open to all" rate that has no eligibility requirements.  Mot. 14-17.  Plaintiffs

5   conclude that Defendants had a duty to cross-offer all affinity group plans where membership was

6   based solely on the payment of a fee or was too broadly defined, regardless of Plaintiffs' purported

7   ineligibility.  *Id.*

8   Plaintiffs' argument is difficult to follow.  It also rests on flawed support.  The sole

9   authority cited by Plaintiffs is a May 2023 declaration by Joel Laucher.  [Docket No. 306-3 (Joel

10   Laucher Decl., May 25, 2023).]  Laucher states: "All insurers that write affinity group insurance

11   plans must also write a separate, non-group rate that is used to insure those who are not in the

12   affinity group.  This means that an insurer with a group rate or rates must include a rate that is

13   'open to all.'"  *Id.* at ¶ 10.  He also states: "All claimed affinity groups . . . that have separate class

14   plans must have and maintain *mutually exclusive eligibility* when writing the same or substantially

15   similar insurance coverage."  *Id.* at ¶ 11 (emphasis in original).  Laucher does not cite any industry

16   standard or factual basis to support his statements; he is simply opining on what he believes the

17   law to be.  "[A]n expert cannot testify to a matter of law amounting to a legal conclusion."  *United*

18   *States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015).  Laucher's statements are legal conclusions,

19   and the court will not consider them.[13]

20   Plaintiffs attempt to bolster Laucher's conclusory statements by pointing to section

21   1861.16(b) for support.  Plfs. Supp. 12.  Under the statute, the Lowest Rates Rule "applies

22   notwithstanding the underwriting guidelines of any of [the] insurers or the underwriting guidelines

23   of the common ownership, management, or control group."  CIC § 1861.16(b).  Nothing in the

24   cited sentence suggests that a group plan must include an "open to all" rate, or that a group plan

25   must maintain "mutually exclusive eligibility" to be valid.  In short, Plaintiffs' argument fails to

26

27   ─────────────

28   [13] Defendants' motion to strike Laucher's May 2023 opinions regarding affinity groups is granted.  [Docket No. 349 at 19-22.]  Laucher's October 2023 declaration regarding affinity groups also constitutes impermissible legal conclusions, and the court does not consider it.  [Docket No. 368-6 (Joel Laucher Decl., Oct. 13, 2023) ¶¶ 16-19.]

United States District Court
Northern District of California

1    establish their broadly stated proposition that an affinity group is invalid, and thus "open to all," if

2    its membership is based on the payment of a fee or is broadly defined.

3              To be clear, this is a different question from whether Plaintiffs are, in fact, eligible for a

4    particular affinity group where membership is based solely on the payment of a fee or is broadly

5    defined.  Defendants argue that their affinity groups are legitimate, but notably, they do not

6    dispute that any insured could be eligible for an affinity group that only requires payment of a fee.

7    Opp'n 4 n.3.  They also do not dispute that an affinity group could be so broadly defined as to

8    effectively have no eligibility requirement.  Instead, Defendants focus on their specific factual

9    argument that Plaintiffs mischaracterized the "Other Employee Groups" MIC affinity group; they

10   argue that the MIC affinity group is narrowly defined, not broadly defined as Plaintiffs say.  *Id.* at

11   11-12.

12             In sum, Section 1861.16(b) requires insurers to offer policies, including affinity group

13   policies, to good driver applicants if they are eligible for those policies.  To meet the standing

14   requirement, Plaintiffs must affirmatively show that the Kings were eligible for the lower-rate

15   MIC policy on June 2, 2012.

16                       **2.    "Affinity Group" Applied to Plaintiffs' Facts**

17             According to Rakesh Patel, Director of Product and Pricing for National General

18   Management Corporation ("National General"), the MIC policy was an affinity group policy that

19   was only open to members of the "GM Employee Group or GM's business partners/accounts, the

20   Hughes Employee Group, or the Raytheon Employee Group."  Patel Decl. ¶¶ 71-74.  Plaintiffs

21   point out that based on Defendants' own data files, the MIC affinity group also includes a vague

22   "Other Employee Groups" membership definition.  Mot. 17; [Docket No. 306-17 (Yeh Dep.)

23   120:1-9].  In response, Defendants offer evidence that this is simply placeholder language for

24   potential future employee accounts, and MIC never expanded the affinity group eligibility beyond

25   the GM, Hughes, and Raytheon employee groups.  Opp'n 12; Patel Decl. ¶¶ 71-74; [Docket No.

