1
2
3
4              UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7    EDD KING, et al.,                        Case No.  15-cv-00313-DMR

8              Plaintiffs,

9         v.                                  **ORDER ON RENEWED MOTION FOR CLASS CERTIFICATION**

10   NATIONAL GENERAL INSURANCE               Re: Dkt. Nos. 438, 454, 456, 460, 474
     COMPANY, et al.,
11
              Defendants.
12

13         Plaintiffs Diedre King and Edd King filed this putative class action against Defendants

14   National General Insurance Company ("NGIC"), Integon National Insurance Company ("INIC"),

15   Integon Preferred Insurance Company ("IPIC"), MIC General Insurance Corporation ("MICG"),

16   and Personal Express Insurance Company ("PEIC") alleging violations of section 1861.16(b) of

17   the California Insurance Code.  Plaintiffs now move to certify a class pursuant to Federal Rule of

18   Civil Procedure 23(b)(3).  [Docket Nos. 438 (Class Cert. Mot.); 452 (Class Cert. Reply).]

19   Defendants oppose.  [Docket No. 445 (Class Cert. Opp'n).]  The court held a hearing on March

20   27, 2025.  For the following reasons, the motion for class certification is granted in part and

21   denied in part.

22   **I.      BACKGROUND**

23         **A.      Good Driver Discounts**

24         California requires insurers that provide private passenger automobile insurance ("PPA"

25   policies) to offer a Good Driver Discount ("GDD") to qualified drivers.  *See* Cal. Ins. Code §§

26   1861.025 (defining persons qualified to purchase a GDD policy), 1861.02(b)(1) ("Every person

27   who meets the criteria of Section 1861.025 shall be qualified to purchase a Good Driver Discount

28   policy from the insurer of his or her choice.").  The rate charged for a GDD policy must be "at

least 20 percent below the rate the insured would otherwise have been charged for the same coverage." *Id.* § 1861.02(b)(2).

When multiple insurers have common ownership or operate in California under common management or control, California law requires that "[a]n agent or representative representing one or more" of such insurers "shall offer, and the insurer shall sell, a good driver discount policy to a good driver from an insurer within that common ownership, management, or control group, which offers the lowest rates for that coverage." Cal. Ins. Code § 1861.16(b).  Insurers sharing "common ownership, management, or control" are also referred to as a "control group."  The requirement to offer the policy with the lowest Good Driver rates in a control group is known as the "Lowest Rates Rule."  An insurer within a control group is not subject to the Lowest Rates Rule if it meets the eight conditions required for a "Super Group Exemption," as set forth in section 1861(c)(1). *See* Cal. Ins. Code § 1861.16(c)(1).

### B.    Factual and Procedural Background

This case has a long history, and the factual allegations in this case have shifted somewhat as events have developed.  The case's procedural history and class allegations are briefly summarized below.

#### 1.    Operative Complaint

Plaintiffs filed this putative class action on January 22, 2015.  The court granted Defendants' motions to dismiss the first and second amended complaints on September 15, 2015 and May 16, 2016 respectively.  [Docket Nos. 70 ("Order on First MTD"); 92 ("Order on Second MTD").]  After Plaintiffs filed a third amended complaint, the court ordered the case stayed while the California Department of Insurance ("CDI") made findings as to some of the issues raised by the parties.  [Docket No. 117 ("Stay Order").]  After the CDI proceedings concluded, Plaintiffs filed a fourth amended complaint on January 28, 2021, which is the operative complaint.  [Docket No. 163 (Fourth Amended Complaint, "4AC").]

In addition to the parties to this motion, the 4AC included named Plaintiffs Elmo Sheen and Sheila Lee and Defendants National General Assurance Company ("NGAC") and Sequoia Insurance Company ("Sequoia").  4AC ¶¶ 9-19.  Plaintiffs alleged that all Defendants were in a

United States District Court
Northern District of California

control group within the meaning of the Lowest Rates Rule.  *Id.* ¶ 20.  Each of the named Plaintiffs and class members held insurance policies issued by one or more of the companies in Defendants' control group.  *Id.* ¶ 5.  All Plaintiffs qualified as "Good Drivers" and were therefore entitled to a GDD policy from an insurer within Defendants' control group that offered the lowest rates for that coverage.  *Id.* ¶ 7.  In violation of the Lowest Rates Rule, Defendants' agents and representatives failed to offer Plaintiffs and class members the lowest available GDD policy premiums within their control group.  *Id.* ¶ 44.  Plaintiffs originally sought to certify a class defined as:

> All of Defendants' current and former policyholders qualified under California law to purchase a Good Driver Discount policy who, from January 1, 2008 through the present (the "Class Period"), paid premiums for Defendants' automobile policies containing Good Driver Discounts (as defined in Cal. Ins. Code section 660), in excess of the lowest rate Good Driver discount policy available for that coverage from another insurance company within Defendants' California-licensed common ownership, management or control (hereafter "Control Group").

### 2.    Case History

On June 11, 2021, the court granted in part and denied in part Defendants' motion to dismiss the 4AC.  [Docket No. 183 ("Order on Third MTD").]  The court cited findings made by the CDI [Docket No. 163-5 ("CDI Letter")] and determined that PEIC was entitled to a Super Group Exemption beginning on July 18, 2014.  Order on Third MTD 8-9.

Plaintiffs moved for class certification on July 7, 2023, and did not propose Elmo Sheen as a class representative.  [Docket No. 309.]  On September 19, 2023, NGAC was dismissed as a party pursuant to stipulation.  [Docket No. 354.]  While the class certification was pending, Sequoia separately moved for summary judgment, and the court granted summary judgment and dismissed Sequoia from the case on December 22, 2023.  [Docket No. 401 ("Order on Sequoia MSJ").]  The court then ordered supplemental briefing from the remaining parties as to some of the key issues raised.  [Docket No. 403.]

On October 8, 2024, the court issued a ruling based on the supplemental briefing and determined that Plaintiffs lacked standing as to certain claims.  [Docket No. 422 ("Order on Supp. Briefing").]  In light of the significant changes to the case, the court denied Plaintiffs' motion for

class certification without prejudice and ordered Plaintiffs to file an amended motion. *Id.*
Plaintiffs filed the renewed class certification motion on December 12, 2024.

### 3.    Key Facts Asserted in Renewed Class Certification

The only remaining Plaintiffs and proposed class representatives are Diedre King and Edd King. The Kings qualified as Good Drivers and had jointly purchased an insurance policy through NGIC. [Docket Nos. 438-1 (Edd King Decl., Dec. 4, 2024) ¶ 2; 439-2 (Diedre King Decl., Dec. 4, 2024) ¶ 2.] On June 2, 2013, they were quoted and purchased a renewal policy from NGIC for $1,752. *Id.* According to Plaintiffs, pursuant to Cal. Ins. Code section 1861.16(b) Plaintiffs should have been offered a lower-rate policy from PEIC or a lower-rate "Members of Club DentPro" policy from INIC, but they were not. Edd King Decl. ¶¶ 3-6; Diedre King Decl. ¶¶ 3-6. If they had been offered either of the lower-rate policies, Plaintiffs would have accepted them. *Id.*

There are two surviving claims: (1) unfair and unlawful business practices under the UCL for violating Cal. Ins. Code section 1861.16(b); and (2) breach of the implied covenant of good faith and fair dealing. Class Cert. Mot. 3.

Plaintiffs now seek to certify a class defined as:

> National General[1] policyholders who purchased California GDD private passenger automobile policies, including renewals, and did not receive[2] the lowest available GD rate during a Class Period defined as: January 22, 2011, to present (NGIC, INIC, IPIC, and MICG); and April 19, 2013, to July 18, 2014 (PEIC).[3]

Class Cert. Mot. 4.

---

[1] At the hearing, Plaintiffs clarified that they used the term "National General" to mean NGIC, INIC, IPIC, MICG, and PEIC. As discussed later, this is confusing because Defendants and witnesses also use the term "National General" to include only NGIC, INIC, IPIC, and MICG (and not PEIC).

[2] At the hearing, the court asked Plaintiffs to clarify why they chose the phrase "did not receive" as opposed to the phrase "were not offered." Plaintiffs stated that although their claims were about Defendants' failure to *offer* the lowest available GD rate, it should be inferred that if a lower GD rate was offered, class members would have accepted it. Therefore, according to Plaintiffs, the phrase "did not receive" is interchangeable with the phrase "were not offered." As discussed later, Defendants dispute this inference.

[3] Excluded from the class are: (1) policyholders who obtained their policies through an insurance broker, (2) directors, officers, and management employees of Defendants, (3) counsel of record and their employees and their immediate families, and (4) any judge assigned to this case and their staff. Class Cert. Mot. 4.

Plaintiffs assert that NGIC, INIC, IPIC, and MICG (collectively "NG Defendants") have been in a control group throughout the relevant time period, and that PEIC was briefly in the control group after it was purchased by AmTrust Financial Services, Inc. ("AmTrust") on April 19, 2013 and before it obtained a Super Group Exemption on July 18, 2014. Class Cert. Mot. 5-7. As such, Plaintiffs contend that each agent or representative of these insurers had a duty to cross-offer, and the insurer had a duty to sell, the lowest rate GDD policy for that coverage from within the control group. *Id.* at 4. Plaintiffs assert that all Defendants acted in concert in their failure to discharge their statutory duty to cross-offer. *Id.* at 8. Specifically, they claim that Defendants had no policy or procedure in place to ensure that cross-offers were made, they did not train their agents or representatives to cross-offer, the procedures followed by agents or representatives made it impossible for them to implement the duty to cross-offer, and the shared policy administration system used by Defendants to generate insurance quotes (the New Policy System, or "NPS") was not equipped to do a comparative rate analysis to quote the lowest GDD premium from within the control group. *Id.* at 8-10.

In addition, Defendants offer several "affinity group" policies, which are designed for people with "specific needs, affiliations, or memberships." [Docket No. 445 (Rakesh Patel Decl., Jan. 30, 2025) ¶ 6.] Affinity group policies are distinct from "broad market" policies, which are designed for the general public. *Id.* Affinity group policies have special eligibility requirements, such as being a member of a "Club DentPro" discount program for dent and windshield repairs, or being employees of General Motors or affiliate companies. *Id.* ¶¶ 11-12. Broad market policies do not have special eligibility requirements. *Id.* ¶¶ 6, 9. INIC, MICG, and NGIC provide coverage only to members of certain affinity groups, and do not offer broad market policies. *Id.* ¶¶ 8-15. Meanwhile, IPIC and PEIC offer only broad market policies and do not offer any affinity group policies. *Id.*; [Docket No. 449 (Paul Braithwaite Decl., Jan. 30, 2025, "Braithwaite Report") ¶ 47.] Plaintiffs assert that affinity group policies must be cross-offered where the only eligibility requirement is membership in a group open to anyone who pays a fee. Class Cert. Mot. 11-12. For example, the Club DentPro discount program is open to anyone who pays an annual membership fee of $36. *Id.* Plaintiffs assert that Defendants are required under section

1861.16(b) to cross-offer its Club DentPro affinity group policy to anyone, including those who are not yet members of the Club DentPro discount program.

## II.    *DAUBERT* MOTIONS

In support of their motion for class certification, Plaintiffs rely on an expert report by Scott Brown.  [Docket No. 438-39 (Scott Brown Decl., Dec. 6, 2024, "Brown Report").]  Plaintiffs also submitted an expert report by Allan I. Schwartz to support the Brown Report.  [Docket No. 438-9 (Allan I. Schwartz Decl., Oct. 13, 2023, "Schwartz Report").]  Other experts proffered by Plaintiffs include Jeffrey Nash, Larry LaStofka, and Joel Laucher.  [Docket Nos. 438-35 (Jeffrey Nash Decl., Dec. 6, 2024); 438-37 (Larry LaStofka Decl., Dec. 2, 2024); 438-38 (Joel Laucher Decl., Nov. 19, 2024).]

Defendants move to exclude the Brown and Schwartz Reports entirely.  [Docket No. 454 (Def. Mot. Exclude).]  Defendants also move to exclude portions of the declarations of Nash, LaStofka, and Laucher.  *Id.*

In their opposition, Defendants rely on an expert report by Paul Braithwaite.  [Docket No. 449 (Paul Braithwaite Decl., Jan. 30, 2025, "Braithwaite Report").]  Plaintiffs move to exclude the Braithwaite Report in its entirety.  [Docket No. 456 (Plf. Mot. Exclude).]