26   348-16 (Ex. 15, MIC Application to Dept. of Insurance for Employee Group Rates, Aug. 9,

27   1999).]  The sole evidence Plaintiffs present to refute this is the testimony of Kenny Yeh, former

28   California Product Manager.  Mot. 17; Yeh Dep.  However, during Yeh's deposition, he testified

United States District Court
Northern District of California

repeatedly that he "wasn't involved in setting up" MIC's group definitions and that he did not

know what "Other Employee Group" meant in terms of MIC affinity group eligibility.  Yeh Dep.

120:11-2, 121:10-11, 121:19.  Yeh said that the phrase "other employee groups" "could"

encompass any company with two or more employees, but taken in context, that statement is pure

speculation and does not support Plaintiffs' argument.  *Id.* at 123:9-16.  Plaintiffs have not offered

sufficient evidence for a reasonable factfinder to determine that the MIC "Other Employee

Groups" affinity group was actually open to all employees of any company with two or more

employees.  *See Evans*, 2012 WL 5877579, at *7.  Plaintiffs do not attempt to argue that the Kings

were affiliated with the GM, Hughes, or Raytheon employee groups.

In sum, Plaintiffs provide insufficient evidence for a reasonable fact finder to conclude that

the Kings were eligible for the MIC policy.  Therefore, Plaintiffs have not established standing

with regard to the Kings' June 2012 policy.

### D.       Comparable Policies

Defendants argue that Plaintiffs lack standing because "the lower rate policies they contend

they should have been offered had different coverages than they actually purchased."  Opp'n 1-2

n.1.  They argue that the Lowest Rates Rule only applies to policies across the control group with

exactly the same coverage.  Opp'n 2.  In their motion for class certification, Plaintiffs argue that

the Lowest Rates Rule applies to policies across the control group with "the same or substantially

similar coverage."  Mot. 2-3.  They assert that Plaintiffs were harmed because there were lower-

rate policies in the same control group that had "substantially similar coverage" compared to the

policies they actually purchased.  *Id.* at 14.

The insurance policies at issue use the term "coverage."  [Docket No. 163-1 (4AC Ex. A,

"King Policy").]  For example, the Kings' NGIC policy on June 2, 2013 lists the "coverages

provided" as:

- Bodily Injury ($100,000 each person and $300,000 each accident limit)

- Property Damage ($100,000 each accident limit)

- Medical Payments ($5,000 each person and each accident limit)

- Uninsured/underinsured Motorist Bodily Injury ($100,000 each person and $300,000

each accident limit)

- Collision ($500 deductible with waiver)

- Other than Collision ($250 deductible)

- Rental Reimbursement ($45 each day and $1350 each term limit)

King Policy 2-3.

PEIC had a policy with a lower rate as compared to the NGIC policy the Kings purchased in June 2013.  Brown Decl. Ex. E.  While the policies are mostly the same, the Rental Reimbursement limits are different—PEIC provides fixed rates for Rental Reimbursement, which is different from the $45 each day, $1350 each term limit purchased by the Kings.  *Id.*

Plaintiffs assert that such minor differences do not impact Defendants' duty to cross-offer the lower-rate policy to Plaintiffs.  Plfs. Supp. 12.  Defendants argue that such differences completely negate Defendants' duty to cross-offer.  Defs. Supp. 12-13.

### 1.    Meaning of "That Coverage" in Section 1861.16

Section 1861.16 states that insurers in a control group must offer "a good driver discount policy to a good driver from an insurer within that . . . control group, which offers the lowest rates for *that coverage*."  CIC § 1861.16(b) (emphasis added).  In its Order for Supplemental Briefing, the court asked the parties to present argument on the statutory meaning of "that coverage."

As an initial matter, the court finds that the statutory language is ambiguous.  "An ambiguity arises only if 'there [is] more than one construction in issue which is semantically permissible, i.e., more than one usage which makes sense of the statutory language given the context and applicable rules of usage.'"  *City of Sacramento v. Pub. Employees' Ret. Sys.*, 22 Cal. App. 4th 786, 795 (1994) (quoting *County of Sutter v. Board of Administration*, 215 Cal. App. 3d 1288, 1295 (1989)).  The Insurance Code does not define "that coverage."  Therefore, the court first looks to the dictionary definition of "coverage" to see if it will shed light on the plain meaning of "that coverage."  *See Comm. to Relocate Marilyn v. City of Palm Springs*, 88 Cal. App. 5th 607, 625 (2023), as modified (Mar. 2, 2023) ("We may look to dictionary definitions to determine the usual and ordinary meaning of a statutory term.").  The Oxford English Dictionary defines the word "coverage" in the insurance context as "the aggregate of risks covered by an