The court will address the Brown, Schwartz, and Braithwaite reports in this section, and will address the challenged Nash and Laucher statements as relevant to the court's opinion.  The court does not rely on the challenged LaStofka statements, and so denies the motion to exclude them as moot.

### A.    Legal Standards for Expert Testimony

Federal Rule of Evidence ("FRE") 702 governs testimony by expert witnesses.  It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  FRE 702 "contemplates a broad conception of expert qualifications," which may be obtained through "knowledge, skill, experience, training, or education."  *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994) (emphasis added).  "In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony."  Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).  However, "the rejection of expert testimony is the exception rather than the rule."  *Id.*  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 595.

"*Daubert* does not require a court to admit or to exclude evidence based on its persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific reliability and relevance."  *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir. 2011).  "The testimony is relevant 'if the knowledge underlying it has a valid connection to the pertinent inquiry.' . . . It is reliable 'if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'"  *Fodera v. Equinox Holdings, Inc.,* 341 F.R.D. 616, 624 (N.D. Cal. 2022) (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)).  "Courts consider factors including: (1) whether the expert's theory or method is generally accepted in the relevant scientific community; (2) whether it can be or has been tested; (3) the technique's known or potential error rate; and (4) whether the method has been subjected to peer review and publication. . . . The focus is on the expert's principles and methodology, not her conclusions."  *Id.* (citing *Daubert*, 509 U.S. at 592-95).

With respect to challenges to experts in the context of Rule 23 motions, "courts should not even apply the full *Daubert* 'gatekeeper' standard at this stage . . . a lower *Daubert* standard should be employed at [the class certification] stage of the proceedings."  *Dukes v. Wal-Mart, Inc.*,

222 F.R.D. 189, 191 (N.D. Cal. 2004) (quoting *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 162-63 (C.D. Cal. 2002)). "[T]he question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met." *Id.* "The court may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence. . . . But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).

### B.    Brown and Schwartz Reports

Defendants argue that the Brown Report should be excluded in its entirety. Def. Mot. Exclude 4. They attack both Brown's methodology and his qualifications. *Id.* Defendants also argue the Schwartz Report should be excluded as unreliable. *Id.* at 19. The court denies Defendants' motions to exclude the Brown Report and the Schwartz Report.

### 1.    Brown's Qualifications

Brown is a credentialed actuary and achieved the highest designation possible in the Casualty Actuarial Society ("CAS") in 2021. Brown Report ¶ 1. He has worked as a consulting actuary for the independent property-casualty actuarial consulting firm SGRisk since 2012, and previously consulted in another California lawsuit involving private passenger auto policies and allegedly improper GDD rates, *Coleman v. United Servs. Auto. Ass'n. Id.* ¶¶ 1-3, Ex. B (Brown CV).[4] He has personally reviewed rates that were established and charged for auto risks, and has also been involved in reviewing private passenger auto policies for insurance in other states including Michigan and New York. *Id.* ¶ 4. As part of his work reviewing and analyzing rate filings for the Michigan Insurance Bureau, he was granted administrative access to the SERFF rate filing system (the same system used by the CDI), and performed an independent check on rate exhibits provided by companies for their rate filings with the state to check for actuarial

_____

[4] While Brown was not the named expert in *Coleman,* his colleague at SGRisk Jonathan Griglack was, and the court ultimately found that Griglack's model for comparing GDD rates was admissible at the class certification stage. *See Coleman v. United Servs. Auto. Ass'n*, No. 21-CV-217-RSH-KSC, 2023 WL 9110926 (S.D. Cal. Dec. 22, 2023).

United States District Court
Northern District of California

1   soundness. *Id.*

2          Defendants argue that Brown is unqualified to testify as to personal automobile rate

3   making or rate filings because he was "never employed by an insurance company" prior to 2023,

4   and lacks experience in specific tasks such as assisting an insurance company in preparing a PPA

5   rate filing or testifying at an insurance rate hearing. Def. Mot. Exclude 11. Defendants fail to

6   explain why such specific experience is necessary for Brown to have sufficient "knowledge, skill,

7   experience, training, or education" for purposes of his expert report. *See* Fed. R. Evid. 702.

8   Defendants cite *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1039 (C.D. Cal.

9   2013), where the court excluded an expert's testimony because although he worked at a restaurant

10  consulting firm, the expert had "never before testified on the primary subjects on which he opines

11  here, that is, restaurant and grocery store competition"; had only worked with a few grocery stores

12  before; and had only given presentations tangentially related to the issues in the case. Reply Def.

13  Mot. Exclude 4-5. *Stonefire Grill* is distinguishable because of its procedural posture (summary

14  judgment, not class certification) and because the expert had only tangentially worked on the

15  subject he testified about. Here, Brown has direct experience in the subject of his testimony and

16  expert opinions—private passenger auto insurance rate filings. Brown Report ¶ 4. In his report,

17  Brown reviewed and analyzed the rate exhibits and policy data provided by Defendants using his

18  direct and substantial experience with the SERFF rate filing system and his extensive training and

19  experience as a consulting actuary. *See id.* ¶¶ 4, 8. Brown is qualified.

20                    **2.      Brown's Methodology**

21          As to his methodology, Brown used publicly available information from the CA SERFF

22  rate filing system and non-public information provided by Defendants in discovery. *Id.* ¶ 13.

23  Each Defendant uses set algorithms to calculate the premium offered to each policyholder

24  depending on various factors unique to the policyholder, such as years of driving experience and

25  history of accidents. *Id.* ¶¶ 17-26. Brown used the algorithms and policyholder data provided by

26  Defendants to replicate the premium each policyholder would have been charged by each GDD

27  policy in the control group. *Id.* ¶¶ 33-38. From there, he determined the lowest rate from among

28  the available GDD policies, and calculated the difference between that rate and the rate the

policyholder was actually charged.  *Id.*  Brown created four different analyses to calculate class damages: 1) damages for NGIC policyholders who could have been offered a lower rate from the rest of the control group, calculated using a random sample of policies; 2) damages for all Defendants' policyholders who could have been offered a lower rate, calculated using the policy characteristics present at the time of quoting; 3) damages from all Defendants' policyholders who could have been offered a lower rate, calculated using a random sample of policies; and 4) damages from all Defendants' policyholders who could have been offered a lower rate with the "same or closest deductibles," calculated using a random sample of policies.  *Id.* ¶ 51, Ex. F. Brown determined the Kings were charged $1,124 for their NGIC policy in 2013 (prorated because the Kings canceled their policy mid-term on January 22, 2014), and the lowest available rate the Kings were eligible for was a PEIC policy that would have cost $706 (prorated).  *Id.* ¶ 31, Ex. A.

Defendants' insurance policies include variable limits and deductibles, which affect the ultimate premium charged.  Brown states that the vast majority (over 90%) of policy limits and deductibles are offered by all Defendant companies in the control group, with the exception of PEIC, which did not offer the 25/50 limit in the relevant timeframe.  Brown Report ¶ 11.  Where a policy had a limit or deductible not offered by another company, Brown included in his models the next available limit or deductible that would have offered an additional amount of coverage.  *Id.* ¶ 42.  Brown explained "it is reasonable to assume a policyholder would accept an additional amount of coverage at a lower rate."  *Id.*  The exception is Brown's Analysis #4, which also included situations where there was an identical policy limit and a closest available deductible— regardless of whether the deductible was greater (less coverage) or smaller (more coverage).  *Id.* ¶ 51.

Brown's model assumes that any insured is eligible for affinity group rates with open eligibility, "elective eligibility," and "those whose membership is solely based upon paying a fee." Brown Report ¶ 16.  He also assumed that MICG had an "open to all" affinity group policy.  *Id.* However, he explained that the model could be adjusted to make MICG "excluded from consideration as an available lowest rate."  *Id.*

United States District Court
Northern District of California

1    Brown also noted that the data contained deficiencies about which Defendants were

2    notified but failed to correct.  Brown Report ¶ 30.  A percentage of the policies in the class period

3    (7%) could not be rated using Brown's model because of deficiencies in Defendants' data.  *Id.* ¶¶

4    39-40.  Where there was missing data that would have only a minor impact on the final premium

5    or that affected only a small number of policies, Brown made "conservative" assumptions that

6    erred on the side of fewer class damages.  *Id.* ¶¶ 41-48.  For example, only some companies

7    offered a good student discount, and only those companies collected data necessary to determine

8    the policyholder's eligibility for a good student discount.  *Id.* ¶ 41.  Where Brown lacked data on a

9    policyholder's good student eligibility, Brown did not apply the discount.  *Id.*  Another example is

10   credit or debit factors, which differed between the companies, so they did not collect the same

11   policyholder data as each other.  *Id.* ¶¶ 43-44.  Where possible, Brown calculated the credit and

12   debit factors "from other provided data."  *Id.*  Where not possible, credit factors were not applied

13   and debit factors were left in, creating a "more conservative estimate of restitution."  *Id.*

14   Defendants raise numerous complaints that Brown's methodology is "unsound and

15   unreliable."  Def. Mot. Exclude 4.  In particular, Defendants challenge the error rate of Brown's

16   methodology.  Defendants offer a rebuttal expert report from Braithwaite to argue that Brown's

17   replicated premiums based on Defendants' rating algorithms and policyholder data had a 96%

18   error rate—in other words, the model exactly matched Defendants' actual premiums only 4% of

19   the time.  *Id.* at 5-7; Braithwaite Report ¶¶ 80-84.  Defendants also argue that Brown did not in

20   fact use his model when calculating the Kings' damages, as Braithwaite came up with slightly

21   different numbers when he attempted to replicate Brown's methodology based on the Kings'

22   policyholder data.[5]  Def. Mot. Exclude 8; Braithwaite Report ¶¶ 94-95.  Plaintiffs move to exclude

23   the Braithwaite Report, which the court grants in part and denies in part for reasons stated below.

24   Even considering Braithwaite's testimony, Defendants' arguments do not support

25

26   _____

27   [5] Braithwaite briefly noted that PEIC should not have been included in Brown's lowest rates
     analysis at all because the Kings' NGIC policy included a "collision deductible waiver."
     Braithwaite Report ¶ 95, n.72.  Braithwaite did not provide any further explanation for this note,
28   and neither party addressed it in their class certification motion papers.  The court does not
     consider it.

excluding the Brown Report under *Daubert* at the class certification stage.  Braithwaite did not himself compare Brown's replicated premiums to Defendants' actual historical premiums.  Rather, Brown's work papers included an analysis comparing replicated premiums (based on Brown's Analysis #3) to actual premiums from a sample of 293,887 of Defendants' policyholders (the "Brown Sample").  Braithwaite Report ¶¶ 76-79.  Braithwaite could not determine whether the Brown Sample was representative, statistically valid or unbiased.  *Id.*  In the Brown Sample, the replicated premiums in the model exactly matched the actual premiums down to the penny 4% of the time.  *Id.* ¶ 80.  Brown's model came within $30 of the actual premium 39% of the time, and within $100 of the actual premium 60% of the time.  *Id.* ¶¶ 85-86.  Defendants argue this error rate is so high that Brown's model must be "hopelessly unreliable" and should be excluded.  Def. Mot. Exclude 9.  Plaintiffs argue that any inconsistencies between Brown's replicated premiums and Defendants' actual premiums are due to deficiencies in Defendants' policyholder data, not Brown's methodology itself.  [Docket No. 459 (Opp'n to Def. Mot. Exclude) 15-16.]