insurance policy."[14]   Likewise, Black's Law Dictionary defines "coverage" as: "Inclusion of a risk under an insurance policy; the risks within the scope of an insurance policy."[15]   The definition does not resolve the ambiguity.  It is semantically permissible for "that coverage" in section 1861.16(b) to mean the specific, detailed benefits provided in a GDD policy, or it could refer broadly to the general types of auto insurance coverage.  Because "the language of the instrument is reasonably susceptible" to both meanings, the court may consider extrinsic evidence that is relevant to prove one meaning over the other.  *See Siskiyou*, 237 Cal. App. 4th at 433.

The court now turns to the parties' arguments.  The parties agree that, as used in section 1861.16, the phrase "that coverage" relates back to the phrase "good driver discount policy."  But they dispute what this means.

Defendants propose that the definition of "that coverage" should be "the coverage(s), limit(s), deductible(s), fee(s), credit(s), and/or any other item that changes the total premium amount the insurer charges to the insured."  Defs. Supp. 9.  Defendants cite two regulations related to GDD policies: CCR sections 2632.12 and 2632.14.[16]   Section 2632.12 requires the good driver discount to be applied "after the total premium is developed under the class plan, including any policy fees that apply to the issuance of the policy."  10 CCR § 2632.12.  Section 2632.14 requires insurers to offer each of the following to a good driver: 1) "a good driver discount policy that contains only the minimum limits of liability coverage," 2) "a good driver discount policy that contains comprehensive coverage or automobile collision coverage, or both of such coverages, in addition to automobile liability coverage," and 3) "a good driver discount policy that contains any

---

[14] "Coverage (*n.*)," *Oxford English Dictionary*, July 2023, https://doi.org/10.1093/OED/6778557850.
[15] *Coverage*, *Black's Law Dictionary* (11th ed. 2019).
[16] Defendants also cite CCR section 2360.5, which requires insureds to be placed with "the company in the group which would charge the insured the lowest Premium," and CCR section 2360.0(c), which defines "Premium" as the "final amount charged to an insured for insurance after applying all applicable rates, factors, modifiers, credits, debits, discounts, surcharges, fees charged by the insurer and all other items which change the amount the insurer charges to the insured."  10 CCR §§ 2360.5, 2360.0(c).  As stated above, CCR section 2360.5 interprets the prohibition of "unfairly discriminatory" rates in CIC section 1861.05(a), not the duty to cross-offer GDD policies in CIC section 1861.16(b), so it is irrelevant to interpreting "that coverage" in CIC section 1861.16(b).

United States District Court
Northern District of California

of the limits of coverage, the types of coverage, and amounts of deductibles that the insurer offers to sell to the public." 10 CCR § 2632.14(a). Defendants rely on these regulations (for unclear reasons, as discussed below) to interpret the phrase "good driver discount policy" as including all coverages, limits, deductibles, and other items affecting the total premium of the policy. Defs. Supp. 10-11. Defendants conclude that because "that coverage" in CIC section 1861.16(b) relates back to "good driver discount policy," "that coverage" must also mean all coverages, limits, deductibles, and other items affecting the total premium of the policy. *Id.* Defendants also argue that the legislative history undermines Plaintiffs' interpretation. *Id.* at 11.

Plaintiffs, on the other hand, propose that the term "that coverage" in section 1861.16(b) refers to the three "primary types" of automobile insurance coverage: liability, physical damage, and collision. Plfs. Supp. 11; Plfs. Reply 6. Plaintiffs explain that the word "policy" is defined in multiple sections of Proposition 103, including section 1861.16 itself, by reference to section 660(a). *See, e.g.,* CIC §§ 1861.02(a) ("Rates and premiums for an automobile insurance policy, as described in subdivision (a) of Section 660 . . . "); 1861.15(a) ("An insurer issuing policies as described in subdivision (a) of Section 660 . . . "); 1861.16(a) ("An insurer issuing a policy described in subdivision (a) of Section 660 . . . "). Section 660(a) defines "policy" as: "an automobile liability, automobile physical damage, or automobile collision policy, or any combination thereof." CIC § 660(a).[17] Plaintiffs argue that, since "policy" means liability, physical damage, or collision coverage in the surrounding statutes, it must mean the same thing in section 1861.16(b). Plfs. Reply 6. And since "that coverage" in section 1861.16(b) relates back to "good driver discount policy," "that coverage" refers to those three general types of coverage. Plfs. Supp. 11. From this, Plaintiffs extrapolate that the Lowest Rates Rule applies whenever there is "substantially similar" coverage in the control group. Mot. 13-14; Reply 2. Finally, Plaintiffs argue that it would "flout the legislative intent of section 1861.16" for the Lowest Rates Rule to