A method's "known or potential error rate" is a relevant consideration under *Daubert.  See Fodera,* 341 F.R.D. at 624.  Defendants cite *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10-861RSM, 2012 WL 5194085 (W.D. Wash. Oct. 18, 2012), in which an expert's testimony about yarn composition was excluded because "objectively verifiable tests" indicated the expert's method of testing yarn composition was "off by a wide margin for every single blended yarn or fiber." *Id.* at 6-7.  *Cascade Yarns* is distinguishable because Defendants have not provided "objectively verifiable" evidence that Brown's error rate is due to Brown's methodology rather than problems with Defendants' policyholder data.  Braithwaite makes no attempt to distinguish between errors due to methodology and errors due to Defendants' missing or inaccurate data.  Nor does Braithwaite propose any explanation for the error rate.  The court will not exclude Brown's testimony at the class certification stage where Defendants' flawed data may account for the error rate, and Defendants failed to provide other explanations for the errors.  *See Coleman*, 2023 WL 9110926, at *12 (rejecting defendants' argument that plaintiffs' damages model was "unreliable for failing to account for data that Defendants themselves do not adequately track"); *Gutierrez v. Wells Fargo & Co.*, No. 7-cv-5923, 2010 WL 1233810, at *11 (N.D. Cal. Mar. 26,

United States District Court
Northern District of California

2010) ("[P]laintiffs cannot be expected to determine, with 100% accuracy, the exact overdraft charge associated with a particular fee reversal when defendant's own data system did not capture and store this information."). Moreover, the record does not indicate whether the error rate in the Brown Sample is even representative of the reliability of Brown's damages calculation.[6]

Curiously, Braithwaite testifies that he applied Brown's model to the Kings' policyholder data, but the results did not match the premiums used by Brown to calculate the Kings' individual damages. Braithwaite Report ¶¶ 94-95. For example, Exhibit A of the Brown Report states that the Kings were charged $1,124 for their NGIC policy, and there was a lower price PEIC policy at $706. *Id.* According to Braithwaite, Brown's model actually estimates that the Kings were charged $1,206.55 for their NGIC policy, and there was a lower price PEIC policy at $661.22. *Id.* Brown testified under oath in Plaintiffs' opposition to Defendants' *Daubert* motion that he did in fact use his model to calculate the Kings' damages, and that his model exactly replicated the numbers in Exhibit A of the Brown Report. [Docket No. 459-1 (Scott Brown Supp. Decl., March 4, 2025) ¶¶ 13-14, Ex. A.] Neither side explains why Braithwaite found different results from Brown. Regardless, this difference can be explored through cross-examination; it is not a reason to find Brown's methodology fundamentally unreliable. *See Coleman*, 2023 WL 9110926, at *14 (citing *McClure v. State Farm Life Insurance Co.*, 341 F.R.D. 242, 248 (D. Ariz. 2022)). Brown explains that his model uses "simple arithmetic" to replicate policyholders' premiums based on Defendants' rate filings. Brown Report ¶ 13. This methodology is "an application of actuarial principles that can be tested and challenged, regardless of whether Defendants agree with their resulting calculations." *Coleman*, 2023 WL 9110926, at *15. While there is fertile ground for cross examination, Defendants have not presented a reason to exclude the Brown Report.

---

[6] Brown calculated damages by comparing replicated premiums for different policies against each other, not by comparing replicated premiums with the historical premium. Brown Report ¶ 27. Brown opines that, "[b]y comparing the two calculated premiums using the exact same rating characteristics, we mitigate any significant impact [defects in policyholder data] would have on the calculation of damages." *Id.* In other words, it is Brown's actuarial opinion that accurately calculating damages does not require accurately replicating historical premiums. Braithwaite argues in a conclusory manner that this is "not a reasonable assumption." Braithwaite Report ¶ 75. The parties can take this up on cross examination; it is not a reason to exclude Brown's testimony at class certification. *See Coleman*, 2023 WL 9110926, at *15.

1    Defendants make other challenges.  First, they argue that Brown failed to account for

2    possible midterm policy changes (such as adding a vehicle) which could alter premiums.  Def.

3    Mot. Exclude 5; Braithwaite Report ¶¶ 61-63.  Defendants fail to explain how midterm policy

4    changes would materially impact the preliminary class-wide injury showing to such a degree that

5    Brown's entire model should be excluded.  *See Coleman*, 2023 WL 9110926, at *14.  At any rate,

6    the issue appears to be moot because Brown's model takes midterm policy changes into account.

7    His Analysis #2 used only the policyholder characteristics at the time that the policyholder was

8    offered a policy by Defendants, while his Analyses #1, #3, and #4 use representative random

9    sampling which reflect midterm policy changes, adequately demonstrating that Brown's model

10   can encompass or exclude midterm policy changes as necessary.

11    Second, Defendants argue that Brown failed to comply with the standards of the actuarial

12   profession because he was not peer-reviewed.  Def. Mot. Exclude 12-13.  To the contrary, the

13   Brown Report was reviewed by Jon Griglack and Allan Schwartz,[7] both fully credentialed

14   actuaries.  Brown Report ¶ 29; Schwartz Report ¶ 1-2, 18.

15    Third, Defendants argue that Brown's model rests on improper assumptions regarding 1)

16   whether the policyholder received a cross-offer, 2) whether the policyholder was eligible for the

17   lower rate, 3) whether Defendants were in the same control group, 4) whether the policyholder

18   would have selected the lower rate despite differences in policy options and features, and 5)

19   whether missing data is material to the damages calculation.  Def. Mot. Exclude 13-14.  These

20   arguments "rest primarily on disputes of fact and the reasonableness of assumptions made by the

21   experts on both sides."  *In re Korean Ramen Antitrust Litig.,* No. 13-CV-04115-WHO, 2017 WL

22   235052, at *13 (N.D. Cal. Jan. 19, 2017).  These disputes do not speak to the reliability of

23

24   ───────────────

25   [7] Defendants move to exclude the Schwartz Report because it "lacks methodology."  Def. Mot.
     Exclude 19.  Schwartz evaluated the overall methodology used by Brown, but did not analyze the

26   computer programming or calculations performed by Brown.  Schwartz Report ¶ 18 n.7.  Schwartz
     applied the relevant Actuarial Standards of Practice to Brown's methodology, analyzed the

27   assumptions Brown made in relation to Defendants' data, and concluded that Brown's
     methodology was a reasonable actuarial procedure in the context of the case.  *Id.* ¶¶ 22-39.  The

28   court finds that Schwartz sufficiently explained how his experience and the standards of the
     actuarial profession led to his conclusion that Brown's methodology was sound.  Defendants'
     motion to exclude the Schwartz Report is denied.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Brown's methodology.

2       In a motion to exclude at the class certification stage, "[t]he focus is on the expert's

3   principles and methodology, not [his] conclusions." *Fodera,* 341 F.R.D. at 624.  Defendants'

4   arguments do not meaningfully undercut the reliability of Brown's principles and methodology.

5   Rather, their arguments go to the weight of the evidence, not its admissibility.  At the class

6   certification stage, the court finds that the Brown Report is "sufficiently probative to be useful in

7   evaluating whether class certification requirements have been met." *Dukes v. Wal-Mart, Inc.*, 222

8   F.R.D. 189, 191 (N.D. Cal. 2004).  Defendants' motion to exclude the Brown Report is denied.

9       **C.      Braithwaite Report**

10      Plaintiffs argue that the Braithwaite Report should be excluded in its entirety.  Plf. Mot.

11  Exclude 4.  Plaintiffs attack Braithwaite's qualifications and methodology.  *Id.* at 1.  The court

12  grants Plaintiffs' motion to exclude in part and denies it in part.

13             **1.      Braithwaite's Qualifications**

14      Braithwaite is a Senior Managing Director in the Global Insurance Services practice of an

15  insurance firm, and has over 40 years of experience in the property and casualty insurance

16  industry.  Braithwaite Report ¶¶ 6-7.  He has been involved in preparing insurance rate analyses

17  and rate filings for submission to California regulators involving private passenger auto insurance

18  three times.  *Id.* ¶ 7.  He has also served as an expert in disputes challenging the appropriateness of

19  private passenger auto insurance rates in California, Texas, and Illinois.  *Id.* ¶ 8.

20      Plaintiffs argue that Braithwaite is not qualified to offer expert opinions because of his lack

21  of experience regarding "the formulation, implementation and impact of California insurance

22  regulations and California auto insurance rates."  Plf. Mot. Exclude 5.  The court is not persuaded

23  that Braithwaite must have extensive experience in formulating California insurance regulations in

24  order to have expertise relevant to this case.  Some portions of his opinion—particularly his

25  analysis of Brown's methodology and his summary of Defendants' different types of coverage—

26  appear to be grounded in his training and experience in preparing insurance rate analyses and rate

27  filings more generally.  Braithwaite is qualified to testify about these matters.

28      However, Braithwaite does not merely testify about rate analyses.  He also makes legal

United States District Court
Northern District of California

1    arguments about who should be in the purported Class. *See* Braithwaite ¶ 100 (arguing that a class

2    member must first demonstrate harm, and that a policyholder was not harmed if he or she would

3    not have accepted a lower-rate policy even if offered).  And he makes broad, conclusory assertions

4    about consumer choice in private passenger auto insurance. *See id.* ¶ 113 (opining on various

5    reasons why a policyholder may opt for a higher premium for the same basic coverage amount);

6    *see also id.* ¶¶ 101, 114, 117.  Nothing in the record indicates that Braithwaite is qualified to offer

7    testimony to support Defendants' legal arguments about the Class definition or about consumer

8    choice.  Accordingly, Braithwaite's testimony and opinions on those subjects are excluded.

9                    **2.    Braithwaite's Methodology**

10           Braithwaite based his opinion on Defendants' records and Brown's work papers.  Plaintiffs

11   complain that Braithwaite failed to personally review the policy data in Defendants' database.  Plf.

12   Mot. Exclude 7-9.  While this may go to the persuasiveness of Braithwaite's opinion, it is not a

13   reason to strike his analysis of Brown's work papers under *Daubert* at the class certification stage.

14           Braithwaite's opinions on Brown's work and rate analyses are admitted for purposes of

15   class certification.

16   **III.    REQUESTS FOR JUDICIAL NOTICE**

17           Plaintiffs make two requests for judicial notice: Amtrust Financial Services, Inc.'s Annual

18   Reports for the fiscal years ending in December 31, 2013 and December 31, 2014; and the

19   California Insurance Commissioner's Bulletins 1980-6 and 2024-14.  [Docket Nos. 439; 453.]  As

20   the court does not rely on these documents in adjudicating this motion, the requests for judicial

21   notice are denied as moot.

22   **IV.    MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF**

23           "The 'classic role' of amicus curiae is to assist a court in a case of public interest by

24   'supplementing the efforts of counsel, and drawing the court's attention to law that escaped

25   consideration.'" *California by & through Becerra v. United States Dep't of the Interior*, 381 F.

26   Supp. 3d 1153 (N.D. Cal. 2019) (quoting *Miller-Wohl Co. v. Comm'r of Labor & Indus. State of

27   Mont.*, 694 F.2d 203, 204 (9th Cir. 1982)).  Whether to allow amici to file a brief is "solely within

28   the Court's discretion," and courts generally exercise "great liberality" in permitting amicus briefs.

1   *Id.* (quoting *Woodfin Suite Hotels, LLC v. City of Emeryville*, No. C 06-1254 SBA, 2007 WL

2   81911, at \*3 (N.D. Cal. Jan. 9, 2007)).  "The scope of amicus briefs, however, should be limited to

3   the issues raised by the parties."  *Id.*

4       Non-party Consumer Watchdog filed a motion for leave to file an amicus curiae brief on

5   March 11, 2025.  [Docket No. 460.]  Defendants oppose because, among other things, the

6   proposed amicus brief only addresses topics that the court already decided in its Order on

7   Supplemental Briefing.  [Docket No. 468.]  The court agrees with Defendants and finds that the

8   amicus brief is not helpful to this class certification motion, nor is it a reason to revisit the court's

9   findings in its previous order.  Consumer Watchdog's motion is denied.

**V.     MOTION FOR CLASS CERTIFICATION**

**A.     Legal Standards**

**1.     Standing**

13      To satisfy the Article III standing requirement, Plaintiffs must show: (1) an "injury in fact"

14  that is concrete and particularized, as well as actual or imminent, and not conjectural or

15  hypothetical; (2) that the injury is fairly traceable to Defendants' challenged conduct; and (3) that

16  it is likely, as opposed to merely speculative, that a favorable decision will redress the injury.

17  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "[E]ach element [of standing] must

18  be supported in the same way as any other matter on which the plaintiff bears the burden of proof,

19  i.e., with the manner and degree of evidence required at the successive stages of the litigation."  *Id.*

20  at 561.