---

[17] CIC § 660(b): "Automobile liability coverage" includes only coverage of bodily injury and property damage liability, medical payments, and uninsured motorists coverage.
(c): "Automobile physical damage coverage" includes all coverage of loss or damage to an automobile insured under the policy except loss or damage resulting from collision or upset.
(d): "Automobile collision coverage" includes all coverage of loss or damage to an automobile insured under the policy resulting from collision or upset.

only apply when there is an exact match between the GDD policies.  Plfs. Supp. 12.

Defendants' interpretation of "that coverage" is untenable.  They rely solely on regulations promulgated by the Insurance Commissioner.  Defs. Supp. 9-13.  Those regulations do not support Defendants' position.  CCR section 2632.12 requires the insurer to calculate the total policy premium before applying the good driver discount, but it says nothing about what should be considered as the coverage of a GDD policy; the word "coverage" does not even appear.  10 CCR § 2632.12(a).  CCR section 2632.14 indicates that GDD policies can include various "limits of coverage," "types of coverage," and "amounts of deductibles," but it says nothing to support Defendants' argument that coverage should include fees, credits, or other items affecting the total premium.  10 CCR § 2632.14(a)(3).  Defendants essentially argue that "coverage" is synonymous with "premium."  There is no basis for this.  *See Alameda Cnty. Flood Control & Water Conservation Dist. v. Dep't of Water Res.*, 213 Cal. App. 4th 1163, 1186 (2013) ("Where the same word or phrase might have been used in the same connection in different portions of a statute but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored.").  Given the context of the statute and the applicable rules of word usage, Defendants' interpretation is not semantically permissible.  *See City of Sacramento*, 22 Cal. App. 4th at 795.

Plaintiffs' arguments fare better but ultimately go too far.  The court previously ruled that it is "logical for Plaintiffs to refer to section 660(a), because section 1861.16(a), explicitly references section 660(a)'s definition of a 'policy.'"  [Docket No. 92 (Order on Second Motion to Dismiss) at 16]; *see also California Society of Anesthesiologists v. Brown,* 204 Cal. App. 4th 390, 403 (2012) ("It is a general rule of statutory construction to construe words or phrases in one statute in the same sense as they are used in a closely related statute pertaining to the same subject.").  The court agrees with Plaintiffs that the Lowest Rates Rule only applies to automobile insurance policies which include the general types of coverage described in section 660(a).  Therefore, ancillary policy benefits such as rental reimbursements do not affect the "coverage" that is subject to the Lowest Rates Rule.  Only the parts of the policy falling under the section 660(a) definition (i.e. liability, physical damage, and collision coverage, as further defined by

section 660(a)) should be considered "that coverage" for purposes of applying the Lowest Rates Rule.

Defendants point out that Plaintiffs' use of the phrase "substantially similar coverage" is unsupported as well as ambiguous—for example, it is unclear under Plaintiffs' definition whether a $500 deductible is "substantially similar" to a $250 deductible. Defs. Supp. 13. Plaintiffs do not directly address this point. The phrase "substantially similar" does not appear in section 660(a) or section 1861.16. Plaintiffs argue that the "substantially similar" language appears in 10 CCR 2360.5, but they rip that quote out of context. Plfs. Supp. 11. The full regulation states: "Any two or more insurers which are members of an insurer group and which use the same type of Insurance Marketing System and which maintain the same eligibility guidelines for the same or substantially similar insurance, shall place the insured with the company in the group which would charge the insured the lowest Premium." 10 CCR § 2360.5. As the court has stated above, this regulation interprets the prohibition on "unfairly discriminatory" rates in CIC section 1861.05. It does not interpret section 1861.16(b).

Plaintiffs rely primarily on the declarations of Laucher and Nash. Reply 2. Laucher's May 2023 declaration states:

> Minor differences in policy limits, policy language (i.e., different exclusion language or deductible amounts) or different miscellaneous coverage benefits (e.g., rental reimbursement amounts) do not relieve the insurer within a Control Group of the requirement to cross-offer. . . . In the case of differences in the mandated coverage offerings, the complying insurer must also quote the insured the next closest coverage option of any other company in the Control Group that has a lower available good driver premium.