21      "Neither the Supreme Court nor the Ninth Circuit has identified the precise evidentiary

22  burden a putative class representative must satisfy to establish her standing at the class

23  certification stage."  *Guzman v. Chipotle Mexican Grill, Inc.*, No. 17-CV-02606-HSG, 2020 WL

24  227567, at \*5 (N.D. Cal. Jan. 15, 2020).  Courts in this district have held that the plaintiff "must

25  demonstrate, not merely allege, that they have suffered an injury-in-fact to establish Article III

26  standing to bring the claims asserted on behalf of the [class]."  *Id.* (quoting *Evans v. Linden Rsch.,*

27  *Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at \*6 (N.D. Cal. Nov. 20, 2012)).  The court must

28  examine standing at the class certification stage "rigorously," but "the standard of review cannot

United States District Court
Northern District of California

1    be more rigorous than it would [be] on a Rule 56 motion for summary judgment." *Torres v. Air to

2    Ground Servs., Inc*., 300 F.R.D. 386, 397 (C.D. Cal. 2014).  In short, the amount of evidence

3    required is more than at the pleadings stage, but not more than what would be required on a

4    motion for summary judgment.  *See, e.g., B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967

5    (9th Cir. 2019) (finding standing where plaintiff presented evidence that she did not receive

6    adequate medical care in the past as well as evidence that statewide policies and practices exposed

7    her to a risk of similar future harms); *Evans*, 2012 WL 5877579, at *7 (finding that standing was

8    not met where plaintiff "did not offer a shred of evidence in support of the existence of [the

9    alleged] economic injury"); *Torres*, 300 F.R.D. at 397 (accepting plaintiffs' version of disputed

10   facts as true in finding standing).

### 2.      FRCP 23

12          "Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal

13   court."  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017).  A plaintiff

14   seeking class certification bears the burden of demonstrating that he or she has met each of the

15   four requirements of Rule 23(a), and at least one of the requirements of Rule 23(b).  *Ellis v.

16   Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011) (citing *Zinser v. Accufix Research

17   Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001)); *Lozano

18   v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007).  Rule 23(a) provides that a court

19   may certify a class only if (1) the class is so numerous that joinder of all members is

20   impracticable, (2) there are questions of law or fact common to the class, (3) the claims or

21   defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

22   representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P.

23   23(a).

24          In addition to establishing numerosity, commonality, typicality, and adequacy, a plaintiff

25   must establish one or more of the following grounds for maintaining the suit as a class action: (1)

26   that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive

27   relief benefitting the class as a whole would be appropriate; or (3) that common questions of law

28   or fact predominate, and the class action is superior to other available methods of

adjudication.  Fed. R. Civ. P. 23(b).  In this case, Plaintiffs seek certification under Rule 23(b)(3).
Mot. 18.  Rule 23(b)(3) requires that "questions of law or fact common to class members
predominate over any questions affecting only individual class members" and that "a class action
is superior to other available methods for fairly and efficiently adjudicating the controversy."

"When adjudicating a motion for class certification, the court accepts the allegations in the
complaint as true so long as those allegations are sufficiently specific to permit an informed
assessment as to whether the requirements of Rule 23 have been satisfied."  *Bally v. State Farm
Life Ins. Co.*, 335 F.R.D. 288, 296–97 (N.D. Cal. 2020) (citing *Blackie v. Barrack*, 524 F.2d 891,
901 (9th Cir. 1975)).  District courts must "engage in a 'rigorous analysis' of each Rule
23(a) factor when determining whether plaintiffs seeking class certification have met the
requirements of Rule 23."  *Ellis*, 657 F.3d at 980 (citing *General Tel. Co. v. Falcon*, 457 U.S. 147,
161 (1982)).  While this analysis "may entail some overlap with the merits of the plaintiff's
underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the
certification stage."  *Amgen*, 568 U.S. at 465-66 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.
338, 351 (2011) (internal quotation marks omitted)).  "Merits questions may be considered to the
extent—but only to the extent—that they are relevant to determining whether the Rule
23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 466.  Thus, "[i]n
determining whether the 'common question' prerequisite is met, a district court is limited to
resolving whether the evidence establishes that a common question is *capable* of class-wide
resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."  *Olean
Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-67 (9th Cir. 2022)
(emphasis in original).  "[P]laintiffs must prove the facts necessary to carry the burden of
establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."  *Id*.
at 665.  The decision to certify a class is committed to the discretion of the district court.  *Vinole v.
Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009).

**B.**    **Discussion**

Plaintiffs argue that they have standing to bring individual claims and claims on behalf of
the class against all five Defendants because Defendants are jointly liable for the alleged failure to

United States District Court
Northern District of California

cross-offer a GDD policy.  Class Cert. Mot. 13-24.  They also argue that they meet the requirements for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3).  *Id.* at 24-30.  Defendants oppose, arguing that the class can only be certified as to each Defendant if Plaintiffs can show they have individual injuries traceable to each Defendant and joint liability does not apply.  [Docket No. 444 (Class Cert. Opp'n) 8.]  Defendants also argue that Plaintiffs do not meet the requirements under Rules 23(a) and 23(b)(3).  *Id.* at 15-30.

### 1.    Joint Liability

Plaintiffs state that they purchased their NGIC policy from an agent employed by NGIC who did not offer any other GDD policy from the control group, even though lower-rate GDD policies were available.  Edd King Decl. ¶¶ 4, 6; Diedre King Decl. ¶¶ 4, 6.  Plaintiffs argue that this failure to cross-offer a GDD policy imputes joint liability as to all five Defendants.  Class Cert Mot. 13-24.  In the court's previous Order on Supplemental Briefing, the court found that a violation of section 1861.16(b) does not automatically impute joint liability on each member of a control group.  Order on Supp. Briefing 34.  Plaintiffs now raise three different theories of joint liability: that all Defendants are liable for all of their agents' failures to cross-offer under *respondeat superior* and agency liability principles; that Defendants are jointly liable as a single enterprise; and that Defendants are jointly liable under the concerted action principles of the Restatement (Second) of Torts section 876.  *Id.*

The court first summarizes the evidence the parties present in their class certification briefs related to joint liability, then applies the evidence to each of Plaintiffs' joint liability theories.

### a.    Evidence Related to Joint Liability

The court previously made the following factual findings regarding Defendants' corporate structure.  In the relevant time period, NGIC, INIC, IPIC, and MICG (the "NG Defendants") were all subsidiaries of National General Holdings Corp. ("NGHC").  Order on Supp. Briefing 17.  PEIC was acquired by AmTrust on April 19, 2013 (AmTrust and NGHC are different publicly traded companies).  *Id.* at 15-17.  PEIC was then acquired by INIC on April 1, 2014, at which point it became an NGHC subsidiary.  *Id.*  PEIC applied for a Super Group Exemption on May 5,

United States District Court
Northern District of California

2014, which was granted by the CDI on July 18, 2014.  Order on Third MTD 7-9.[8]

Plaintiffs have provided evidence through the Brown Report that there was a lower-rate GDD policy available from PEIC when the Kings renewed their NGIC policy on June 2, 2013. Brown Report Ex. A.  In addition to the PEIC policy, Plaintiffs also attempt to argue that there was a lower-rate GDD policy available from INIC.  Plaintiffs cite the Nash Declaration, in which Nash opines that Plaintiffs were eligible for the INIC Club DentPro affinity group policy and would have received a lower premium under that policy.  Nash Decl. ¶ 13.  Defendants move to exclude this statement under *Daubert*.  Def. Mot. Exclude 24.  The court grants Defendants' motion to exclude because Nash opines on an ultimate legal issue—whether a good driver should be considered eligible for an affinity group that requires payment of a membership fee for the purposes of the Lowest Rates Rule.  *See United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) ("[A]n expert cannot testify to a matter of law amounting to a legal conclusion.").  Regardless, the Kings were not harmed by any alleged failure to cross-offer the INIC policy for purposes of standing.  The Brown Report clearly indicates that even though the INIC policy had a lower premium, it charged additional fees that would have resulted in the Kings paying more for their prorated insurance policy under INIC than they actually paid under NGIC.  Brown Report Ex. A; *see also* Class Cert. Opp'n 17; Class Cert. Reply 10.

Plaintiffs also attempt to resuscitate their argument that they were eligible for a lower-rate MICG policy, which the court already dismissed in its Order for Supplemental Briefing.  Class Cert. Reply 10-11.  The court made an evidentiary finding that the lower-rate MICG policy identified by Plaintiffs (an affinity group defined as "Other Employee Groups") was in fact only open to members of the "GM Employee Group or GM's business partners/accounts, the Hughes Employee Group, or the Raytheon Employee Group," and the Kings were not eligible for it.  Order for Supp. Briefing 23-24.  Plaintiffs recycle their old argument that this "Other Employee Groups" policy rate was actually "open to all."  Class Cert. Reply 10-11.  As support, they cite

---

[8] At the hearing, Defendants conceded that PEIC was in the control group at least for the period between April 1, 2014 and May 5, 2014.  Defendants dispute that PEIC was in the control group before April 1 (when it was acquired by INIC) and after May 5 (when PEIC submitted its application for a Super Group Exemption).

Laucher, who opines that "generic, general and overly-broad eligibility descriptions such as 'Other Employee Groups' are applied literally and have traditionally been interpreted as open-to-all insureds that qualify (e.g., every insured who is a member of *any* employee group)." Laucher Decl. ¶ 9. The court has already made the factual finding that the "Other Employee Groups" MICG affinity group policy was *not* open to all. Order for Supp. Briefing 23-24. Laucher's vague and conclusory statements do not give the court any reason to reverse its prior decision.

In addition, Plaintiffs cite Laucher to argue that INIC, MICG, and NGIC were legally required to offer a broad market policy in addition to their affinity group policies. Class Cert. Reply 1; Laucher Decl. ¶ 5. Separately, Laucher states that some of Defendants' affinity group policies are legally improper and should be interpreted as broad market policies. Laucher Decl. ¶ 9. For example, Laucher testifies in conclusory fashion that the INIC Club DentPro affinity group policy is "inappropriate" because it does not follow CDI requirements and therefore it should be considered as having no eligibility requirements. Laucher Decl. ¶ 10. Laucher's opinions are legal conclusions. He prefaces his opinions with the phrase, "It is long-standing and consistently accepted and applied California auto insurance industry and CDI custom, practice and standard that . . . ." *Id.* But that template phrase does not transform his legal conclusions into non-legal expert testimony. Whether an affinity group policy is legally valid, and whether Defendants were legally required to cross-offer it, are both legal conclusions. Plaintiffs do not cite Laucher as evidence of an industry custom; they cite Laucher to argue that the court should follow Laucher's interpretation of the law. This is improper. *See Tamman*, 782 F.3d at 552; *Allstate Indem. Co. v. Lindquist*, No. C20-1508JLR, 2022 WL 2192868, at *5 (W.D. Wash. June 17, 2022). The court grants Defendants' motion to exclude paragraphs 5 and 8-10 of Laucher's declaration.

Thus, the PEIC policy with the lowest GDD rate is the only policy that can support Plaintiffs' standing. To demonstrate joint liability, Plaintiffs must connect NGIC's failure to cross-offer a PEIC policy in June 2013 with the rest of the Defendants. Much of Plaintiffs' evidence goes toward joint liability between the NG Defendants, but *not* PEIC. For example, Plaintiffs cite the testimony of Lawrence Pentis, who was president and CEO of the NG Defendants from 2010 to 2012. Hurst Decl. ¶ 11, Ex. C; [Docket No. 438-10 (Lawrence Pentis

Dep., Jan. 27, 2023) 15, 20]. Pentis testified that the NG Defendants were "run as one organization," or "one consolidated organization"—however, he could not testify to anything after 2012, and so he would have no knowledge of whether PEIC was treated as part of that consolidated organization (PEIC was not acquired by AmTrust until April 2013). *Id.* at 25. Notably, Byron Storms, Pentis's successor who was president of the NG Defendants from 2012 to 2015, stated that he was not president of PEIC until after PEIC was acquired by INIC in April 2014, suggesting that PEIC was treated as a separate organization in 2013. Hurst Decl. ¶ 15, Ex. F; [Docket No. 438-14 (Byron Storms Dep., May 11, 2023) 13-14, 21-22].

Brenda Castellano was Executive Vice President of sales for brokers and independent agents for specialty vehicles since 2012 for the NG Defendants. Hurst Decl. ¶ 14, Ex. E; [Docket No. 438-13 (Brenda Castellano Dep., April 27, 2023) 11-14]. Castellano was aware of the Lowest Rates Rule in California and understood it to mean that each company in the group was required to offer the lowest GDD price based on the client's coverage selection and eligibility among the NG Defendants. Castellano Dep. 16. Castellano testified that the NG Defendants shared management, operating systems, data, forms, and training. *Id.* at 45-46. Describing the four companies, she stated: "We just refer to everything as National General." *Id.* at 37. Michael Juszczakiewicz has been Director or Vice President of inside sales for NGHC since roughly 2015 and testified that when a client calls an agent for one of the NG Defendants, the agent would identify the company to clients as "National General," and would not distinguish between the four companies. Hurst Decl. ¶ 24, Ex. O; [Docket No. 438-23 (Michael Juszczakiewicz Dep., March 24, 2023) 15-16, 21-22, 63]. Castellano and Juszczakiewicz did not testify about PEIC.