May Laucher Decl. ¶ 13. Nash's declaration states:

> Differences in policy limits or policy language such as different exclusion language, limits variations, different deductibles, or different miscellaneous coverage benefits such as rental car reimbursements, do not relieve the insurer within a Control Group of the requirement to cross-offer. . . . In the case of any differences or variations in the mandated coverage offerings, the complying insurer must also quote the insured the next closest coverage option of any other company in the Control Group that has a lower available good driver premium. This is an industry standard and customary practice for property and casualty insurers in California offering private passenger automobile insurance for Good Drivers.

United States District Court
Northern District of California

Nash Decl. ¶ 10.

Plaintiffs offer no argument for why the court should rely on these expert opinions to interpret the statute.  Neither Laucher nor Nash describe their interpretations of "that coverage" as representing the CDI's interpretation.[18]  The court admits the testimony to the extent that the experts opine that the *industry standard* is to cross-offer the next closest coverage option regardless of differences in policy limits or policy language.  *See United States v. Holmes,* No. 5:18-CR-00258-EJD-1, 2021 WL 2035177, at *4 (N.D. Cal. May 21, 2021) ("while [the expert] may be precluded from testifying that [the defendant] violated CLIA regulations by failing to perform sufficient proficiency testing, he may testify that it is typical to perform proficiency testing in the industry and that [the defendant] did not do so.").  But even admitting this testimony, the experts' opinions are too vague and conclusory to help resolve the ambiguity in the statute.  For example, Nash does not explain what the "next closest coverage option" would mean in the context of the statute.  Nash Decl. ¶ 10.  For example, if the consumer requested a $50,000 limit for bodily injury coverage with a $500 deductible, would the insurer be required to cross-offer a $25,000 limit/$500 deductible policy if that is the next closest option?  What if the control group also included a $30,000 limit/$750 deductible policy?  Plaintiffs do not address the potential absurdities and challenges with administering such a regime.

Since Plaintiffs fail to support their point, at this time the court will not go out on a limb and extend the meaning of "that coverage" to the vague and poorly defined "substantially similar" definition.  The court need not do so to decide the issue of standing.  For the purposes of this motion, the court interprets the Lowest Rates Rule to apply where the basic policies (i.e. liability, physical damage, or collision coverage) are the same, regardless of different ancillary coverage benefits such as rental reimbursement.  The court does not reach whether the Lowest Rates Rule still applies where the policies have different limits and deductibles.  If Plaintiffs argue for their

---

[18] Even if they had, Laucher and Nash provide no context, such as whether an agency interpretation has been long-standing and consistent since CIC section 1861.16(b) was passed. *See Busker v. Wabtec Corp.,* 11 Cal. 5th 1147 (2021) (stating that the "most pertinent fact" in using an agency interpretation to help discern legislative intent was that the agency's interpretation was "long-standing and consistent").

United States District Court
Northern District of California

interpretation of "substantially similar" again in their renewed motion for class certification, they must provide adequate support for their interpretation.

### 2. Applied to Facts

The parties do not dispute that the policies purchased by Plaintiffs are automobile policies as defined by section 660(a).  Plaintiffs need to additionally show that there were lower-rate policies in the control group with comparable coverage as the higher-rate policies Plaintiffs were offered.

The lower-rate PEIC policy had fixed rates for Rental Reimbursement; the Kings were offered a NGIC policy with a Rental Reimbursement limit of $45 each day, $1350 each term.  The policies otherwise appear to be the same.  Brown Decl. Ex. E.   Because Rental Reimbursement is an ancillary coverage benefit, this single difference does not affect the insurers' duty to cross-offer.  Plaintiffs have met their burden to provide sufficient evidence from which a reasonable juror could determine that Defendants had a duty to cross-offer the lower-rate PEIC policy to the Kings in June 2013.

### E. Duty to Cross-Offer

The Order for Supplemental Briefing instructed the parties to explain how the duty to cross-offer operates.  The parties agree that, assuming all other elements of the statute are met, "[t]he insurer with the lowest priced good driver policy is required to sell that policy, and to provide insurance through that policy."  *See* Plfs. Supp. 8; Defs. Resp. 5.  The parties diverge with respect to how the duty to cross-offer must be implemented.  The parties do not address all of the court's questions in their briefings.  But for the purposes of standing, the court does not need to resolve the issue here.  The court will address the issue if necessary in the context of renewed Rule 23 briefing.