Kenny Yeh, product manager from 2011 to 2012 for the NG Defendants, stated he was familiar with the Lowest Rates Rule, but did not remember any instances of cross-offering the lowest GDD rate. Hurst Decl. ¶ 23, Ex. N; [Docket No. 438-22 (Kenny Yeh Dep., Jan. 13, 2023) 14, 25-26]. Since Yeh left in 2012, he would not have any knowledge regarding PEIC in 2013-2014. Amber Cononico, who was a claims manager for NGHC in 2012-2015 and is now Director of Training and Operations for NGHC, was not able to point to any training for inside sales agents for the NG Defendants regarding the Lowest Rates Rule and the duty to cross-offer. Second

Cononico Dep. 104-105; Hurst Decl. ¶ 25, Ex. P-1; [Docket No. 438-24 (Amber Cononico Dep., March 23, 2023, "First Cononico Dep.") 38].  Cononico also did not mention PEIC.

Plaintiffs also point to a document titled "2021 Unacceptable Behaviors," in which "Placing any business in a different Plan Code than what the client actually called in with" is listed as behavior that may subject an employee to "immediate termination."  [Docket No. 438-34.]  The "Plan Code" refers to a marketing assignment for a product: for example, if a client receives a mailed advertisement for a particular affinity group product, then when the client calls the phone number on the advertisement, the client will be automatically assigned the Plan Code for the associated affinity group product.  Hurst Decl. ¶ 26, Ex. P-2; [Docket No. 438-25 (Amber Cononico Dep., May 24, 2023, "Second Cononico Dep.") 107-109].  Plaintiffs state that the Unacceptable Behaviors list suggests that an agent who cross-offers when a client calls about an affinity group product can be punished with termination.  However, Plaintiffs do not point to any evidence that PEIC ever used the same Unacceptable Behaviors list.[9]

Plaintiffs offer some evidence that relates to PEIC.  Rainy Tayal was Vice President of PEIC from 2012 to 2022.  Hurst Decl. ¶ 20, Ex. K; [Docket No. 438-19 (Rainy Tayal Dep., March 9, 2023) 15, 18.]  Tayal stated that PEIC agents did not make any cross-offers with the National General Defendants because PEIC was a "completely separate" company.  Tayal Dep. 118, 120, 137-138.  This undermines rather than supports joint liability regarding PEIC.  Testimony from Kristi Harris and Rene Treadaway cited by Plaintiffs relates to PEIC's super group exemption.  Class Cert. Mot. 16; Hurst Decl. ¶¶ 17-18, Exs. H, I; [Docket Nos. 438-16 (Kristi Harris Dep., Dec. 6, 2022); 438-17 (Rene Treadaway Dep., Dec. 7, 2022)].  At most, the Harris and Treadaway testimony supports Plaintiffs' argument that PEIC was in the control group in 2013.  But as the court has found, being part of a control group is not enough to demonstrate joint liability.  Order on Supp. Briefing 34.

Daniel Wolfram, director of data services at NGHC since 2008, stated that PEIC and the rest of the Defendant companies use the NPS policy administration system.  Hurst Decl. ¶ 22, Ex.

_____

[9] Defendants also note Cononico testified that an agent can still change a client's Plan Code with supervisor approval.  *Id.* at 124.

United States District Court
Northern District of California

M; [Docket No. 438-21 (Daniel Wolfram Dep., March 7, 2023) 34, 42-44]. Wolfram stated he was not aware of any automated process for doing a "comparative rate analysis" to quote the lowest available GDD premium in the control group in NPS. Wolfram Dep. 107-108. However, Wolfram also testified that PEIC only began using NPS on September 2, 2014, which is *after* PEIC obtained its Super Group Exemption. *Id.* at 101.[10] Before then, PEIC used a different policy administration system, and nothing in the record indicates that Wolfram was competent to testify about that other system. *Id.* Like Tayal's testimony, Wolfram's testimony cuts against rather than supports joint liability for PEIC.

Defendants submit counter evidence that similarly undercuts Plaintiffs' joint liability theories. Rakesh Patel, Senior Product Manager at NGHC from 2015 to 2020, testified that in 2013, 100% of PEIC policies were sold by agents and brokers not employed by "National General." Patel Decl. ¶ 48. Patel's testimony indicates he used the term "National General" in the same way Castellano did (referring only to the NG Defendants and not PEIC). Patel further states that PEIC policies have "never been" sold by National General inside agents. *Id.* Cononico testified she is responsible for training inside sales agents for the NG Defendants, but not for PEIC; that PEIC maintains a separate sales team; that the PEIC sales team and the National General sales team are not trained on each other's products; and that the teams do not have access to each other's sales data. [Docket No. 448 (Amber Cononico Decl., Jan. 29, 2025) ¶¶ 8-9.]

### b.    Application to Joint Liability Theories

Plaintiffs cite Cal. Civ. Code section 2338 and the Restatement (Third) of Agency sections 1.01, 4.01, and 4.06 in arguing that all Defendants are liable for NGIC's failure to cross-offer a PEIC policy under general agency liability principles. Class Cert. Mot. 18.

The Restatement (Third) of Agency has been adopted by California courts. *See, e.g., RSB Vineyards, LLC v. Orsi*, 15 Cal. App. 5th 1089, 1100 (2017). The Restatement defines an agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to

---

[10] Plaintiffs appeared to reference page 101 of Wolfram's deposition in their motion brief (Class Cert. Mot. 3 n.4), but did not attach page 101 to their motion exhibits. For the sake of completeness, the court refers to the full Wolfram deposition at Docket No. 281-1.

1   another person (an 'agent') that the agent shall act on the principal's behalf and subject to the

2   principal's control, and the agent manifests assent or otherwise consents so to act." Restatement

3   (Third) Of Agency § 1.01 (2006). Under California law, an agency is either "actual or ostensible."

4   *Preis v. Am. Indem. Co.*, 220 Cal. App. 3d 752, 761 (Ct. App. 1990) (citing Cal. Civ. Code §

5   2298). An agency is actual when the agent is employed by the principal. Cal. Civ. Code § 2299.

6   An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a

7   third person to believe another to be his agent who is not actually employed by him. *Id.* § 2300.

8   A principal is responsible to third persons for "wrongful acts committed by [the] agent in and as a

9   part of the transaction of [the agency's] business." *Id.* § 2338. Additionally, under the

10  Restatement, a principal is "subject to vicarious liability for a tort committed by an agent in

11  dealing or communicating with a third party on or purportedly on behalf of the principal when

12  actions taken by the agent with apparent authority constitute the tort." Restatement (Third) Of

13  Agency § 7.08.

14          Plaintiffs' argument is not well articulated, but they appear to assert that the NGIC agent

15  who sold the Kings their insurance policy was acting as an agent not only for NGIC, but for all

16  Defendants. Plaintiffs have presented evidence that the inside sales agents for the NG Defendants

17  operated as one unit. Indeed, witnesses such as Castellano and Patel did not distinguish between

18  agents for one company or another, but simply described them as agents for "National General."

19  Castellano Dep. 37; Patel Decl. ¶ 48. In addition, there is evidence that agents presented

20  themselves to clients as agents for "National General" as a group, not agents for a specific

21  subsidiary. Juszczakiewicz Dep. 63. Defendants offer no evidence to refute this. Defendants do

22  not dispute that if the Kings' NGIC agent was acting on behalf of all four NG Defendants jointly,

23  then under principles of common law agency, NG Defendants are jointly responsible for the

24  agent's violation of section 1861.16(b). With respect to standing at the class certification stage,

25  Plaintiffs have met their burden to trace their injury to NG Defendants.

26          However, Plaintiffs have not presented evidence that their injury can be traced to PEIC.

27  The only evidence that directly addresses PEIC is Wolfram's testimony that PEIC began using the

28  same NPS policy administration system as the other Defendants in September 2014 (after PEIC

1   received a super group exemption), and Tayal's testimony that PEIC agents did not make any

2   cross-offers with the other Defendants.  Wolfram Dep. 34, 42-44, 101; Tayal Dep. 118, 120, 137-

3   138.  Plaintiffs' other arguments go no further than arguing that PEIC was not subject to a super

4   group exemption before July 2014.  This falls far short of demonstrating that PEIC "manifested

5   assent" to the NGIC agent acting on its behalf when the Kings were offered their renewal policy.

6   *See* Restatement (Third) Of Agency § 1.01.  Plaintiffs cite principles of ratification in arguing that

7   Defendants are all jointly liable; however, PEIC can only ratify an act if the NGIC agent "acted or

8   purported to act as an agent on [PEIC's] behalf."  *See id.* § 4.03.  Plaintiffs have not offered any

9   evidence that the NGIC agent was acting or purporting to act on PEIC's behalf.

10      Plaintiffs' other theories—single enterprise and concerted action—fail for the same reason.

11   The single enterprise theory requires: "(1) such a unity of interest and ownership that the separate

12   corporate personalities are merged, so that one corporation is a mere adjunct of another or the two

13   companies form a single enterprise; and (2) an inequitable result if the acts in question are treated

14   as those of one corporation alone."  *Tran v. Farmers Grp., Inc.,* 104 Cal. App. 4th 1202, 1219

15   (2002), *as modified on denial of reh'g* (Jan. 27, 2003).  As discussed above, Plaintiffs' evidence

16   only shows that PEIC may have been in the same control group as the NG Defendants for a short

17   period of time, that Defendants all used the same policy administration system during an irrelevant

18   period of time, and that no cross-offers were made.  This does not come close to demonstrating the

19   requisite "unity of interest."  *See Jeong v. Nexo Fin. LLC,* No. 21-CV-02392-BLF, 2022 WL

20   174236, at *12 (N.D. Cal. Jan. 19, 2022) (discussing the nine factors courts consider for the single

21   enterprise test, which envisions "pervasive control . . . such as when a parent corporation dictates

22   every facet of the subsidiary's business").  Furthermore, the concerted action theory requires at

23   least some level of "tacit understanding" between the parties to engage in a common plan.  *Sindell*

24   *v. Abbott Lab'ys,* 26 Cal. 3d 588, 604 (1980) (citing Prosser, Law of Torts (4th ed. 1971) § 46).

25   Such "tacit understanding" is totally absent here, where PEIC maintained a completely separate

26   sales team and training procedures from the other companies, and where there is no evidence that

27   PEIC ratified the NGIC agent's violation of section 1861.16(b).

28      At the hearing, Plaintiffs raised the argument for the first time that PEIC can be directly

United States District Court
Northern District of California

27

1    liable to Plaintiffs as the insurer with a duty to sell the lowest rate GDD policy to them.  Plaintiffs

2    failed to raise the theory in their papers, and so the court will not consider it.

3         The court finds that Plaintiffs lack standing to assert a claim against PEIC because they

4    cannot trace an injury to PEIC.  PEIC is dismissed as a Defendant.  However, facts about PEIC are

5    still relevant to the period of time PEIC was part of the control group and whether the NG

6    Defendants violated the law by failing to cross-offer PEIC policies during that window.

7              **2.    FRCP 23(a)**

8         Rule 23(a) provides that a class action is proper only if four requirements are met: (1)

9    numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  *See* Fed. R. Civ.

10   P. 23(a)(1)-(4).

11             **a.    Numerosity**

12        Plaintiffs must demonstrate that the proposed class is "so numerous that joinder of all

13   members is impracticable."  Fed. R. Civ. P. 23(a)(1); *see also Hanlon v. Chrysler Corp.*, 150 F.3d

14   1011, 1019 (9th Cir. 1998).  "Whether joinder would be impracticable depends on the facts and

15   circumstances of each case and does not, as a matter of law, require the existence of any specific

16   minimum number of class members."  *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D.

17   439, 448 (N.D. Cal. 1994) (citation omitted).  Courts have found 40 or more class members

18   sufficient and 21 or fewer class members insufficient to satisfy numerosity.  *See Californians for*

19   *Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008).

20        Plaintiffs cite the Brown Report and assert that there are about 936,000 class members.

21   Class Cert Mot. 24; Brown Report ¶ 39.  Plaintiffs have established numerosity (which Defendants

22   do not dispute).

23             **b.    Commonality**

24        Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed.