### F. Joint Liability

Finally, the Order for Supplemental Briefing asked the parties to brief whether each insurer in a control group is jointly liable for the actions of other insurers in the control group under section 1861.16(b).  This order only addresses that specific legal question posed by the court and raised by Plaintiffs' position in their motion for class certification.

31

1     Section 1861.16(b) does not speak to how liability should be apportioned among members

2     of a control group.  Indeed, the statute does not provide a private right of action.   Plaintiffs in this

3     case have pleaded the violation of 1861.16(b) as the underlying statute for their UCL "unlawful

4     practice" claim.  The parties agree that liability at least attaches to an agent or representative who

5     fails to offer and an insurer that refuses to sell the lowest rate policy.  Defs. Supp. 8.  Plaintiffs

6     additionally argue that Section 1861.16(b) makes all insurers in a control group automatically

7     jointly liable for each other's violations.  Plfs. Supp. 8.  They claim that this reading of section

8     1861.16(b) is consistent with California common law concepts of joint and several liability.  *Id.* at

9     9.

10     Joint and several liability allows an injured person to sue for and recover the full amount of

11     recoverable damages from any jointly and severally liable person.  Restatement (Third) of Torts:

12     Apportionment Liab. § 10 (2000). Plaintiffs cite the Restatement Third of Torts, which states:

13     "When persons are liable because they acted in concert, all persons are jointly and severally liable

14     for the share of comparative responsibility assigned to each person engaged in concerted activity."

15     *Id.* at § 15.  California has adopted the Restatement Third of Torts.  *See Kesmodel v. Rand*, 119

16     Cal. App. 4th 1128, 1143 (2004).  In other words, Plaintiffs contend that joint liability applies

17     because section 1861.16(b) requires all insurers in a control group to act in concert to comply with

18     the Lowest Rates Rule.  Plfs. Supp. 9-10.  They contend that a violation of section 1861.16(b) is

19     always the result of concerted activity.  *Id.*

20     The court is not persuaded by Plaintiffs' argument.  In California law, joint liability for

21     concerted action "reflect[s] the principle, applied in both the criminal and civil realm, that all

22     members of a 'conspiracy' or partnership are equally responsible for the acts of each member in

23     furtherance of such conspiracy."  *Am. Motorcycle Assn. v. Superior Ct.,* 20 Cal. 3d 578, 587

24     (1978).  A quintessential example of concerted action is the "drag race" context.  *Agovino v.*

25     *Kunze*, 181 Cal. App. 2d 591 (Ct. App. 1960).  In *Agovino,* the defendant and a third party were

26     allegedly racing their cars against each other.  *Id.* at 593.  The third party collided with the

27     plaintiff; the defendant never made contact.  *Id.*  Nevertheless, the court found that the facts, if

28     proven, showed that the defendant was jointly liable with the third party for injury to the plaintiff

United States District Court
Northern District of California

32

because the defendant's participation in the drag race proximately caused the plaintiff's injury. *Id.* at 597-98. The defendant's participation "aided and abetted" the third party's tortious conduct. *Id.* at 597. Joint liability was appropriate because the racers "were not acting independently of each other, and . . . were jointly engaged in a series of acts which led directly to the collision." *Id.* at 598 (citing *People v. Kemp*, 150 Cal. App. 2d 654, 659 (1957)).

Unlike in the "drag race" context, the members of a control group may not all be acting in furtherance of a conspiracy whenever section 1861.16(b) is violated. For example, there may be a scenario where nine out of ten insurers in a control group are taking the appropriate measures to apply section 1861.16(b), but due to one insurer's negligence, that insurer fails to cross-offer. In this hypothetical scenario, there is no proximate causation between the other nine insurers' conduct and the good driver's injury. The other insurers did not aid or abet the individual insurer's failure to cross-offer. Plaintiffs attempt to overcome this logical inconsistency by again citing Laucher, who baldly states: "Each insurer in a control group is responsible for having violated the law each time there is a failure to offer the lowest rate for any insurer within the [control group]." Plfs. Supp. 8; [Docket No. 408 (Supp. Joel Laucher Decl., Jan. 3, 2024)]. As explained above, the court does not consider this late-submitted expert opinion, and does not consider Laucher's impermissible legal conclusions.