25   R. Civ. P. 23(a)(2).  The common question "must be of such a nature that it is capable of classwide

26   resolution—which means that determination of its truth or falsity will resolve an issue that is

27   central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*,

28   564 U.S. 338, 350 (2011).  "By contrast, an individual question is one where members of a

United States District Court
Northern District of California

proposed class will need to present evidence that varies from member to member." *Olean*, 41 F.4th at 663 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).  The inquiry turns on whether "the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* at 666-67 (emphasis in original).  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citation and emphasis omitted).  "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (citing *Dukes*, 564 U.S. at 359).

Plaintiffs raise at least one common question: whether NG Defendants acted in concert (that is, pursuant to a common policy) in their failure to cross-offer.  Plaintiffs submit evidence that NG Defendants had a general course of conduct in the class period (January 22, 2011 to present) of failing to cross-offer the lowest rates within their control group.  Cononico was not able to point to any training for inside sales agents for the National General companies regarding the Lowest Rates Rule and the duty to cross-offer.  First Cononico Dep. 38; Second Cononico Dep. 104-105.  The "2021 Unacceptable Behaviors" document suggests that an agent may be punished for cross-offering a lower rate to a client who calls about an affinity group product, or at least must consult with a supervisor before doing so.  Second Cononico Dep. 107-109, 124; [Docket No. 438-34].  Wolfram stated he was not aware of any automated process for doing a "comparative rate analysis" to quote the lowest available GDD premium in the control group in NPS.  Wolfram Dep. 107-108.  The court finds that Plaintiffs have demonstrated by a preponderance of evidence that there is a common question as to whether NG Defendants failed to cross-offer the lowest rates within their control group pursuant to a common policy.  *See Olean*, 31 F.4th at 665.

Defendants' arguments are unavailing.  They raise numerous issues which they argue are not susceptible to class-wide proof and are dispositive to class members' claims, such as whether a client would have purchased the lower-rate policy simply because of its price.  Class Cert. Opp'n

15-16.  These arguments will be addressed in the court's 23(b)(3) predominance analysis.  They are not relevant to commonality, which requires only "a single common question" under Rule 23(a)(2).  *See Wang*, 737 F.3d at 544.  Plaintiffs meet commonality.

### c.    Typicality

Under Rule 23(a)(3), the claims of the representative parties must be "typical of the claims . . . of the class."  Fed. R. Civ. P. 23(a)(3).  "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  "Typicality 'assure[s] that the interest of the named representative aligns with the interests of the class.'"  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,* No. 2672 CRB (JSC), 2017 WL 672820, at *7 (N.D. Cal. Feb. 16, 2017).

Plaintiffs demonstrate typicality.  Plaintiffs argue that all the proposed class members' injuries "arise from a common wrong."  Class Cert. Mot. 26.  They cite *In re Yahoo Mail Litig.,* 308 F.R.D. 577 (N.D. Cal. 2015), in which the court found that typicality was met where each class member was "subject to the same [unlawful] practices" by the defendant.  *Id.* at 593.  As stated above, Plaintiffs have demonstrated a common question of whether NG Defendants' failure to cross-offer the lowest rates within their control group was pursuant to a common policy, which would subject each class member to the same unlawful practices.  *See Olean*, 31 F.4th at 665

Defendants argue that Plaintiffs are not typical because they are subject to unique defenses: specifically, that Diedre King was never a policyholder because she was only a listed driver on Edd King's policy, and that the Kings made a misrepresentation on their initial policy application.  Class Cert. Opp'n 16-17.[11]  "[A] named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is

---

[11] The court does not consider Defendants' arguments regarding Plaintiffs' claims about INIC and MICG policies because the court already found Plaintiffs do not have standing to support those claims.

United States District Court
Northern District of California

1    preoccupied with defenses unique to it." *Belyea v. GreenSky, Inc.*, No. 20-CV-01693-JSC, 2025

2    WL 589037, at *19 (N.D. Cal. Feb. 24, 2025) (quoting *Hanon*, 976 F.2d at 508).  Defendants'

3    argument regarding Diedre King is not unique to her—it would apply to any class member who

4    was a listed driver on a spouse's policy.  Whether listed drivers can be considered policyholders is

5    a merits question likely common to many potential class members, and thus does not defeat

6    typicality.  *See id.* at 19-20 (finding that statute of limitations and arbitration defenses did not

7    defeat typicality where "thousands of class members" would be subject to the same defenses).

8    Furthermore, whether or not a listed driver on another's policy should be counted as a class

9    member does not affect the damages analysis.  Brown's model calculates damages for each policy

10   as a single unit, regardless of the number of listed drivers.  At the hearing, Plaintiffs confirmed

11   that if Diedre King is found to not be a policyholder, Edd King can proceed on his own behalf and

12   recover the same amount of damages the Kings would recover jointly.

13           As for Plaintiffs' alleged misrepresentation, Defendants argue that the Kings stated in their

14   policy application that they were married, but they were not in fact married until June 15, 2013.

15   This is a mere two weeks after the Kings purchased their renewal policy on June 2, 2013.

16   Defendants make much of this discrepancy.  They argue that Plaintiffs did not fulfill their

17   obligation under the contract "to provide truthful information," and so Plaintiffs could not have

18   entered into an implied covenant of good faith and fair dealing.  Class Cert. Opp'n 17 (citing

19   *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010)).

20   Defendants also suggest that Plaintiffs' breach of the implied covenant should be barred under the

21   unclean hands doctrine.  Class Cert. Opp'n 18.  But Plaintiffs point out that whether the Kings

22   were married or merely about to be married is not something listed as a "material

23   misrepresentation" under California insurance law justifying cancellation of a policy.  Cal. Ins.

24   Code § 661(a)(4).  Defendants have not persuaded the court that the Kings' "misrepresentation" is

25   so significant that they will be preoccupied litigating whether they should be deemed not to have

26   entered into a contract, or whether their claims should be barred under the unclean hands doctrine.

27   Despite Defendants' attempts to raise unique defenses, there is not significant danger that absent

28   class members will be prejudiced if the Kings go forward as class representatives.  *Belyea*, 2025

WL 589037, at *19.

Plaintiffs meet the typicality requirement.

### d.    Adequacy

Finally, Rule 23(a)(4) requires that the named plaintiffs, who seek to be class representatives, "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts engage in a dual inquiry to determine adequate representation and ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Volkswagen*, 2017 WL 672820, at *7.

Defendants argue again that Plaintiffs are subject to unique defenses, and thus have a conflict of interest with other class members. Class Cert. Opp'n 18. For reasons stated above, this argument is unpersuasive. Defendants also assert, speculatively, that Plaintiffs might have a conflict of interest with class members because of a factual dispute over whether each class member purchased their policy through a broker or an agent.[12] *Id.* As discussed below in the analysis of predominance, there is no longer a factual dispute over the identity of Defendants' brokers and agents. Defendants have not raised any real challenge to Plaintiffs' adequacy as class representatives.

Plaintiffs have been involved in preparing and appearing for depositions, participating in reviewing expert reports, responding to discovery requests, and collaborating with counsel for the last ten years. Class Cert. Mot. 25-26. Plaintiffs have amply demonstrated they can carry out the duties of class representatives. *See Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 552 (N.D. Cal. 2007) (finding that plaintiffs were adequate class representatives where they were familiar with "the basic elements of the case").

Defendants do not challenge the adequacy of class counsel and the record supports that counsel will fairly and adequately represent and protect the interests of the proposed class.

Plaintiffs have satisfied the adequacy of representation element.

---

[12] As the court previously held, only policyholders who purchased through agents, not brokers, can assert a claim in this case. Order on Supp. Briefing 8.

United States District Court
Northern District of California

### 3.    FRCP 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), Plaintiffs must also meet one of the three requirements of Rule 23(b) to certify the proposed class.  Plaintiffs seek certification of the class under Rule 23(b)(3), which states that a class action may be maintained if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *See* Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Rule 23(b)(3) also requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The superiority requirement focuses on "whether maintenance of [the] litigation as a class action is efficient and whether it is fair." *Volkswagen*, 2017 WL 672820, at *8.

### a.    Predominance

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024) (quoting *Tyson Foods*, 577 U.S. at 453).  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.*  "[M]ore important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Ruiz Torres v. Mercer Canyons Inc.,* 835 F.3d 1125, 1134 (9th Cir. 2016) (internal citations omitted).

"It is the plaintiff's burden to prove that class issues predominate. . . . However, a plaintiff need not rebut every individualized issue that could possibly be raised." *Van v. LLR, Inc.,* 61 F.4th 1053, 1066 (9th Cir. 2023).  The plaintiff only needs to demonstrate by a preponderance of the evidence that a common question of law or fact exists. *Id.* at 1066-67 (citing *Olean*, 31 F.4th

United States District Court
Northern District of California

1   at 666, 675.  "If the plaintiff demonstrates that class issues exist, the defendant must invoke

2   individualized issues and provide sufficient evidence that the individualized issues bar recovery on

3   at least some claims, thus raising the spectre of class-member-by-class-member adjudication of the

4   issue."  *Id.* at 1067 (citing *True Health Chiropractic, Inc. v. McKesson Corp.,* 896 F.3d 923, 932

5   (9th Cir. 2018)).  Only after the defendant has provided evidence that a valid defense will bar

6   recovery on some claims does the court determine whether the individualized issues will

7   "overwhelm common ones and render class certification inappropriate under Rule 23(b)(3)."  *Id.*

8   (citing *Olean*, 31 F.4th at 669).

9          Plaintiffs demonstrated a common question of law or fact.  Thus, the burden shifts to

10  Defendants to provide evidence that individualized issues may bar recovery.  Defendants argue

11  that an individualized inquiry is necessary to determine if each of Plaintiffs' proposed class

12  members was harmed.  Opp'n Class Cert. 19.  Defendants rely heavily on *Van.*  In that case, the

13  plaintiffs brought a class action alleging that Alaskan consumers were improperly charged a sales

14  tax on products purchased from the defendant.  *Van*, 61 F.4th at 1058-60.  The defendant made

15  two arguments that individual issues predominated: first, that some class members were informed

16  at the time of purchase about the improper sales tax, but voluntarily paid it anyway; and second,

17  that some class members received a discount which offset the improper sales tax, and thus lacked

18  meritorious claims.  *Id.* at 1064-69.  The Ninth Circuit held that the first argument did not defeat

19  class certification because the defendant had not raised any evidence to support it, but that the

20  second argument might defeat class certification because it could require individualized inquiries

21  for thousands of class members, and remanded to district court.  *Id.*

22         Defendants argue that individual issues predominate because there is no means of common

23  proof to determine: 1) whether a class member was a good driver and therefore qualified for a

24  GDD rate; 2) whether a class member purchased their policy through an agent or broker, and thus

25  whether Defendants are liable for any statutory violations; 3) whether a class member qualified for

26  an affinity group rate; 4) whether a class member would have accepted an offer to purchase the

27  lower-priced GDD policy, and thus whether the class member was harmed; and 5) damages.

28  Following *Van*, the court first evaluates whether Defendants have raised sufficient evidence to

1  demonstrate the existence of individual issues before determining whether those issues

2  predominate.

3                          **i.  Inaccurate Good Driver Records**

4          Section 1861.16(b) only applies to drivers who qualify for a good driver discount.

5  Defendants contend that a class member's good driver qualification is an individual issue because

6  Defendants' own records have been shown to be inaccurate on this point.  As evidence,

7  Defendants raise the example of one of the former named Plaintiffs in this case.  Defendants'

8  records indicated that Elmo Sheen was a good driver when he purchased his NGIC policy; but

9  Defendants learned in deposition that Sheen had a suspended driver's license at the time, and so he

10  did not qualify for a GDD policy and there was no section 1861.16(b) statutory violation.  Class

11  Cert. Opp'n 21-22; Patel Decl. ¶ 59.  Patel's declaration states, vaguely, that there are "various

12  reasons" why a suspended license may not appear on a driver's motor vehicle record, such as

13  "identity theft or another privacy reasons [sic]."  Patel Decl. ¶ 59.  Elmo Sheen is the only

14  example Defendants pointed to of a driver misidentified in Defendants' records as a good driver.

15          Plaintiffs have presented a means of common proof to determine a class member's good

16  driver status: Defendants' records.  The parties simply dispute the accuracy and reliability of those

17  records.  The court finds that the preponderance of the evidence weighs in favor of Plaintiffs that

18  the good driver status is susceptible to common proof.  Defendants' records were apparently

19  reliable enough for Defendants to issue Sheen a good driver policy without further investigation.