Plaintiffs also make a cursory argument that joint liability is appropriate because Defendants "acted as part of a joint enterprise, commonly owned, managed and controlled, to injure Plaintiffs and the Class." Plfs. Supp. 10. As the court has previously held: "That companies are affiliated is not, by itself, a basis for imposing joint liability." MSJ Order at 13 n.12 (quoting *Florists' Mut. Ins. Co. v. Floricultura Pac., Inc.*, No. 19-CV-05793-WHO, 2020 WL 6440039, at *3 (N.D. Cal. Apr. 3, 2020)). In *Florists' Mutual Insurance*, the court found that joint liability did not apply to the affiliated defendant companies because the plaintiff failed to show the elements of a joint venture, agency, or alter ego relationship. 2020 WL 6440039, at *3. Plaintiffs do not attempt to argue that a joint venture, agency, or alter ego theory applies to insurers in a control group. The case cited by Plaintiffs, *I-CA Enterprises, Inc. v. Palram Americas, Inc.*, 235 Cal. App. 4th 257 (2015), actually undermines their own argument. In this

United States District Court
Northern District of California

United States District Court
Northern District of California

1    tortious interference action, the court found that joint and several liability was inapplicable to the

2    defendant companies because there was no evidence of "collusion" or "agreement" between them

3    in harming the plaintiff.  *Id.* at 272.  One insurer's violation of section 1861.16(b) does not imply

4    collusion among all the members of the control group to violate section 1861.16(b) simply

5    because they share common control.

6          In sum, the court holds that insurers in a control group are not automatically liable for each

7    other's violations of section 1861.16(b) under a concerted action theory solely by virtue of being

8    members of a control group.

9          **G.    Injunctive Relief**

10          At the class certification stage, "Plaintiffs must show standing with respect to each form of

11   relief sought."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011).  One of the

12   forms of relief Plaintiffs seek is to enjoin Defendants from violating section 1861.16(b).  4AC ¶¶

13   111-116.  Therefore, the class can only be certified if at least one of the Plaintiffs has standing to

14   pursue injunctive relief.  *See Ellis*, 657 F.3d at 978.

15          To establish standing to pursue injunctive relief, a plaintiff "must demonstrate a real and

16   immediate threat of repeated injury."  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946

17   (9th Cir. 2011).  "[T]he threat of injury must be 'actual and imminent, not conjectural or

18   hypothetical.'"  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting

19   *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  "A plaintiff bears the burden of

20   demonstrating that her injury-in-fact is 'concrete, particularized, and actual or imminent; fairly

21   traceable to the challenged action; and redressable by a favorable ruling.'"  *Id.* (quoting *Monsanto

22   Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  "Past exposure to illegal conduct does

23   not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by

24   any continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

25          Defendants argue that Plaintiffs lack standing to seek injunctive relief because "no

26   Plaintiffs continue to have an insurance relationship with [] Defendants."  Opp'n 14.  Defendants

27   cite *Tigbao v. QBE Fin. Inst. Risk Servs., Inc.*, No. SACV 13-177 JLS JCX, 2014 WL 5033236

28   (C.D. Cal. July 24, 2014).  In *Tigbao*, the court found that the plaintiff lacked standing for

injunctive relief related to the defendant placing insurance on the plaintiff's home, because the defendant had terminated its relationship with the plaintiff's mortgage lender and there was no evidence that the defendant would ever place insurance on the plaintiff's home again. *Id.* at 3. Defendants argue that, likewise, Plaintiffs have terminated their insurance relationship with Defendants, and Plaintiffs have not demonstrated "any imminent threat that [] Defendants might offer them an improperly high insurance rate in the future." Opp'n 14.

Plaintiffs respond that they have standing because "they may purchase auto insurance in the future if [Defendants are] ordered to follow the law." Reply 11. As support, Plaintiffs cite generally to the Kings' declarations in which they say that they look for the lowest prices when purchasing insurance, although Plaintiffs do not point to any specific statements. *Id.* Plaintiffs also cite to cases finding that a consumer has standing to seek injunctive relief where the consumer would like to purchase the defendant's products, but would be prevented from doing so if he or she could not rely on the defendant's representations. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 972 (9th Cir. 2018) (seeking to enjoin defendant from falsely labeling wipes as "flushable"); *Cepelak v. HP Inc.*, No. 20-CV-02450-VC, 2021 WL 5298022, at *3 (N.D. Cal. Nov. 15, 2021) (seeking to enjoin defendant from failing to disclose that its printers use color ink even when purportedly printing in black and white). In addition, Plaintiffs cite *Steen v. Am. Nat'l Ins. Co.*, 609 F. Supp. 3d 1066, 1076 (C.D. Cal. 2022), in which the court found that the plaintiffs had standing to seek injunctive relief because they allegedly still had active, unlapsed insurance policies with defendants—but this case is inapposite, because here, Plaintiffs do not have active, unlapsed policies with Defendants.