20  There is no evidence that anyone other than Sheen obtained a good driver policy without being

21  qualified for one.  Patel's declaration merely states that there are "various reasons" why Sheen's

22  suspended license may not have been reported on his motor vehicle record; it says nothing about

23  how common these issues are.  Patel Decl. ¶ 59.  It is pure speculation for Defendants to argue that

24  there are other policyholders erroneously identified as a good driver in Defendants' records.

25  Defendants' singular example of one incorrect data point does not render Defendants' entire

26  database unreliable for the purpose of determining whether a policyholder was a good driver.

27          Defendants' inaccurate good driver records do not create an individualized issue.

28                          **ii.  Agent or Broker Records**

United States District Court
Northern District of California

1    As the court has previously found, the section 1861.16(b) duty to cross-offer requires the

2    plaintiff's producer (the person or entity that sold plaintiff the insurance policy) to be an agent, not

3    a broker.  Order on Supp. Briefing 8.  Defendants argue that their records do not identify whether

4    a policy was purchased through an agent or broker.  Class Cert. Opp'n 22.  Defendants point to

5    former named Plaintiff Sheila Lee as their sole example.  Plaintiffs previously attempted to rely on

6    a single spreadsheet from Defendants which categorized Lee's producer as an "Agency" under a

7    column titled "DistributionChannel" to prove that Lee purchased from an agent.  Order on Supp.

8    Briefing 9-10.  The court found that this was not sufficient evidence to prove that Lee's producer

9    was an agent, because other evidence indicated that the "DistributionChannel" column did not

10   distinguish between brokers and agents, and because Defendants also offered the contract between

11   Lee's producer and Defendants which clearly identified Lee's producer as a broker, not an agent.

12   *Id.*

13   Based on the court's findings with respect to Lee, Defendants attempt to argue that

14   Plaintiffs have no viable method to establish on a class-wide basis which producers were agents as

15   opposed to brokers.  Defendants stretch the court's findings on Lee too far.  The court only found

16   that Plaintiffs failed to demonstrate that the "DistributionChannel" column as used by Lee

17   accurately distinguished between agents and brokers.  Plaintiffs now raise other evidence

18   demonstrating that Defendants have the ability to determine whether a policyholder purchased

19   from an agent or broker through class-wide means.  Reply Class Cert. 2-4.  Wolfram testified it

20   was possible to sort between agents and brokers in NPS.  [Docket Nos. 452-2 (Shelby Serig Decl.,

21   Feb. 13, 2025) ¶ 7; 452-8 (Wolfram Dep., March 7, 2023) at 103-104, 115-116].  Wolfram also

22   testified that, if the producer data was not readily available to Defendants—such as if the data

23   came from Defendants' legacy data system which could not sort between agents and brokers—

24   Defendants could access the National Insurance Producer Registry to determine whether a

25   particular producer was an agent or broker.  Wolfram Dep. 119-122.  Alternatively, Patel testified

26   that Defendants may "physically review the specific contract entered into with [each] producer

27   and confirm whether the producer is a broker or an agent."  Patel Decl. ¶ 26.

28   Defendants complain there are "thousands" of brokers who sold Defendants' policies,

United States District Court
Northern District of California

potentially necessitating thousands of manual examinations by Defendants to determine whether a particular producer was an agent or a broker.  Class Cert. Opp'n 22.  "The need to manually review files is not dispositive.  If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained."  *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 545 (E.D. Cal. 2014) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 540 (6th Cir. 2012)).  Indeed, "class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people.  To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies."  *Id.*  Plaintiffs have identified a way for Defendants to use their own data to determine producer information on a class-wide basis.  Neither party disputes the reliability of Wolfram's or Patel's testimony, the National Insurance Producer Registry, or Defendants' records on their contracts with producers.  Even if there were a dispute, the same common evidence would apply for every class member who purchased through that producer.  Defendants at most complain of the potential burden on *Defendants* to sort through their own records, but that does not raise the "spectre of class-member-by-class-member adjudication of the issue."  *Van,* 61 F.4th at 1067.

Defendants' method of obtaining producer data does not create an individualized issue.

### iii. Affinity Group Eligibility

Plaintiffs argue that Defendants are required to cross-offer certain affinity group policies with lower rates, such as affinity groups where the only eligibility criteria is payment of a fee.  Class Cert. Mot. 11-12.[13]  Defendants argue they should not have to cross-offer any of their affinity group policies because some insureds may not want to join an affinity group policy or may not want to pay the membership fee.  Class Cert. Opp'n 23-24.  The NG Defendants' duty to cross-offer an affinity group policy is separate from the driver's decision to join an affinity group in order to accept that policy; the question of consumer choice is analyzed below.  As to the first

---

[13] For the reasons stated above, the court does not consider Laucher's and Nash's opinions on this legal issue.

1    issue, Defendants fail to raise any meritorious argument that they do not have a duty to cross-offer

2    affinity groups where the only eligibility criteria is paying a membership fee.  Moreover, whether

3    Defendants had a duty to cross-offer a particular affinity group policy is a merits question

4    common to the entire class.  It does not create an individualized issue.

5         Defendants also argue that their records are insufficient to demonstrate when a class

6    member qualifies for an affinity group.  Class Cert. Opp'n 23.  This supposed problem is not at

7    issue here.  Plaintiffs concede that affinity groups that require an individualized eligibility

8    determination are not included in the Lowest Rates Rule analysis.  *See* Brown Report ¶ 16 (stating

9    that Plaintiffs' damages model did not include a cross-comparison of affinity group rates with

10   special eligibility criteria).  The only affinity group policies Plaintiffs claim are subject to the

11   cross-offer obligation are those which do not require any individual determination of eligibility,

12   such as groups where eligibility is based solely on paying a fee.

13        In sum, affinity group eligibility does not create an individualized issue.

### iv.  Consumer Choice

15        "Considering whether questions of law or fact common to class members predominate

16   begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc.*

17   *v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (internal quotation marks and citation omitted).

18        The UCL prohibits unfair competition, which is defined as, inter alia, "any unlawful, unfair

19   or fraudulent business act or practice."  Cal. Bus. Prof. Code § 17200.  Plaintiffs bring their UCL

20   claim under the "unlawful" prong and the "unfair" prong.  Mot. Class Cert. 28.  To state a claim

21   under the unlawful prong, a plaintiff must allege facts that show that a defendant's business

22   practice—or conduct which can be characterized as a business practice—violates the law,

23   including statutory or regulatory law.  *California v. McKale*, 25 Cal.3d 626, 632 (1979).  Whether

24   a business practice is "unfair" requires an analysis of whether (i) there exists substantial consumer

25   injury, (ii) the injury is not outweighed by countervailing benefits to consumers or competition,

26   and (iii) the injury was not reasonably avoidable by the consumer.  *Camacho v. Auto. Club of So.*

27   *Cal.*, 142 Cal. App. 4th 1294, 1403 (2006).  To have standing under the UCL, a plaintiff must

28   demonstrate "lost money or property as a result of" the challenged conduct.  *Ehret v. Uber Techs.*,

United States District Court
Northern District of California

1   *Inc.*, 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014) (quoting Cal. Bus. & Prof. Code § 17204).

2         To state a claim for breach of the implied covenant of good faith and fair dealing, a

3   plaintiff must allege the following elements: "(1) the parties entered into a contract; (2) the

4   plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the

5   defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights

6   to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's

7   conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).

8   The "implied covenant imposes upon each party the obligation to do everything that the contract

9   presupposes they will do to accomplish its purpose." *Chateau Chamberay Homeowners Ass'n v.*

10  *Associated Int'l Ins. Co.,* 90 Cal. App. 4th 335, 345 (2001). The obligations imposed by the

11  implied covenant are not those set out in the terms of the contract, but are obligations governing

12  the manner in which contractual obligations must be discharged. *See Gruenberg v. Aetna Ins.*

13  *Co.,* 9 Cal.3d 566, 574 (1973) (implied covenant imposes obligations "under which the insurer

14  must act fairly and in good faith in discharging its contractual responsibilities").

15        Defendants argue that whether class members suffered harm caused by Defendants'

16  policies requires individualized inquiry because some class members may not have accepted a

17  lower-rate policy even if it had been offered. Class Cert. Opp'n 24-25. Defendants submit

18  testimony that each of Defendants' different carriers and policies have unique elements such as

19  how much coverage non-listed drivers receive, rental vehicle coverage, methods for calculating

20  payment in total loss scenarios, repair coverage policies, and deductible options. Patel Decl. ¶ 27-

21  36. These unique elements may be important to different drivers depending on their individual

22  situation, and so "it cannot be assumed that an insured would automatically accept a policy from

23  another carrier that offered a lower premium but different coverages, limits or deductibles."

24  [Docket No. 446 (Rainy Tayal Decl., Jan. 29, 2025) ¶ 26.] "For many insureds, factors other than

25  price matter. . . . An insured may be happy with their current carrier; or, an insured who highly

26  values rental car coverage, may not be willing to accept a 'substantially similar' policy from

27  another insurer without rental car coverage, even if that policy was cheaper." Patel Decl. ¶ 21. As

28  such, it would require individualized inquiry to determine if each class member would have

39

United States District Court
Northern District of California

1  accepted a lower-rate policy if offered, and therefore, if each class member suffered a harm.

2      First, a clarification.  As the court previously found, "coverage" as used in section 1861.16

3  refers to three "primary types" of automobile insurance coverage: liability, physical damage, and

4  collision.  Order on Supp. Briefing 27.  The court found that the Lowest Rates Rule applied

5  regardless of ancillary coverage benefits such as rental vehicle coverage.  *Id.* at 30-31.  The court

6  did not reach whether the Lowest Rates Rule would apply where policies have different limits or

7  deductibles.  *Id.*  Here, Defendants argue that even if they did violate the statutory duty to cross-

8  offer, a class member still cannot bring a claim under the UCL or the breach of the implied

9  covenant without also individually proving that the class member would have accepted the lower-

10  rate policy.

11      Defendants' position boils down to an argument about reliance: that to prove a class

12  member's claims for violation of the UCL and breach of the implied covenant, the class member

13  must demonstrate they would have actually relied on Defendants' cross-offer and accepted the

14  lower-rate policy.

15      With respect to the UCL, actual reliance is not a required element for the claims in this

16  case.  Reliance is "the causal mechanism of fraud" and must be shown in UCL actions based on a

17  fraud theory.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 325-326 (2009).  But reliance is not an

18  element of a claim under the UCL unlawful or unfair prongs which are not based on fraud.

19  *Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 12 (2012), *as modified on denial of reh'g*

20  (Apr. 16, 2012) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 325 n.17 (2009)).  For example, in

21  *Medrazo*, the plaintiff sought class certification because a motorcycle seller failed to follow a

22  statutory requirement to attach a label indicating the retail price and dealer-added charges on new

23  motorcycles.  *Id.* at 4-5.  The defendant argued there was no injury because the plaintiff was

24  informed of the dealer-added charges in the sales contract before actually purchasing the

25  motorcycle, so there was no evidence that she (or any other class member) would have behaved

26  any differently if the defendant had followed the law.  *Id.* at 9, 11.  The California appellate court

27  found that reliance was irrelevant to the plaintiff's legal theories under the UCL unlawful and

28  unfair prongs.  *Id.* at 12.  The plaintiff sufficiently demonstrated harm by showing that the

defendant violated her legal right to be informed about the dealer-added charges before negotiating the sales contract, and by showing that she paid for a motorcycle that the defendant used such unlawful means to sell. *Id.* at 13-14. This harm could be determined based on class-wide proof. *Id.* at 14. Therefore, the court reversed the lower court's denial of class certification. *Id.* at 13-14.

Defendants' argument resembles the one that was foreclosed in *Medrazo.* Plaintiffs have demonstrated a means of common proof that Defendants had a common policy of unlawfully failing to cross-offer the lowest GDD rates, and that class members purchased policies under those circumstances. *See Medrazo*, 205 Cal. App. 4th at 13-14; *see also Miller v. Travel Guard Grp., Inc.*, No. 21-CV-09751-TLT, 2023 WL 7106479, at *16 (N.D. Cal. Sept. 15, 2023) (finding that plaintiffs did not need to show that class members would have chosen less expensive travel insurance to demonstrate "harm under an unlawful theory, i.e., Defendants allegedly charged a hidden fee on top of an insurance premium, in violation of California insurance law"). This is sufficient for class certification of a UCL unlawful or unfair case. Defendants do not offer any case where individual reliance was treated as an element of a claim in a UCL case that was not based on fraud. They cannot bring reliance in the "backdoor" under a causation analysis where it is not an element of the underlying claim. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.,* 609 F. Supp. 3d 942, 980 (N.D. Cal. 2022) (finding that individual questions of reliance did not defeat predominance in a RICO class action because reliance was not an element of a RICO claim).