Plaintiffs do not explain how *Davidson* and *Cepelak* could be applied to the facts of this case. While it is true that Plaintiffs are consumers who may hypothetically purchase insurance policies from Defendants again, more is necessary to demonstrate standing to pursue injunctive relief. In *Davidson*, the plaintiff "continue[d] to desire to purchase wipes that are suitable for disposal in a household toilet" and "would purchase truly flushable wipes manufactured by [the defendant] if it were possible"—the only thing stopping her was her inability to rely on the defendant's advertisements and labelling. *Davidson*, 889 F.3d at 970-71. The court found that the

plaintiff had alleged (1) an "imminent or actual threat of future harm" because she still desired to purchase the defendant's flushable wipes; (2) a "concrete and particularized" harm because she was personally affected by her inability to rely on the defendant's representations and purchase the wipes; (3) a "sufficient likelihood that [s]he will again be wronged in a similar way" because she would be faced with a similar injury every time she encountered the defendant's product in the future; and (4) redressable by a favorable ruling because the plaintiff would be able to reasonably rely on the defendant's representations if the injunction were granted, and so the plaintiff would purchase the defendant's flushable wipes. *Id.* at 971-72.

In contrast, Plaintiffs here do not allege, much less show with sufficient evidence, that Plaintiffs still desire to purchase insurance from Defendants. Their statements that they "would have purchased the lowest priced good driver policy offered by the Defendants" are unavailing, because these are purely retrospective statements. Edd King Decl. ¶ 4; Diedre King Decl. ¶ 4. Plaintiffs do not state that they currently desire to buy an insurance policy from Defendants; for instance, they do not state that they would leave their current insurer and purchase a policy from Defendants if an injunction were granted. Plaintiffs have not shown an "imminent or actual threat of future harm" because the potential that they may purchase a policy from Defendants again is only "conjectural or hypothetical." *See Davidson*, 889 F.3d at 967. For the same reason, they have not shown a sufficient likelihood that they may be harmed by Defendants again for failing to cross-offer the lowest rate GDD policies.

In sum, the court finds that Plaintiffs have not met their burden to establish standing for injunctive relief.

## V.     MOTIONS TO STRIKE

Sequoia's motions to strike are denied as moot. [Docket Nos. 336, 337, 338, 339.] For the reasons stated above, Defendants' motion to strike the expert testimony of Scott Brown, Larry LaStofka, Joel Laucher, and Jeffrey Nash is granted in part and denied in part. [Docket No. 349.] Plaintiffs' motion to strike the testimony of Benjamin Nelson is denied. [Docket No. 377.] Plaintiffs' motion to strike the declaration of Paul Braithwaite is denied as moot; Plaintiffs may renew the motion in the context of their renewed class certification motion. [Docket No. 378.]

## VI.   CONCLUSION

In summary, the court finds that:

- Plaintiffs have not established Article III standing for Lee;

- Plaintiffs have shown sufficient evidence from which a reasonable juror could determine that PEIC was in the control group between April 19, 2013 and April 1, 2014;

- Plaintiffs have failed to establish that the Kings were eligible for the MIC lower-rate policy;

- Plaintiffs have shown sufficient evidence to support their argument that the lower-rate PEIC policy was comparable to the NGIC policy purchased by the Kings in June 2013; and

- Plaintiffs have not established standing for injunctive relief.

The court also finds that insurers in a control group are not automatically liable to each other for violations of section 1861.16(b) under a concerted action theory solely because they are members of the control group.

The parties' administrative sealing motions are addressed in a separate order.

This order, coupled with the grant of summary judgment in favor of Defendant Sequoia,[19] will have a significant impact on the parties' positions on class certification.  The pending class certification motion is therefore denied without prejudice to Plaintiffs' refiling the motion to conform to these developments.  All existing case deadlines are vacated.  The parties shall meet and confer and shall submit a proposed Rule 23 briefing schedule[20] as well as a new case schedule by October 22, 2024.

//

//

---

[19] The court does not address the parties' arguments regarding Sequoia because it is no longer a Defendant and Plaintiffs make no further arguments regarding Sequoia's relevance to this case. For example, Plaintiffs abandoned their claim that Sequoia was part of the control group. *See* Plfs. Resp. 1.

[20] The new Rule 23 filings must stand on their own and may not refer to or incorporate any other filings by reference.

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: October 8, 2024

_____
Donna M. Ryu
Chief Magistrate Judge