The court's analysis of Plaintiffs' breach of the implied covenant of good faith and fair dealing reaches a different result. Under California law, it is an essential element of contract-based claims (including breach of the implied covenant) that the plaintiff suffered damages proximately caused by the defendant's breach, and that their causal occurrence be "at least reasonably certain." *Vu v. California Com. Club, Inc.,* 58 Cal. App. 4th 229, 233 (1997); *see also Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.,* 34 Cal. 4th 960, 968 (2004) (holding that contract damages must "flow directly and necessarily from a breach of contract," or must be "reasonably foreseeable" when the contract was formed). Unlike with the UCL, reliance

United States District Court
Northern District of California

United States District Court
Northern District of California

1 can implicate the causation analysis in a breach of contract. For example, in *Small v. Allianz Life*

2 *Ins. Co. of N. Am.,* 122 F.4th 1182 (9th Cir. 2024), the plaintiffs moved to certify a class against

3 the defendant insurer alleging breach of contract for violating California Insurance Code sections

4 10113.71 and 10113.72. Those statutes require insurers to follow mandatory notice provisions

5 when a life insurance policyholder fails to pay premiums, in order to prevent life insurance

6 policies from inadvertently lapsing. *Id.* at 1188. In reality, it is common for life insurance

7 policyholders to intentionally allow their policies to lapse as a means of canceling their policy

8 without informing the insurer. *Id.* at 1191. The Ninth Circuit held that to prove a breach of

9 contract, the plaintiffs had to prove they did not intend for their policies to lapse in order to

10 establish that the defendant's failure to provide notice caused them harm. *Id.* at 1197. Simply

11 showing a statutory violation was not enough. *Id.* The defendant's expert conducted a random

12 sampling of 100 class member policies and found that almost half of the policy files had evidence

13 that the policyholder knowingly allowed their policy to lapse, and that determining the reason for

14 a lapse generally required an individual review of a policy file that could take hours. *Id.* at 1199.

15 The Ninth Circuit concluded that individual questions of causation and injury predominated over

16 the common question of whether the defendant violated the statutes. *Id.* at 1200.

17     Here, unlike in *Small,* Defendants only speculate that price may not be the most important

18 factor for "many insureds" when choosing between PPA policies. *See* Patel Decl. ¶ 21. There is

19 no indication of how many policyholders would turn down a lower-rate policy if offered, or even a

20 single example of a policyholder who actually did so. However, Defendants do present evidence

21 that there are a number of differences between their policies which were never addressed by

22 Plaintiffs. *See id.* ¶ 27-36. Plaintiffs, meanwhile, repeatedly fall back on the conclusory and

23 unproven assumption that any driver would naturally accept an offer of the same insurance

24 coverage for a lower price. Defendants' whole point is that these are not the same coverages, and

25 that at least some drivers are willing to pay a higher price for benefits that go beyond the basic

26 coverage amounts, such as having more coverage for non-listed drivers, or having full coverage

27 when the insured drives rental vehicles. Plaintiffs fail to meaningfully engage with this point.

28 Nash and Laucher did not offer any opinions about consumer preference. Brown simply testified,

1    "it is reasonable to assume a policyholder would accept an additional amount of coverage at a

2    lower rate" (and his model implicitly assumes that a policyholder would accept the same amount

3    of coverage at a lower rate).  Brown Report ¶ 42.  Brown did not support this assumption with any

4    explanation, and does not address the issue of policies that have the same amount of basic

5    coverage (i.e. liability, physical damage, collision) but different ancillary benefits.[14]  Plaintiffs'

6    only other evidence is testimony from the Kings, who stated they would have purchased a lower-

7    priced policy from the control group if offered.  Edd King Decl. ¶¶ 4-5; Diedre King Decl. ¶¶ 4-5.

8    The Kings were not testifying on behalf of the whole class on this point, nor can they.

9          While Plaintiffs argued at length that *Small* is inapplicable to Plaintiffs' UCL claim,

10   Plaintiffs were notably silent about *Small*'s effect on their breach of implied covenant claim.[15]

11         Plaintiffs have had multiple opportunities to address Defendants' arguments on consumer

12   choice.  To date, Plaintiffs have not raised any legal theory to overcome Defendants' arguments,

13   nor have they raised any evidence of a method of common proof to determine proximate causation

14   on a class-wide basis for their breach of implied covenant claim.  The court finds that individual

15   issues predominate as to causation and damages for Plaintiffs' breach of implied covenant claim,

16   and therefore denies class certification as to that claim.  *See Parducci v. AMCO Ins. Co.,* No. 18-

17   CV-07162-WHO, 2021 WL 5908379, *7 (N.D. Cal. Dec. 14, 2021) (denying class certification in

18   a breach of implied covenant case against an insurer because, among other things, the

19   determination of liability would require individual assessments of "why the applicable coverage

20   amount was selected, whether coverage affords the insured a desired level of comfort, security,

21   and peace-of-mind, and whether coverage meets the insured's personal and third party contractual

22

23   _____

24   [14] Plaintiffs argued at the hearing that Brown only applied the Lowest Rates Rule if the policies
     were exactly the same, but Plaintiffs were unable to point to any portion of Brown's testimony that
     actually supports that conclusion, and the court could not identify it in the record.  The court will
25   not consider methodology that was not clearly explained in the renewed class certification record.

26   [15] Defendants did not cite *Small,* 122 F.4th 1182 in their class certification papers, but discussed
     *Small* at length at the March 27, 2025 motion hearing.  On April 4, 2025, Plaintiffs moved for
27   leave to submit a three-page brief to address *Small*.  [Docket No. 474.]  The court grants Plaintiffs'
     motion solely for the purpose of briefing *Small*, but does not consider Plaintiffs' attempts to raise
28   additional evidence or arguments that they had the opportunity to make earlier.  The court denies
     Defendants' request to file a response brief.  [Docket No. 475.]

United States District Court
Northern District of California

1    needs").

2         The court finds that consumer choice does not defeat predominance as to Plaintiffs' UCL

3    claim under the unlawful and unfair prongs.

4                                    **v.  Damages**

5         Finally, Defendants attack Plaintiffs' damages model as not suitable for calculating class-

6    wide damages.  Class Cert. Opp'n 27.

7         "[T]he presence of individualized damages cannot, by itself, defeat class certification

8    under Rule 23(b)(3)."  *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir. 2013).  However,

9    a plaintiff seeking certification under Rule 23(b)(3) must show that damages are capable of

10   measurement on a class-wide basis.  *Comcast Corp. v. Behrand*, 569 U.S. 27, 35 (2013).  "[A]t the

11   class-certification stage (as at trial), any model supporting a plaintiff's damages case must be

12   consistent with its liability case."  *Id.* (internal quotation marks and citation omitted).  The plaintiff

13   need only show "that damages *could* be calculated on a classwide basis, even where such

14   calculations have not yet been performed."  *Lytle v. Nutramax Lab'ys, Inc.,* 114 F.4th 1011, 1025

15   (9th Cir. 2024), *cert. denied,* No. 24-576, 2025 WL 663695 (U.S. Mar. 3, 2025).

16        Defendants first rehash their *Daubert* arguments, which the court rejects for the reasons

17   stated above.  Defendants then argue that their records are insufficient to accurately calculate

18   damages, but as discussed above, Defendants' data deficiencies do not create individual issues

19   which would defeat predominance.  The data deficiencies may go toward the persuasiveness of

20   Brown's model, but "persuasiveness is, in general, a matter for the jury."  *Tyson Foods*, 577 U.S.

21   at 459.  Plaintiffs do not have to actually prove damages at the class certification stage, only that

22   damages are "capable of measurement on a classwide basis."  *Comcast Corp.*, 569 U.S. at 34.

23        Defendants raise a somewhat convoluted argument that Brown's model is inconsistent with

24   Plaintiffs' liability case because his model cannot effectively capture class members' eligibility for

25   affinity groups.  Class Cert. Opp'n 28.  For example, Brown cannot simply include the MICG

26   affinity group in his comparison analysis because not every class member qualifies as a GM,

27   Hughes, or Raytheon employee.  At the same time, Brown cannot simply exclude the MICG

28   affinity group because some class members may qualify for the group.  This is a potential point of

United States District Court
Northern District of California

44

tension in the class damages calculation (setting aside the fact that Defendants elsewhere argue that there is no duty to cross-offer an affinity group rate even if the class member is eligible). The court finds that the issue is not so significant that it overwhelms the common questions in this case that will drive the resolution of the litigation. "Predominance is not . . . a matter of nose-counting." *Ruiz Torres,* 835 F.3d at 1134. Hypothetically, there may exist a class member who qualified for an affinity group with special eligibility requirements but who purchased a higher rate policy instead. However, Defendants offer no evidence that any such class member actually exists. "We do not permit a defendant to support its invocation of individualized issues with mere speculation." *Van,* 61 F.4th at 1068. The court will not deny class certification based on a hypothetical possibility.

Defendants also argue that Brown's model fails to account for "the value of the insurance policies actually purchased by class members." Class Cert. Opp'n 28. For example, some class members may have already filed claims under their existing policies. Defendants fail to explain how simply calculating a setoff for claims already filed would create an individual issue. Defendants then attempt to argue that the policies have "inherent value" not captured by Brown's model, such as different ancillary benefits. Brown's model is based on the estimated premium charged for an entire policy, which obviously takes into account the value of the entire policy. The case cited by Defendants, *Freitas v. Cricket Wireless, LLC,* No. C 19-07270 WHA, 2022 WL 3018061, at *3 (N.D. Cal. July 29, 2022), is inapposite. In *Freitas,* the plaintiff's claim required the plaintiff to "isolate the price premium attributable only to overcharges due to misrepresentations about 4G coverage," and the model failed to do so because it did not control for the various factors affecting the price. *Id.* Here, Brown calculated the difference between the offered GDD rate and the lowest available GDD rate, which matches Plaintiffs' theory of liability.

Defendants have not pointed to any individual questions that predominate over the common questions of the class for Defendants' UCL claim. The court finds that the predominance requirement is met for that claim.

### b.      Superiority

Rule 23(b)(3) lists four non-exclusive factors courts should consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (citing § 1780 Class Actions in Which Common Questions Predominate Over Individual Questions—Matters to Be Considered by the Court, 7AA Fed. Prac. & Proc. Civ. § 1780 (2d ed. 1986)).

"Where damages suffered by each putative class member are not large," the first factor weighs in favor of certifying a class action. *Zinser*, 253 F.3d at 1190. Defendants do not dispute that the damages suffered by each putative class member here are relatively modest. This factor weighs in favor of certification.

As for the second and third factors, the record does not indicate that any other actions are pending concerning this controversy, and the class allegations are limited to California GDD policies so it would be desirable to concentrate litigation in a California forum. These factors weigh in favor of certification.

Defendants challenge the fourth factor, arguing that the class is not manageable or ascertainable. The Ninth Circuit has declined to adopt a separate "administrative feasibility requirement." *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121, 1133 (9th Cir. 2017). Defendants simply restate the arguments previously made in the joint liability and predominance sections. Since the court has already found that Defendants' arguments do not have merit, the court will not reconsider them here.

The common questions in this case predominate as to Plaintiffs' UCL claim, and class treatment is superior to litigating this case as individual actions.

## C. Conclusion

The court finds that Plaintiffs lack standing to assert a claim against PEIC. PEIC is

1    dismissed as a Defendant.

2    The court grants Plaintiffs' renewed motion for class certification as to their UCL claim

3    alleging unfair and unlawful business practices in violation of Cal. Ins. Code section 1861.16(b).

4    The court denies Plaintiffs' motion as to their claim for breach of the implied covenant of good

5    faith and fair dealing.

6    The court certifies this modified class definition:

7    Policyholders of NG Defendants (NGIC, INIC, IPIC, and MICG)
     who purchased California GDD private passenger automobile
8    policies, including renewals, and were not offered the lowest
     available GD rate within the control group during the Class Period.
9    The control group is defined as NGIC, INIC, IPIC, and MICG from
     January 22, 2011 to present; and includes PEIC during the period of
10   April 19, 2013 to July 18, 2014.

11

12   **IT IS SO ORDERED.**

13   Dated: May 5, 2025

14   _____

15   Donna M. Ryu
     Chief Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

47