Michael F. Ram, SBN 104805
mram@forthepeople.com
Marie N. Appel, SBN 187483
mappel@forthepeople.com
Colin G. Losey, SBN 352223
colin.losey@forthepeople.com
Abraham Barkhordar, SBN 359425
abarkhordar@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 846-3862

Jeffrey B. Cereghino, SBN 99480
jbc@cereghinolaw.com
CEREGHINO LAW GROUP LLP
739 Bryant Street
San Francisco, CA 94107
Telephone: (415) 433-4949

W. Craig Bashein, Admitted *Pro Hac Vice*
John P. Hurst, Of Counsel,
Admitted *Pro Hac Vice*
BASHEIN & BASHEIN CO., L.P.A.
Terminal Tower
35th Floor, 50 Public Square
Cleveland, Ohio 44113
Telephone: (216) 771-3239

*Attorneys for Plaintiffs and Class*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDD KING, DIEDRE KING, ELMO SHEEN, and SHEILA LEE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL GENERAL INSURANCE COMPANY, INTEGON NATIONAL INSURANCE COMPANY, INTEGON PREFERRED INSURANCE COMPANY, MIC GENERAL INSURANCE CORPORATION,<br><br>Defendants. | No. 4:15-cv-00313-DMR<br><br>**NOTICE OF MOTION AND MOTION OF PLAINTIFF CLASS FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL GENERAL INSURANCE COMPANY, INTEGON NATIONAL INSURANCE COMPANY, INTEGON PREFERRED INSURANCE COMPANY AND MIC GENERAL INSURANCE CORPORATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: July 10, 2025<br>Time: 1:00 p.m.<br>Dept.: Courtroom 4 – 3rd Floor<br>  Oakland Courthouse<br>Honorable Chief Magistrate Judge Donna M. Ryu<br><br>Action Filed: January 22, 2015 |

PLAINTIFFS' NOTICE OF MOTION AND                    NO. 4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on July 10, 2025, at 1:00 p.m., or as soon thereafter as the matter may be heard in the above Court located at 1301 Clay Street, Oakland, CA 94612, Plaintiffs, Edd King and Diedre King, will and hereby do move the Court for partial summary judgment on liability pursuant to Federal Rule of Civil Procedure 56. This Motion is based on this Notice; the Memorandum of Points and Authorities; the Declarations of John Hurst, Jeff Nash, Joel Laucher, Larry Lastofka, Scott Brown, Diedre King and Edd King; Plaintiffs' Evidence in Support of Motion for Partial Summary Judgment, the accompanying Proposed Order, as well as any additional matters this Court may rely on or judicially notice.

Dated: June 5, 2025                    By:        _/s/ Michael F. Ram_

Michael F. Ram, SBN 104805
mram@forthepeople.com
Marie N. Appel, SBN 187483
mappel@forthepeople.com
Colin G. Losey, SBN 352223
colin.losey@forthepeople.com
Abraham Barkhordar, SBN 359425
abarkhordar@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 846-3862
Facsimile: (415) 358-6923

Jeffrey B. Cereghino, SBN 99480
jbc@cereghinolaw.com
CEREGHINO LAW GROUP LLP
739 Bryant Street
San Francisco, CA 94107
Telephone: (415) 433-4949

W. Craig Bashein, Admitted *Pro Hac Vice*
cbashein@basheinlaw.com
John P. Hurst, Of Counsel
Admitted *Pro Hac Vice*
jhurst@basheinlaw.com
BASHEIN & BASHEIN CO., L.P.A.
Terminal Tower
35th Floor, 50 Public Square
Cleveland, Ohio 44113
Telephone: (216) 771-3239

*Attorneys for Plaintiffs and Proposed Class*

PLAINTIFFS' NOTICE OF MOTION AND                              NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF ISSUES TO BE DECIDED ..................................................3

III.  STATEMENT OF UNCONTROVERTED MATERIAL FACTS ........................4

   A.   SECTION 1861.16(B) REQUIRED NG DEFENDANTS' AGENTS AND REPRESENTATIVES TO CROSS-OFFER, AND NG DEFENDANTS TO SELL, THE LOWEST AVAILABLE GDD RATE FROM WITHIN THEIR CONTROL GROUP OF INSURERS. ..........................................4

   B.   DEFENDANTS ARE ALL PART OF THE SAME CONTROL GROUP. ........................................4

   C.   NG DEFENDANTS EITHER FAILED TO FILE AN EXHIBIT 19 OR EXHIBIT 17, OR THEIR FILING ACKNOWLEDGES COMMON MANAGEMENT. ..........................................6

   D.   NG DEFENDANTS ARE STILL PART OF A COMMON CONTROL GROUP AND HAVE NOT FILED AN EXHIBIT 19 OR 17 SUFFICIENT TO MEET THE SUPER GROUP EXEMPTION. ....................................6

   E.   NG DEFENDANTS KNEW THAT THEIR AGENTS AND REPRESENTATIVES HAD A DUTY TO CROSS-OFFER, YET THEY ACTED IN CONCERT TO PREVENT THEIR AGENTS AND REPRESENTATIVES FROM DISCHARGING THIS STATUTORY DUTY. ..........................................6

   F.   PLAINTIFFS AND CLASS MEMBERS WERE DAMAGED BY THE UNLAWFUL FAILURE OF NG DEFENDANTS' AGENTS AND REPRESENTATIVES TO CROSS-OFFER. ....................................9

   G.   ANY INSURED IS ELIGIBLE FOR AN AFFINITY GROUP THAT ONLY REQUIRES A FEE. ....................10

IV.   ARGUMENT...................................................................................................12

A.   LEGAL STANDARD FOR SUMMARY JUDGMENT. ........................................12

   B.   NG DEFENDANTS ACTED IN CONCERT TO ENSURE THAT THEIR AGENTS AND REPRESENTATIVES VIOLATED THEIR STATUTORY DUTY TO CROSS-OFFER UNDER SECTION 1861.16(B)..........................................12

   C.   THE FAILURE OF NG DEFENDANTS' AGENTS AND REPRESENTATIVES TO CROSS-OFFER IS IMPUTED TO NG DEFENDANTS THROUGH THEIR AGENCY RELATIONSHIP AND THEIR CONCERTED ACTION. ..........................................13

   D.   ACTING IN CONCERT AS A CONTROL GROUP AND SINGLE ENTERPRISE, NG DEFENDANTS ARE JOINTLY LIABLE FOR THEIR AGENTS AND REPRESENTATIVES' VIOLATION OF THEIR STATUTORY DUTY TO CROSS-OFFER UNDER THE SINGLE ENTERPRISE THEORY OF LIABILITY. 17

   E.   NG DEFENDANTS ARE JOINTLY LIABLE FOR THEIR AGENTS AND REPRESENTATIVES' VIOLATION OF THEIR STATUTORY DUTY TO CROSS-OFFER UNDER THE CONCERTED ACTION PRINCIPLES OF THE REST. (SECOND) OF TORTS SECTION 876...........................................19

      1.   Defendants are jointly liable based on civil conspiracy – Rest. (Second) of Torts section 876(a)..........................................20

i

2.   Defendants are jointly liable for civil aiding and abetting—Rest. (Second) of Torts section 876(b). ...................................................................................................21

F.   NG DEFENDANTS ARE LIABLE UNDER THE UCL FOR UNLAWFUL AND UNFAIR PRACTICES. ...23

1.   NG Defendants are liable under Plaintiffs' "unlawful" count as a matter of law. ..........23

2.   As a matter of law, the uncontroverted facts establish an "unfair business practice" for violation of the balancing and public policy tests. ..........................................................23

3.   Plaintiffs have no adequate remedy at law. ...................................................................24

V.   CONCLUSION.................................................................................................................25

PLAINTIFFS' NOTICE OF MOTION AND                                    NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**

**Cases**

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) ...................................................................................................... 20

*Backus v. Gen. Mills, Inc.*,
122 F. Supp. 3d 909 (N.D. Cal. 2015) ........................................................................ 23, 24

*Bailey v. Household*,
2011 WL 12854796 (S.D. Cal. June 29, 2011) ............................................................. 12

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests ., Inc.*,
213 F.3d 474 (9th Cir. 2000) ......................................................................................... 12

*Camacho v. Automobile Club of S. Cal.*,
142 Cal.App.4th 1394 (2006) ........................................................................................ 23

*Cappello v. Walmart Inc.*,
394 F. Supp. 3d 1015 (N.D. Cal. 2019) ......................................................................... 23

*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal.4th 163 (1999) .................................................................................................... 23

*Dallas & Lashmi, Inc. v. 7-Eleven, Inc.*,
112 F. Supp. 3d 1048 (C.D. Cal. 2015) ......................................................................... 23

*Hansen v. United States*,
7 F.3d 137 (9th Cir. 1993) .............................................................................................. 12

*Hilario v. Allstate Ins. Co.*,
642 F. Supp. 3d 1048 (N.D. Cal. 2022) ......................................................................... 22

*In re First Alliance Mortgage Co.*,
471 F.3d 977 (9th Cir. 2006) .......................................................................................... 22

*In re McKinsey & Co., Inc. Nat'l Prescription Opiate Litig.*,
2024 WL 2261926 (N.D. Cal. May 16, 2024) ...................................................... 20, 21, 22

*In re PFA Ins. Mktg. Litig.*,
696 F. Supp. 3d 822 (N.D. Cal. 2022) ..................................................................... 20, 21

*Kemp v. Wells Fargo Bank, N.A.*,
2017 WL 4805567 (N.D. Cal. Oct. 25, 2017) ................................................................ 22

*Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*,
235 Cal. App. 3d 1220 (1991) ........................................................................................ 17

*Lin v. Solta Med., Inc.*,
760 F. Supp. 3d 926 (N.D. Cal. 2024) ............................................................................ 12

*Lozano v. AT & T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007) .......................................................................................... 23

PLAINTIFFS' NOTICE OF MOTION AND                    NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

*McLoughlin v. L. Bloom Sons Co., Inc.*,
206 Cal. App. 2d 848 (1962) ........................................................................................... 17, 18

*Murphy v. Olly Pub. Benefit Corp.*,
651 F. Supp. 3d 1111 (N.D. Cal. 2023) .................................................................................. 24

*Navarrete v. Meyer*,
237 Cal. App. 4th 1276 (2015) .............................................................................. 19, 20, 21

*Newton v. Am. Debt. Servs., Inc.*,
75 F. Supp. 3d 1048 (N.D. Cal. 2014) .................................................................................. 20

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
213 F. Supp. 2d 1146 (C.D. Cal. 2002) ................................................................................ 19

*Rose v. Bank of Am., N.A.*,
57 Cal. 4th 390 (2013) ......................................................................................................... 23

*Rubio v. Capital One Bank*,
613 F.3d 1195 (9th Cir. 2010) ......................................................................................... 23, 24

*S. Cal. Gas Co. v. City of Santa Ana*,
336 F.3d 885 (9th Cir. 2003) ............................................................................................... 12

*Saunders v. Super. Ct.*,
27 Cal. App. 4th 832 (1992) ................................................................................................ 19

*Sindell v. Abbott Lab'y*,
26 Cal. 3d 588 (1980) .......................................................................................................... 19

*Stueve Bros Farms, LLC v. Berger Kahn*,
222 Cal. App. 4th 303 (2013) .............................................................................................. 22

*Tan v. Quick Box, LLC*,
2024 WL 150611 (S.D. Cal. Jan 12, 2024) .......................................................................... 20

*Toho-Towa Co., Ltd. v. Morgan Creek Prods., Inc.*,
217 Cal. App. 4th 1096 (2013) ............................................................................................ 17

*Tran v. Farmers Grp., Inc.*,
104 Cal. App. 4th 1202 (2003) ............................................................................................ 17

*Valiente v. Simpson Imports, Ltd.*,
717 F. Supp. 3d 888 (N.D. Cal. 2024) .................................................................................. 24

*Wallis v. Centennial Ins. Co.*,
2013 WL 3803971 (E.D. Cal. July 19, 2013) ....................................................................... 17

**Statutes**

Cal. Civ. Code § 233 .............................................................................................................. 16
Cal. Ins. Code § 1816.16 ............................................................................................... 3, 13, 19
Cal. Ins. Code § 1861.02 ......................................................................................................... 9
Cal. Ins. Code § 1861.025 ....................................................................................................... 9

PLAINTIFFS' NOTICE OF MOTION AND                    NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

Cal. Ins. Code § 1861.16(b) .................................................................................................. passim
Cal. Ins. Code § 1861.16(c) ......................................................................................................... 4
Cal. Ins. Code § 1861.16(c)(1)(A) .............................................................................................. 4
Cal. Ins. Code § 1861.16(c)(1)(A)-(H) ........................................................................... 4, 14, 19
Cal. Ins. Code § 1861.16(c)(1)(B)-(C) ......................................................................................... 5
Cal. Ins. Code § 1861.16(c)(1)(D) ............................................................................................... 5
Cal. Ins. Code § 1861.16(c)(1)(E) ................................................................................................ 5
Cal. Ins. Code § 1861.16(c)(1)(F) ................................................................................................ 5
Cal. Ins. Code § 1861.16(c)(1)(G) ............................................................................................... 5
Cal. Ins. Code § 1861.16(c)(1)(H) ............................................................................................... 5
Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200 *et seq* ....................................... 23, 24

**Other Authorities**

California Insurance Commissioner Bulletin 2024-14 (Nov. 25, 2024) ..................................... 1, 4
Judge Karen L. Stevenson & James E. Fitzgerald, Rutter Practice Guide—Federal Civil Procedure
    Before Trial § 14:202 (Calif. and 9th Cir. Ed. April 2025 update) ...................................... 12
Prosser, Law of Torts (4th ed. 1971) § 46 .................................................................................. 20
Restatement (Second) of Torts § 876 ................................................................................... 19, 20
Restatement (Second) of Torts section 876(a) ............................................................................ 20
Restatement (Third) of Agency, § 4.01 (2006) ........................................................................... 16
Restatement (Third) of Agency, § 4.06 (2006) ........................................................................... 16

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 23
Fed. R. Civ. P. 30(b)(6) .......................................................................................................... 5, 11
Fed. R. Civ. P. 56(a) .................................................................................................................. 12

PLAINTIFFS' NOTICE OF MOTION AND                     NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

After more than a decade of litigation and years of discovery, summary adjudication of liability is now appropriate. The four Defendants are National General Insurance Company (NGIC), Integon National Insurance Company (INIC), Integon Preferred Insurance Company (IPIC) and MIC General Insurance Corporation (MICG) (collectively, "NG Defendants" or "NG"). NG Defendants acted in concert as a single enterprise with common ownership, management and control, and shared product, marketing, data and policy service operations, systems and personnel. They engaged in a deceitful and unlawful scheme to ensure that their jointly controlled agents and representatives would not cross-offer California Good Driver Discount (GDD) lowest rate policies from among their Control Group, in violation of California Insurance Code section 1861.16(b).

Throughout the Class Period, NG Defendants have been part of the same Control Group of commonly owned, managed and controlled insurers. They do not dispute this.  Dkt. 422 at 11 ("The parties do not dispute that NGIC, Integon National, Integon Preferred, and MIC . . . were in the same control group during all relevant times."). Section 1861.16(b)[1] mandates that

> An agent or representative representing one or more insurers having common ownership or operating in California under common management or control shall offer, and the insurer shall sell, a good driver discount policy to a good driver from an insurer within that common ownership, management, or control group, which offers the lowest rates for that coverage.

The California Department of Insurance (CDI) recently reaffirmed that insurers, not their agents, have the duty and responsibility to ensure that their agents comply with Section 1861.16(b):

> An insurer is required to charge each insured, on application or renewal, the lowest premium for which the insured qualifies. If an insurer delegates this responsibility to an agent, the insurer – not the agent or the insured – remains responsible for ensuring the applicant is offered the lowest premium for which the applicant qualifies [citing 10 C.C.R. § 2360.4].

CIC Bulletin 2024-14 (Nov. 25, 2024), Ex. A to Request for Judicial Notice ("RJN"), filed with this brief.  The onus was always on the NG Defendants to ensure that their agents cross-offered. NG Defendants have never claimed that their agents or representatives ever cross-offered or that they had a super group exemption from their statutory obligation.  The uncontroverted testimony

---

[1] Unless otherwise indicated, all statutory references are to the California Insurance Code.

PLAINTIFFS' NOTICE OF MOTION AND                                  NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

establishes that these things never happened. Instead, they systematically functioned as one consolidated organization with no training or procedure to ensure that their agents cross-offered. Dkt. 438-24, 3/23/23 Cononico Rule 30(b)(6) Dep., 37:1-38:16; 66:17-67:6. They admittedly did not collect the information needed to cross-offer. Dkt. 444, Opp'n to Renewed Mot., 5:20-22.

To attempt to excuse their statutory violations, the NG Defendants argue about minor and irrelevant coverage differences. *Id*. pp. 3–4. But this Court has held that such "ancillary policy benefits" do not "affect the 'coverage' that is subject to the Lowest Rates Rule." Dkt. 422, Order on Suppl. Briefing, 28:26–27. And Plaintiffs' actuary ("Brown") used the same or better coverage as comparators. Brown excluded any comparative company policy where the three mandatory coverages did not have a lower available Good Driver premium. Brown additionally excluded from the class any policies available within the control group that had an overall higher policy premium *when considering all ancillary coverages*. Dkt. 368-4, Brown Decl., ¶ 53. For example, where ancillary coverages such as Towing & Labor or Rental Reimbursement/Extended Transportation Expense were present in the originally underwritten company and not provided under another company, *the other company was excluded from the restitution calculation. Id*. ¶¶ 15(a), 52. When there was no identical coverage, Brown assumed better coverage for the insured in the comparator. *Id.* ¶ 52. Applying all of the above, Brown's methodology actually excluded nearly 43% of the Good Drivers in the policyholder data produced by NG Defendants and determined that 57.1% of NG Defendants' Good Driver eligible policyholders paid more for their policies than they should have. *Id.* ¶ 53. If the Court prefers, Plaintiffs will not offer Brown analysis #4 (closest deductible) at trial to eliminate even rank speculation that any insured would have rejected the lower premium had NG offered it.

The undisputed evidence shows that NG Defendants, and the agents and representatives they jointly controlled, failed to cross-offer. Director of Data Services, Daniel Wolfram, whose department performed common duties for all NG Defendants, confirmed that there is *no* record of *any* cross-offering by any Defendant. Wolfram Dep., 107:14–108:1, Ex. 1 to the Declaration of John Hurst, filed with this brief. NG Defendants acted as a single consolidated entity, utilizing the same personnel at every level and the same policy administration system. The purpose of their scheme

2

was to ensure that their jointly controlled, trained and instructed agents and representatives would never cross-offer. And it worked.  Acting in concert and as a single enterprise, NG Defendants accomplished this scheme by doing four things. First, they neither trained nor instructed any of their agents or representatives in their duty to cross-offer. Second, they instructed their agents that they would be subject to termination if they did cross-offer. Third, they utilized agency sales processes and scripts (known as "steps") that made it impossible for cross-offering to occur based on the lack of information gathered from applicants. Fourth, they implemented a shared New Policy System (NPS) that they knew would not permit cross-offering. This concerted action and scheme by the Control Group of NG Defendants explains why there is *not a single known instance* of cross-offering from within this Control Group.

NG Defendants have emphasized affinity groups. However, Plaintiffs' damages analysis accepts NG Defendants' determinations of who is a member of which affinity group. Dkt. 427-1, Brown Report. Notably, NG Defendants "do not dispute that any insured could be eligible for an affinity group that only requires payment of a fee." Dkt. 422, 23:5–6. "Defendants fail to raise any meritorious arguments that they do not have a duty to cross-offer where the only eligibility criteria is paying a membership fee." Dkt. 480, Order on Renewed Motion, 38:1–2.  Defendants have likewise never cited any authority for their failure to offer an affinity group insured a lower available non-affinity GD premium from other Defendant insurers within their same Control Group.

Plaintiffs seek partial summary judgment on liability for their claims under the UCL unlawful and unfairness prongs. The undisputed evidence confirms the failure of the NG Defendants and their jointly controlled agents and representatives to cross-offer in violation of the statutory duties they owed under California Insurance Code section 1816.16.

## II.    STATEMENT OF ISSUES TO BE DECIDED

Should the Court grant summary adjudication of UCL "unlawful" and "unfair" liability where the uncontroverted evidence shows that the NG Defendants and their jointly controlled agents and representatives violated their statutory duties under section 1861.16(b) to offer and sell qualified policyholders the lowest available GDD premium of any company within their Control Group?

\\\

## III.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS

**A.    Section 1861.16(b) required NG Defendants' agents and representatives to cross-offer, and NG Defendants to sell, the lowest available GDD rate from within their Control Group of insurers.**

National General determined which of their policyholders are "GDs." Plaintiffs accept these determinations. When multiple insurers have common ownership or operate under common management or control ("Control Group"), "[a]n agent or representative representing one or more" of such insurers "shall offer, and the insurer shall sell, a [GDD] policy to a [GD] from an insurer within that common ownership, management, or control group, which offers the lowest rates for that coverage." § 1861.16(b). The CDI reaffirmed that insurers, not their agents, have the duty and responsibility to ensure that their agents comply with section 1861.16(b):

> An insurer is required to charge each insured, on application or renewal, the lowest premium for which the insured qualifies. If an insurer delegates this responsibility to an agent, the insurer – not the agent or the insured – remains responsible for ensuring the applicant is offered the lowest premium for which the applicant qualifies [citing 10 C.C.R. § 2360.4].

CIC Bulletin 2024-14 (11/24/24), Ex. A to RJN.

**B.    Defendants are all part of the same Control Group.**

In its October 8, 2024, Order on Supplemental Briefing, this Court stated: "The parties do not dispute that NGIC, Integon National, Integon Preferred, and MIC (collectively the "Defendants") were in the same control group during all relevant times." Dkt. 422, 11:11-13. NG Defendants' common and shared ownership, management, sales, marketing, policy service operations and personnel preclude them from being exempt under section 1861.16(c).

Based on NG Defendants' records and the testimony of their officers and employees, they did not meet any of section 1861.16(c)(1)(A)-(H)'s requirements to be exempted from cross-offering. They instead acted in concert to violate the cross-offer requirement. This uncontroverted evidence establishes that NGIC, INIC, IPIC and MICG:[2]

- Operated in concert as one consolidated organization with common ownership and management, as opposed to being independently managed as required by section

---

[2] Many of the deposition exhibits and excerpts, declarations, and reports cited in this brief are already in the record.    For the Court's convenience they are attached after the new exhibits to the Declaration of John Hurst, filed with this brief.

4

1861.16(c)(1)(A). Ex. 2 to Hurst Decl., Pentis Dep., 20:22–24, 23:11–25:13; Ex. 3 to Hurst Decl., Patel 3/22/23 Rule 30(b)(6) Dep., 79:16–20; Ex. 4 to Hurst Decl., Castellano Dep., 45:16–46:23; Dkt. 438-14, Storms Dep., 13:22–14:1, 21:14–22:18, 24:23–25:13.

- Shared loss and expenses statistics and other data used in ratemaking in concert, instead of refraining from doing so as required by section 1861.16(c)(1)(B)-(C). Ex. 5 to Hurst Decl., Hanes Dep., 119:11–120:22.

- Used each other's marketing, sales and/or underwriting data in concert, instead of refraining from doing so as required by section 1861.16(c)(1)(D). Ex. 3, Patel 3/22/23 Rule 30(b)(6) Dep., 80:25–81:8.

- Had the same Regulatory Specialist and Compliance Manager for filing class plans and underwriting rules in concert, along with common policy forms in their shared NPS, instead of refraining from doing so as required by section 1861.16(c)(1)(E). Dkt. 438-16, Harris Dep., 10:17–11:15, 13:9–14:8, 186:10–188:6; Ex. 6 to Hurst Decl., Treadaway Dep., 9:22–10:7, 63:9–64:3, 83:13–84:5, 164:4–25.

- Had common and shared sales operations with identical sales managers, product managers and personnel, including a shared call center, instead of separate sales operations as mandated by section 1861.16(c)(1)(F). Ex. 4, Castellano Dep., 11:23–12:5, 13:16–14:13, 45:16–46:23; 87:18–89:1; Dkt. 438-16, Harris Dep., 205:9–16; Dkt. 438-18, Alexander Dep., 7:22–8:12, 9:23–10:14, 11:21–22; Dkt. 438-14, Storms Dep., 24:23–25:13; Ex. 7 to Hurst Decl., Tayal Dep., 135:2–25; Dkt. 484-4, Conroy Dep., 11:16–12:12, 16:22–25; Ex. 8 to Hurst Decl., 1/24/23 Patel Dep., 77:9–79:5, 86:11–88:7.

- Had common and shared marketing operations, instead of separate marketing operations as mandated by section 1861.16(c)(1)(G). Dkt. 438-14, Storms Dep., 24:23–25:13; Ex. 7, Tayal Dep., 135:2–25.

- Had common and shared policy service operations, instead of separate policy service operations as mandated by section 1861.16(c)(1)(H). Ex. 1, Wolfram Dep., 40:14–18, 41:21–44:16; Ex. 8, 1/24/23 Patel Dep., 115:3–122.

When asked about the importance of the super group designation, NG's Executive VP of Sales, Brenda Castellano, confirmed that "it needs to be separate management, operations, sales and no sharing of the data" and an "independent operation." Ex. 4, Castellano Dep., 44:24–45:4. She confirmed that NGIC, INIC, IPIC and MICG failed to meet these standards. *Id*. 45:5–46:8. NG's common and shared Policy Services Regulatory Specialist, Kristi Harris, who has been with National General and its predecessor since 2002, likewise confirmed that NGIC, INIC, IPIC and MICG have not complied with these requirements because they have common ownership, management, systems, marketing, and sales. Dkt. 438-16, Harris Dep., 174:11–176:24. Federal Rule of Civil Procedure 30(b)(6) deponent Rakesh Patel admitted that NGIC, INIC, IPIC and MICG had common and shared management, business operations, operations personnel, sales personnel,

PLAINTIFFS' NOTICE OF MOTION AND                                     NO. 4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

operating systems and underwriting data from 2008 to the present. Ex. 3, Patel 3/22/23 Rule 30(b)(6) Dep., 79:16–20, 80:25–81:6. Finally, NG's former President, Lawrence Pentis, confirmed that NGIC, INIC, IPIC and MICG were run as "one consolidated organization" throughout his tenure, and that they were required to sell the lowest rate within their family of companies for the GDD. Ex. 2, Pentis Dep., 23:11–25:22, 100:10–22.

**C.    NG Defendants either failed to file an Exhibit 19 or Exhibit 17, or their filing acknowledges common management.**

NGIC, IPIC, INIC and MICG never filed an Exhibit 19 or Exhibit 17 for the purpose of attempting to seek a Super Group exemption for their companies vis-à-vis one another. This was confirmed by NG's former President, and by Larry LaStofka, former CDI Bureau Chief. Dkt. 438-14, Storms Dep., 125:7–126:4; Dkt. 438-37, Declaration of Larry LaStofka ("LaStofka Decl."), ¶¶ 9–15; Dkt. 435-35, Declaration of Jeffrey Nash (Nash Decl.), ¶¶ 31–33. While INIC and IPIC have filed Exhibit 17s, their sole purpose was to assert their separateness and operational independence from other unrelated Allstate companies and groups. These filings *do not* claim or assert their separateness or operational independence from each other or from MICG or NGIC. On the contrary, these filings acknowledge *common* management, sales, marketing, and policy services. Dkt. 438-35, Nash Decl., ¶¶ 28–32; Dkt. 438-37, LaStofka Decl. ¶¶ 10–14.

**D.    NG Defendants are still part of a common Control Group and have not filed an Exhibit 19 or 17 sufficient to meet the Super Group exemption.**

Larry LaStofka confirms that Allstate rate filings in 2023 show NG Defendants are still (admittedly) operated as a common Control Group and have not filed an Exhibit 19 or 17 to be eligible for the Super Group exemption. Dkt. 438-37, LaStofka Decl., ¶¶ 9–10. The filings confirm that the NG Defendants, all now owned by Allstate since January 2021, continue to have common management, sales, marketing, and policy services operations. *Id*. ¶¶ 14–15.

**E.    NG Defendants knew that their agents and representatives had a duty to cross-offer, yet they acted in concert to prevent their agents and representatives from discharging this statutory duty.**

NG Defendants acted in concert as a single enterprise under common ownership, management, and control, as well as through inextricably intertwined and shared sales, marketing, product, data, and policy service operations, systems, and personnel. Ex. 2, Pentis Dep., 15:19–16:1,

6

16:17–25, 20:22–24, 23:11–25:22, 105:14–113:8; Dkt. 438-14, Storms Dep., 13:22–14:1, 21:14–22:18, 24:23–25:22; Dkt. 438-22, Yeh Dep., 14:1–15:2; Dkt. 438-16, Harris Dep., 9:3–10:8, 13:9–14:7, 16:13–18:21, 35:4–36:19, 70:24–71:16; Ex. 6, Treadaway Dep., 9:1–11:11, 83:13–23; Dkt. 484-4, Conroy Dep., 11:16–12:12; Ex. 4, Castellano Dep., 11:23–12:5, 13:16–19, 37:12–23, 94:8–24; Ex. 1, Wolfram Dep., 34:9–25, 42:4–44:16; Ex. 7, Tayal Dep., 15:21–24, 18:4–17, 48:12–19, 50:14–51:2, 51:21–23, 135:2–25; Ex. 8, Patel 1/24/2023 Dep., 9:16–10:8, 111:16–112:19; Ex. 3, Patel 3/22/2023 30(b)(6) Dep., 79:16–20, 80:25–81:6; Dkt. 438-18, Alexander Dep., 8:10–10:14.

NG Defendants, and their common and identical officers, managers, and personnel, had actual knowledge of their duty to cross-offer. Ex. 2, Pentis Dep. 93:21–95:3, 100:1–22, 103:20–104:9; Dkt 438-14, Storms Dep., 52:12–54:3, 71:9–73:21, 132:22–133:10; Dkt. 438-22, Yeh Dep., 68:1–12, 130:8–16, Dkt. 438-16, Harris Dep., 49:10–25, 130:5–16, 160:5–12, 174:11–176:24; Dkt. 484-4, Conroy Dep., 75:24–76:9; Ex. 4, Castellano Dep., 15:25–16:20, 44:24–46:4. Despite admitting that the NG Defendants had common/shared operations, they only chose to file for Exhibit 19 approval (nka Exhibit 17) for former Defendant PEIC. NG Defendants and their agents and representatives continued to refuse to cross-offer, despite knowing of their duty to do so, and despite knowing that the only way they could be exempt from this duty would be by satisfying all requirements of Cal. Ins. Code § 1861.16(c)(1)(A) through (H) and by filing an Exhibit 19, which they failed to do.

The Director of Data Services, who performed his duties for each of the named Defendants, confirmed that there is *no* record of *any* cross-offering. Ex. 1, Wolfram Dep., 34:9–25, 42:4–44:16, 63:7–64:7. Numerous officers, managers and/or personnel of NG Defendants were likewise unaware of a single instance in which the statutorily required cross-offering occurred. Ex. 2, Pentis Dep., 101:25–102:7; Ex. 7, Tayal Dep. 117:17–118:7; Ex. 5, Hanes Dep. 154:19–156:3; Dkt. 438-22, Yeh Dep. 25:16–26:16; Ex. 4, Castellano Dep., 109:10–16.

NG Defendants, acting in concert and as a single enterprise, engaged in a scheme through which their jointly controlled agents and representatives would never discharge their statutory duty to cross-offer. First, NG Defendants had no policy or procedure in place to ensure that the lowest premium within their Control Group of companies would be offered to California GDs. Ex. 2, Pentis

7

Dep., 90:19–91:10 (did not recall "even generally" any process used to ensure compliance with the duty to cross offer); *Id.*, 73:10–75:3; Dkt. 438-18, Alexander Dep., 116:21–117:6 ("no way" that he could cite a written procedure to cross-offer the lowest GDD premium); Ex. 7, Tayal Dep., 137:9–138:3 (confirming the absence of cross-offering written rules or procedures).

Second, NG Defendants, who jointly trained all National General agents and representatives, provided no training or instruction relating to their duty to cross-offer. Dkt. 438-24, 3/23/23 Cononico Rule 30(b)(6) Dep., 17:4–17, 37:1–38:16, 66:17–67:6; Dkt. 438-25, 5/24/23 Cononico Rule 30(b)(6) Dep., 103:10–104:10, 106:22–107:9, 111:4–9; Ex. 5, Hanes Dep., 154:18–156:3; Ex. 4, Castellano Dep., 107:1–108:2 (confirming she has never instructed an agent to cross-offer); Dkt. 484-4, Conroy Dep., 39:3–8. Instead, NG Defendants prohibited their agents from cross-offering with "Unacceptable Behaviors" which are "subject to immediate termination of employment." This included "placing any business in a different Plan Code than what the client actually called in with." Dkt. 438-25, 5/24/23 Cononico Rule 30(b)(6) Dep., 123:4–124:3, 124:25–125:20; Dkt. 484-5, Ex. 154 (Dep. Ex. 154), 2021 List of Unacceptable Behaviors.

NG Defendants also jointly control communications that their direct agents and representatives have with potential insureds through call centers. They have a script, referred to as "Steps," which does not allow for cross-offering. Dkt. 438-23, Juszczakiewicz Dep., 106:1–21; *id.* 15:10–16:7, 21:11–22:9; Dkt. 438-25, 5/24/23 Rule 30(b)(6) Dep., 105:7–18, 106:6–107:9, 110:5–12. By concerted design, NG Defendants' agents and representatives were required to quote only one company based on the phone number the potential insured called. Each number has an assigned Plan Code, and NG Defendants' shared NPS policy administration system produces a single quote based on that Plan Code alone. Dkt. 438-25, 5/24/23 Cononico Rule 30(b)(6) Dep., 108:16-109:16.

Fourth, the process NG Defendants' jointly controlled agents and representatives are required to follow makes it impossible for cross-offers to occur based on the lack of information they are instructed to gather. Amber Cononico, Director of Training and Operations, confirmed that "the Defendants do not all collect the same information during the application process and do not all use the same rating factors when rating a policy to arrive at a premium" and that "[a]s a result, the type of information collected for each applicant varies." Dkt. 448 Cononico Decl. in Support of

8

Class Cert. Opp'n, Dkt. 348-41, ¶ 12. This concerted failure to request from insured applicants the applicable rating factors for all the companies means that none of the Defendant companies determines the lowest available GDD rate within the Control Group. Dkt. 438-38, Laucher Decl., ¶ 11. This is contrary to California auto insurance industry and CDI custom, practice, and standards. *Id.* ¶ 12; Dkt. 438-35, Nash Decl., ¶¶ 9, 10.

Finally, NG Defendants' jointly controlled agents and representatives all generate quotes using the same NPS policy system. Ex. 7, Tayal Dep., 48:12–19, 51:21–23; Ex. 1, Wolfram Dep., 40:14–18, 42:4–44:16, 105:11–106:5, 106:17–107:3; Ex. 8, Patel Dep., 115:3–22. At all times, NG Defendants have known that their shared NPS system is not equipped to do a comparative rate analysis to quote the lowest GDD premium from within their Control Group. Dkt. 438-14, Storms Dep., 73:2–13; Dkt. 484-4, Conroy Dep., 43:8–12, 66:17–67:7; Ex. 1, Wolfram Dep., 107:14–108:1.

**F.    Plaintiffs and class members were damaged by the unlawful failure of NG Defendants' agents and representatives to cross-offer.**

Plaintiffs and the class members held insurance policies issued by one or more of NG Defendants' Control Group of companies and paid premium overcharges. *See* Dkt. 484-1, Brown Decl., ¶¶ 38 ("Using the process described herein, I have identified all class member policyholders who did not receive the lowest available Good Driver premium from Defendants since January 22, 2011."), 8, 31.

Plaintiffs and the class members were all qualified GDs as defined in California Insurance Code sections 1861.02 and 1861.025. Accordingly, they should have been cross-offered the lowest California GD premium from among the Control Group of insurer Defendants.

NG Defendants produced policyholder data from their NPS system. Plaintiffs' experts, SG Risk, used that data to determine Plaintiffs' policy premium calculations and damages. Dkt. 484-1, Brown Decl., ¶¶ 8–9. Plaintiffs paid more than they should have, based on lower available GDD premiums from other Control Group companies. In performing their analyses, Plaintiffs' actuarial experts accepted NG's determinations of: (a) who is a GD, (b) which policyholders bought through agents, (c) what the rates are, and (d) who is in which so-called "affinity group." *See* Dkt. 484-1, Brown Decl., ¶¶ 5, 8, 9. Similarly, Plaintiffs' experts accepted the coverages and deductibles that

PLAINTIFFS' NOTICE OF MOTION AND                    NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

class members chose. *See id.* ¶ 51. Where there was no comparison policy with the same limits and deductible, Brown used the closest comparator policy with higher limits and lower deductible. That is, Brown used a comparator policy with better coverage.

Plaintiffs purchased policies through NGIC. Dkt. 438-1, E. King Decl., ¶ 2; Dkt. 438-2, D. King Decl., ¶ 2. The premium was $1,615 for their first policy and $1,752 for their renewal. Dkt. 438-1, E. King Decl., ¶ 2; Dkt. 438-2, D. King Decl., ¶ 2. They qualified as California GDs. Dkt. 438-1, E. King Decl., ¶ 2; Dkt. 438-2, D. King Decl., ¶ 2. The Kings were quoted $1752 and paid a renewal premium for the NGIC policy of $1,124 pro-rata, considering a cancellation mid-policy effective January 22, 2014. Dkt. 427-1, Brown Decl., Ex. A. A lower premium was available from PEIC for $706. *Id.* ¶ 13. "Plaintiffs have provided evidence through the Brown Report and Declaration that there was a lower-rate GDD policy available from PEIC when then Kings renewed their NGIC policy on June 2, 2013." Dkt. 427-1, Brown Report, Ex. A; Dkt 480, Cert. Order, 21:2–3. Had the lower priced policies been offered, the Kings would have accepted them. Dkt. 438-1, E. King Decl., ¶ 4; Dkt. 438-2, D. King Decl., ¶ 4.  Defendants do not dispute that PEIC had a lower available GDD premium, and this Court has ruled that PEIC was a member of the same Defendant Control Group at the time of the Kings' policy renewal. *See* Dkt. 480, Order on Renewed Motion, 28:4-6 ("[F]acts about PEIC are still relevant to the period of time PEIC was part of the control group and whether the NG Defendants violated the law by failing to cross-offer the PEIC policies during that window."), 47:6-10 ("The control group is defined as NGIC, INIC, IPIC, and MICG from January 22, 2011 to present; and includes PEIC during the period of April 19, 2013 to July 18, 2014.").

**G.    Any insured is eligible for an affinity group that only requires a fee.**

NG Defendants "do not dispute that any insured could be eligible for an affinity group that only requires payment of a fee." Dkt. 422, 23:5–6. Three of NG Defendants' most common affinity groups had no eligibility requirement other than paying a fee, which every insured pays together with the premium. For example, NGIC created its own "Affinity Group" called "Club DentPro" with a third-party repair vendor that has no "members." This claimed "Affinity Group" required policyholders to pay to become members of a "club" for discounts on paintless dent repair and

10
PLAINTIFFS' NOTICE OF MOTION AND                                          NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

windshield repair. Anyone can join Club DentPro upon the payment of a membership fee that National General collects with the premium. Other than signing up for National General insurance and paying the fee, there is no eligibility criterion. Dkt. 484-4, Conroy Dep., 72:9–15; Ex. 9 to Hurst Decl., Whitglob Dep., 61:7–11, 78:25–79:8; Ex. 8, Patel 1/24/23 Dep., 156:1–10. Club DentPro does not exist apart from National General and was created entirely by NG. Ex. 9, Whitglob Dep., 43:15–22. The annual membership fee is $36.  National General charges and collects the fee, of which DentPro gets thirty cents or less while National General keeps $35.70 or more. *Id*. 77:4–13; Ex. 3, Patel 3/22/23 Rule 30(b)(6) Dep., 131:6. Patel confirmed that National General does not disclose to the insured or the CDI that National General keeps the bulk of this fee. *Id.* 132:15–134:19.

While National General did not create the "Nations Safe Driver" Program, INIC's "membership group," it enrolls members in this open-to-all, criterion-free program and collects the membership fee. Dkt. 484-4, Conroy Dep., 81:10–83:4 (no eligibility criterion other a membership fee); Ex. 4, Castellano Dep., 54:21–55:25 (same). As with "Club DentPro," anyone can join. Membership is involuntary; when an insured purchases a policy from a company within the Control Group, they are automatically enrolled in the "Affinity Group" and charged a membership fee. Ex. 4, Castellano Dep., 54:1–11. Therefore, the existence of these groups cannot excuse the failure to cross-offer the lowest available GDD rate from within NG Defendants' Control Group of companies.

As for the "Good Sam" club, NG Defendants' former President confirmed that "anyone" who receives a quote can get a free membership without *any* eligibility requirement. Ex. 2, Pentis Dep., 98:3–21. And significantly, NGIC's inside sales agents are not even required to obtain any documentation of a prospective insured's membership in the Good Sam group before a policy is bound or underwritten. Dkt. 438-24, Cononico Rule 30(b)(6) Dep., 51:8–52:10. "Defendants fail to raise any meritorious argument that they do not have a duty to cross-offer affinity groups where the only eligibility criteria is paying a membership fee." Dkt. 480, Order on Renewed Mtn., 38:1–2.

\\\

\\\

PLAINTIFFS' NOTICE OF MOTION AND                          NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

## IV.      ARGUMENT

### A.      Legal standard for summary judgment

"The basic standard for granting summary judgment is that the court must find there is 'no *genuine dispute* as to any *material fact* and that the movant is entitled to judgment *as a matter of law*.'" Judge Karen L. Stevenson & James E. Fitzgerald, *Rutter Practice Guide—Federal Civil Procedure Before Trial* § 14:202 (Calif. and 9th Cir. Ed. April 2025 update) (emphasis in original) (quoting Fed. R. Civ. P. 56(a)). "[T]he moving party bears the initial burden of proof (production) as to each material fact upon which it has the burden of persuasion at trial: 'Where the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Id.* § 14:124 (citing *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

"'Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with,'" *Lin v. Solta Med., Inc.*, 760 F. Supp. 3d 926, 933 (N.D. Cal. 2024) (quoting *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993)), "'significant probative evidence tending to support its claim or defense,'" *Bailey v. Household*, 2011 WL 12854796, at *6 (S.D. Cal. June 29, 2011) (quoting *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)).

### B.      NG Defendants acted in concert to ensure that their agents and representatives violated their statutory duty to cross-offer under section 1861.16(b).

Section 1861.16(b) mandates that:

> An agent or representative representing one or more insurers having common ownership or operating in California under common management or control shall offer, and the insurer shall sell, a good driver discount policy to a good driver from an insurer within that common ownership, management, or control group, which offers the lowest rates for that coverage.

Insurers sharing "common ownership, management, or control" are referred to as a "Control Group." Dkt. 422, 3:7-9. NGIC, INIC, IPIC and MIC have all conceded that they were in the same "Control Group" during all relevant times. *Id.* at 11:11-13; *see also* Dkt. 409, Defs. Reply, 4:10-12,

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PARTIAL SUMMARY JUDGMENT                                NO.  4:15-CV-00313-DMR

n.7.

Plaintiffs' regulatory experts explain that it is long-accepted California auto insurance industry standard and CDI standard, practice, and interpretation that the company within the Control Group with the lowest available GDD premium must be quoted if that company has the identical or better/higher limits and identical or better/lower deductible. Dkt. 438-38, Laucher Decl. ¶¶ 13-15; Dkt. 438-35, Nash Decl. ¶¶ 14-19. This is consistent with consumer choice, as well as long-standing and consistently applied and accepted California auto insurance industry standard and CDI standard, practice and interpretation and the statutory duties imposed by section 1861.16(b). Despite Defendants' knowledge of the Lowest Rates Rule and the Exhibit 19 exemption for which they did not qualify, and despite the long-standing and consistent California auto insurance and CDI standard, practice and interpretation, the NG Defendants never cross-offered. *See supra* section III.E.

**C.    The failure of NG Defendants' agents and representatives to cross-offer is imputed to NG Defendants through their agency relationship and their concerted action.**

Discovery has confirmed that NG Defendants implemented their unlawful scheme to keep their agents and representatives in the dark and to prevent and even prohibit them from cross-offering. Discovery also establishes that the NG Defendants knew that they and their agents and representatives were not exempt from the statutory duties of section 1861.16(b) based on their: (a) common ownership, management, and control, and (b) inextricably intertwined, shared and identical sales, marketing, product, data and policy service operations, systems and personnel.

NG Defendants knew of their, their agents, and their representatives' duty to cross-offer. From March 2010 until May of 2012, Lawrence Pentis, was National General's President and CEO Ex. 2, Pentis Dep., 15:19–16:1, 16:17–25, 20:22–24. He confirmed that the underwriting, claims, actuarial, policyholder, accounting, technology, and administrative functions of NGIC, INIC, IPIC and MICG were all done in concert by the same Administrator under a Management Services Agreement. Dkt. 368-22, Ex. 78; Ex. 2, Pentis Dep., 105:14–113:8. He also confirmed that these companies were run as "one consolidated organization" with common ownership and management, and that they were required to sell the lowest rate within their family of companies for the good

driver to comply with section 1861.16. *Id*. 23:11–25:22, 93:21–95:3, 100:1–22. Pentis stated that National General had Product Managers for specific states, including California, who had accountability for complying with section 1861.16. *Id*. 103:20–104:9.

In June 2012, Byron Storms replaced Pentis as National General's President and also was the President of NGIC, INIC, IPIC and MICG. Dkt. 438-14, Storms Dep., 13:22–14:1, 21:14–22:18. Storms performed the same duties for each entity and was responsible for their marketing, sales, and customer service operations, and for implementing the NPS policy administration system they all used. *Id*. 24:23–25:22. Like Pentis, Storms was aware of the Lowest Rates Rule. *Id*. 52:12–54:3.

Kenny Yeh was the California Product Manager for NGIC, INIC, IPIC and MICG starting in May 2011. Dkt. 438-22, Yeh Dep. 14:1–15:2. He admits that he was familiar with section 1861.16 and that it was part of his job to know this law and make sure that the companies he managed complied. *Id*. 130:8–16. Yeh confirmed that the cross-offering requirement meant that they had to offer the lowest GDD for a comparable policy within the group of companies. *Id.* 68:1–12.

Since 2015, Rakesh Patel has been the California Product Manager for NGIC, INIC, IPIC and MICG. Before coming to National General, Patel served as a California Product Manager for Nationwide Insurance from 2009 to 2015. Ex. 8, Patel Dep., 9:16–10:8, 68:18–69:1. Patel confirmed that the purpose of an Exhibit 19 is to ensure that the requirements of section 1861.16(c)(1)(A)-(H) are met. He testified about the Exhibit 19s he filed for the Nationwide subsidiaries he managed to establish that Nationwide had separate management and product managers, and separate sales, marketing, and policy administration systems, unlike the situation here. *Id.* 14:10–15:23, 17:7–19:2, 73:2–24. Patel could not explain why NG Defendants had not filed Exhibit 19s earlier. *Id*. 71:3–24. Patel's boss at National General, Doug Hanes, who has been the executive vice president of product management for NGIC, INIC, IPIC and MICG since 2013, could likewise not explain why this had not been done. Ex. 5, Hanes Dep., 48:5–49:24, 142:12–16. Hanes confirmed that compliance with California law by NGIC, INIC, IPIC and MICG "would ultimately roll up to me." *Id*. 157:10–17.

Kristi Harris has been with NG since 1999 – as a regulatory specialist since 2002 for NGIC, INIC, IPIC and MICG – and stated they all had the same Compliance and Product Managers. Dkt. 438-16, Harris Dep. 9:3–10:8, 13:9–14:7, 16:13–18:21, 35:4–36:19. Harris was aware of the cross-

offering requirement and testified that, if you do not have an Exhibit 19 or 17, a GDD must be offered and it has to be the lowest rate of the affiliated companies, with the onus on the insurance company, not the insured. *Id*. 49:10–25, 130:5–16. She knew that the individual insurers did not comply with the exemption requirements of section 1861.16(c)(1)(A)-(H) because they had common ownership, management, operating systems, marketing, and sales. *Id*. 160:5–12, 174:11–176:24.

From 2002 to September 2011, Renee Treadaway was a Regulatory Specialist at National General for NGIC, INIC, IPIC and MICG. She then served as National General's Compliance Manager for all of them September 2011–January 2022. Ex. 6, Treadaway Dep., 9:1–11:11. Treadaway represented to the CDI (through a mandatory submission of her qualifications to the Department) that she had "[e]xpert knowledge of state regulatory statutes and laws and the insurance industry." *Id*. 69:12–70:19, 86:17–22, 88:20–89:10, 189:17–20, 198:13–199:14, 201:16–21.

Torry Conroy was: (a) National General's vice president of agency sales July 2012–January 2021 and (b) responsible for NGIC, INIC, IPIC, and MICG. He explained the "California super group" as "the lowest rates rule so anybody that's a risk that's qualified for a good driver discount should be offered the lowest eligible rates for the coverages selected" from within the National General underwriting companies. Dkt. 484-4, Conroy Dep., 11:16–12:12, 75:24–76:9. Brenda Castellano has worked for National General since 2012; is an officer of NGIC, INIC, IPIC and MICG; and is responsible for their external agents. She testified that "National General" is the "brand" name all of them use. Ex. 4, Castellano Dep., 11:23–12:5, 13:16–19, 37:12–23, 94:8–24. She knew about the California "low cost rule," which she describes as "for good drivers, based on coverage selection, offering the lowest price that they are eligible for" among the group of companies. *Id*. 15:25–16:20. She knows that a super group requires "separate management, operations, sales and no sharing of the data" and "an independent operation." She confirmed that NGIC, INIC, IPIC, and MICG had common management and sales personnel, operating systems, and data. *Id*. 44:24–46:4.

All internal National General agents are legally authorized to quote for all the companies. Ex. 8, Patel 1/24/23 Dep., 184:5–20; Dkt. 448, Cononico Decl., ¶ 9. But their communications with

15

potential insureds through National General's common call center were controlled by a written script, referred to as "Steps," which does not allow for cross-offering. Dkt. 438-23, Juszczakiewicz Dep., 106:1–21; 15:10–16:7; 21:11–22:9; Dkt. 438-25, 5/24/23 Cononico Dep., 105:7–18, 106:6–107:9, 110:5–12. And neither did their common and shared NPS Policy quoting system. Instead, National General's agents and representatives are required to use only one company based on the marketing number the potential insured calls. Each number has a Plan Code, and NG Defendants' shared NPS system produces a single quote for that Plan Code alone. Dkt. 438-25, 5/24/23 Cononico Rule 30(b)(6) Dep., 108:16–109:16. This scheme violates California auto insurance industry and CDI customs, practices, and standards. Dkt. 438-35, Nash Decl., ¶¶ 42–43.

NG Defendants provided no training or instruction to their agents and representatives in their duty to cross-offer and sell the lowest rate GDD policy from among the Control Group of insurers. Not a single training document addressed this. Dkt. 438-24, 3/23/23 Cononico Rule 30(b)(6) Dep., 17:4–17, 37:1–38:16, 66:17–67:6; Dkt. 438-25, 5/24/23 Cononico Rule 30(b)(6) Dep., 103:10–104:10, 106:22–107:9, 111:4–9; *see also* Ex. 5, Hanes Dep., 154:18–156:3 (Senior vice president of product management confirming that no one to his knowledge ever instructed agents to cross-offer among the control group of insurers); Ex. 4, Castellano Dep., 107:1–108:2 (confirming she has never instructed an agent to cross-offer). Instead, NG Defendants acted in concert to *prohibit* their agents and representatives from cross-offering with a list of "Unacceptable Behaviors," which are "subject to immediate termination of employment." This included "placing any business in a different Plan Code than what the client actually called in with." Dkt. 438-25, 5/24/23 Cononico Dep., 123:4–124:3, 124:25–125:20; *see also* Dkt. 484-5, Ex. 154 (Dep. Ex. 154, List of Unacceptable Behaviors). Thus, NG Defendants acted in concert to keep their agents and representatives from knowing their duty to cross-offer, and NG Defendants even jointly trained and instructed their employee agents and representatives that they would be fired if they did cross-offer Dkt. 438-25, 5/24/23 Cononico Rule 30(b)6) Dep., 123:4-125:20.

NG Defendants' agents and representatives' failure to cross-offer was accomplished pursuant to NG Defendants' scheme and is imputed to them, including under the doctrine of respondeat superior and agency liability principles. This is particularly true here because NG

Defendants not only collectively authorized their agents and representatives to violate this statutory duty but directed them to do so. *See* Cal. Civ. Code § 2338; *Restatement (Third) of Agency*, § 1.01; *see also Restatement (Third) of Agency*, §§ 4.01 and 4.06 (2006) (addressing ratification). Indeed, the Court found that "Plaintiffs have demonstrated by a preponderance of evidence that there is a common question as to whether NG Defendants failed to cross-offer the lowest rates within their control group pursuant to a common policy." Dkt. 480, 29:22–24.

**D.    Acting in concert as a Control Group and single enterprise, NG Defendants are jointly liable for their agents and representatives' violation of their statutory duty to cross-offer under the single enterprise theory of liability.**

In *Toho-Towa Co., Ltd. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1109 (2013), the court held that three affiliated business entities were a single enterprise for purposes of liability. "Because it is founded on equitable principles, application of the alter ego is not made to depend upon prior decisions involving factual situations which appear to be similar . . . . It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case." *Id.* at 1108 (citations and internal quotations omitted); *id.* n.4; *see also id.* at 1108 ("The 'single-business-enterprise' theory is an equitable doctrine applied to reflect partnership-type liability principles when corporations integrate their resources and operations to achieve a common business purpose.") (citations omitted); *accord Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 235 Cal. App. 3d 1220, 1249 (1991) ("[I]t would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit fraud and other misdeeds with impunity.").

In *Tran v. Farmers Grp., Inc.*, 104 Cal. App. 4th 1202, 1219 (2003), the court described the elements of the single enterprise doctrine as follows: "Two conditions are generally required for application of the doctrine to two related corporations: (1) such a unity of interest and ownership that the separate corporate personalities are merged, so that one corporation is a mere adjunct of another or the two companies form a single enterprise; and (2) an inequitable result if the acts in question are treated as those of one corporation alone." *Id.*; *see also Wallis v. Centennial Ins. Co.*, 2013 WL 3803971, at *5 (E.D. Cal. July 19, 2013) (following the same standard and recognizing that courts will apply these principles when the corporate form is used to "circumvent a statute, or

17

accomplish some other wrongful or inequitable purpose").

In *McLoughlin v. L. Bloom Sons Co., Inc.*, 206 Cal. App. 2d 848 (1962), the court applied the single enterprise doctrine to separate but related corporations. The original corporation, L. Bloom Sons Co., was a shoe store that entered into a collective bargaining agreement. A new corporation under common ownership, management, and control, Blooms Valley Fair, opened a store and rejected the union's demand to be recognized as the bargaining agent. *Id*. at 850. The trial court disregarded the separate corporate entity of Blooms Valley Fair to bind it to the agreement. *Id*. The appellate court affirmed, noting that the corporations were under common ownership, management and control and that it would be unjust to the union, its members, the employees, and the public if its separate corporate entity was not disregarded for this limited purpose. *Id.* at 851–53. The court cited to "[a] very numerous and growing class of cases wherein the corporate entity is that wherein it is so organized and controlled, and its affairs are so conducted as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation." *Id*. at 851–52 (citations omitted). Here, as in *McLoughlin*, this Court need not disregard the separate corporate status of the Control Group of insurer Defendants for all purposes. The Court should treat them as a single business enterprise for the limited purpose of the statutory duties jointly imposed on them and their agents and representatives under section 1861.16(b). This approach is consistent with the facts of this case, as well as the legislative history and purpose of Proposition 103 and section 1861.16(b).

This case falls within the single enterprise theory of liability. NG Defendants operated as "one consolidated organization" with common ownership, management, and control, and with common and shared underwriting, claims, actuarial, accounting, data, regulatory and policy administration functions, and personnel. They had common directors and officers, and the individual companies were collectively known as "National General."[3] Agents would not mention individual insurers by name when speaking with insureds but would instead simply refer to "National General."

---

[3] Dkt. 438-10, Ex. C, Pentis Dep., 23:11-25:22, 93:21-95:3, 100:1-22, 105:14-113:8; Dkt. 438-14, Storms Dep., 13:22-14:1, 21:14-22:18, 24:23-25:22; Dkt. 438-22, Yeh Dep., 14:1-15:2; Dkt. 438-16, Harris Dep., 9:3-10:8, 13:9-14:7, 16:13-18:21, 35:4-36:19, 160:5-12, 174:11-176:24; Dkt. 484-4, Conroy Dep., 11:16-12:12; Dkt. 438-13, Ex. E, Castellano Dep., 13:16-19, 37:12-23, 94:8-24; Ex. 1, Wolfram Dep., 34:9-25, 42:4-44:16; Ex. 7, Tayal Dep., 15:21-24, 18:4-17, 48:12-19, 50:12-51:2, 51:21-23, 135:2-25; Ex. 8, 1/24/23 Patel Dep., 9:16-18, 68:18-69:1; Dkt. 438-17, Treadaway Dep., 9:1-11:5, 83:13-84:5. (Additional citations omitted).

18

Dkt. 438-23, Juszczakiewicz Dep., 62:23–63:23. "National General" is the "brand" name all of the Defendant companies use. Ex. 4, Castellano Dep., 11:23–12:5, 13:16–19, 37:12–23, 94:8–24.

In addition, it would be inequitable if the scheme of NG Defendants' Control Group were treated as independent acts as opposed to joint effort of NG Defendants acting in concert as a single enterprise. Doing so would also defeat the purpose of Prop 103 and section 1861.16, which only allows a Control Group to be exempt from the statutory duties set forth in section 1861.16(b) when they each establish their separateness under section 1861.16(c)(1)(A)-(H). Doing so would be unlawful and unfair to the certified class of NG policyholders. Here, despite their actual knowledge of the statutory duties that they and their agents and representatives were required to discharge, NG Defendants operated as a single entity and engaged in a concerted scheme so that their agents and representatives, whom they jointly controlled and trained, could never cross-offer.

There is uncontroverted evidence that: (a) NG Defendants constitute a single enterprise for purposes of their statutory duties under section 1861.16(b), (b) their agents and representatives' failure to cross-offer in violation of their statutory duties is imputed to them, and (c) each of them is jointly liable for Plaintiffs' injuries.

**E.   NG Defendants are jointly liable for their agents and representatives' violation of their statutory duty to cross-offer under the concerted action principles of the Rest. (Second) of Torts section 876.**

California has adopted the joint liability principles of the Restatement (Second) of Torts section 876 for "Acting in Concert." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1183 (C.D. Cal. 2002); *Saunders v. Super. Ct.*, 27 Cal. App. 4th 832, 846 (1992); *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1286 (2015). Section 876 describes three separate and distinct situations in which liability will apply to those acting in concert:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he:
> a) does a tortious act in concert with the other or pursuant to a common design with him, **or**
> b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement so to conduct himself, **or**
> c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

PLAINTIFFS' NOTICE OF MOTION AND                    NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

Restatement (Second) of Torts § 876 (emphasis added). In *Sindell v. Abbott Lab'y*, 26 Cal. 3d 588 (1980), the California Supreme Court explained Restatement section 876 principles:

> [T]hose who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him. (P) Express agreement is not necessary, and all that is required is that there be a tacit understanding.

*Id.* at 604 (quoting Prosser, *Law of Torts* (4th ed. 1971) § 46, p. 292).

### 1.   Defendants are jointly liable based on civil conspiracy – Rest. (Second) of Torts section 876(a).

Civil conspiracy is a theory of co-equal legal liability under which defendants may be held liable for an independent wrong committed by others. *Navarrete*, 237 Cal. App. 4th at 1291. A participant in the conspiracy "effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." *Id.* Civil conspiracy and civil aiding and abetting liability exists for class UCL claims. *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 822, 858–61 (N.D. Cal. 2022); *Newton v. Am. Debt. Servs., Inc.*, 75 F. Supp. 3d 1048, 1064 (N.D. Cal. 2014); *Tan v. Quick Box, LLC*, 2024 WL 150611, at *11 (S.D. Cal. Jan 12, 2024). The circumstances under which liability will attach to parties acting in concert are as follows:

> Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts. The theory of the early common law was that there was a mutual agency of each to act for the others, which made all liable for the tortious acts of any one.

Restatement (Second) of Torts § 876 cmt. a. Civil conspiracy, like aiding and abetting, "is just a means of assigning liability for a tortious injury to those who act in support of a wrong, even though they do not directly commit the tortious act." *In re McKinsey & Co., Inc. Nat'l Prescription Opiate Litig.*, 2024 WL 2261926, at *16 (N.D. Cal. May 16, 2024). Both are forms of "vicarious liability for concerted action." *Id.* at *18.

In *In re McKinsey & Co.*, Judge Breyer reiterated that:

> The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design . . . . In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a

PLAINTIFFS' NOTICE OF MOTION AND                                    NO. 4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.

2024 WL 2261926, at *5 n.2. (citing *Restatement (Second) of Torts* section 876(a) and *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994).

The need for a defendant to intend the object of the conspiracy does not entail that a civil conspiracy claim can only be based on an "intentional tort." *In re McKinsey & Co.*, 2024 WL 2261926, at *6; *Navarrete*, 237 Cal. App. 4th at 1294 (noting a lack of California "authority requiring the participants to a conspiracy to possess the specific intent to harm a particular person or commit a specific injury"); *see also id.* at 1293 (recognizing that "the law in California remains that a civil conspiracy requires an express or tacit agreement only to commit a civil wrong or tort, which then renders all participants 'responsible . . . for all damages ensuing from the wrong").

The Northern District recently reiterated that actual knowledge may be inferred from the nature of the acts done, the relationship of the parties and their common interests:

> The "finder of fact may infer the requisite concurrence and knowledge from the nature of the acts done, the parties' relations to each other, and the common interest of the alleged conspirators." [Citations.] A plaintiff need not "produce evidence showing that the defendants met and actually agreed to undertake the performance of the unlawful act." [Citation.] "Tacit consent is enough to prove a conspiracy" so long as the conspirator "concurred in the tortious scheme with knowledge of its unlawful purpose." [Citation.]

*In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d at 859; *accord Navarrete*, 237 Cal. App. 4th at 1292 (to show actual knowledge, "an agreement may be tacit as well as express," and "[a] conspirator's concurrence in the scheme . . . may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances").

Under 876(a) NG Defendants are jointly liable for acting in concert pursuant to their concerted scheme to prevent (and actually prohibit) their agents and representatives from discharging their duty to cross-offer. There is uncontroverted evidence that the failure of NG Defendants' agents and representatives to cross-offer in violation of their statutory duties is imputed to NG Defendants, and that each of them is jointly liable.

**2.      Defendants are jointly liable for civil aiding and abetting—Rest. (Second) of Torts section 876(b).**

Aiding and abetting is another means of assigning liability for a tortious injury to those who

21

act in support of a wrong, even if they do not directly commit it. It creates vicarious liability for concerted action. *In re McKinsey & Co.*, 2024 WL 2261926, at *18. It requires that the defendant: (1) had "actual knowledge of the specific primary wrong," and (2) "substantially assisted" it. A plaintiff may prove actual knowledge through inference or circumstantial evidence. *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d at 858. A showing of specific intent is not required. Instead, the defendant must have "actual knowledge of the specific primary wrong the defendant substantially assisted." *In re First Alliance Mortgage Co.*, 471 F.3d 977, 993 (9th Cir. 2006).

Aiding and abetting focuses on whether a defendant knowingly gave "substantial assistance" to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct. *Stueve Bros Farms, LLC v. Berger Kahn*, 222 Cal. App. 4th 303, 324 (2013); *accord In re McKinsey & Co.*, 2024 WL 2261926, at *18 (recognizing that aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts). In addition, the Restatement endorses aiding and abetting liability "both when the act done is [intentional] and when it is merely a negligent act." *In re McKinsey & Co.*, 2024 WL 2261926, at *16.

This case also falls within section 876(b) which holds NG Defendants jointly liable for acting in concert pursuant to their common plan to prevent their agents and representatives from cross-offering. NG Defendants knew that their agents and representatives had a statutory duty to cross-offer and provided substantial assistance and encouragement for them to not discharge this duty. Acting in concert as "one consolidated organization" they jointly instructed their agents and representatives that they could be terminated if they did so, and they implemented "steps" and a shared NPS policy quoting system that they knew would not even permit cross-offering to occur. This satisfies the giving of "substantial assistance" to their agents and representatives that resulted in them not discharging their statutory duty under section 1861.16(b).

For these reasons, and the additional reasons discussed in the preceding sections, this Court should hold that: (a) the failure of NG Defendants' agents and representatives to cross-offer in violation of their statutory duties is imputed to NG Defendants, and (b) that each of them is jointly liable for Plaintiffs' and the class members' injuries. Indeed, there is no *genuine* dispute as to any *material* fact on these issues, such that Plaintiff is entitled to judgment as a matter of law.

PLAINTIFFS' NOTICE OF MOTION AND                                    NO. 4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

**F.      NG Defendants are liable under the UCL for unlawful and unfair practices.**

"'To state a UCL claim, a plaintiff must show either an (1) 'unlawful, unfair, or fraudulent business act or practice,' or (2) 'unfair, deceptive, untrue or misleading advertising.'"" *Hilario v. Allstate Ins. Co.*, 642 F. Supp. 3d 1048, 1060 (N.D. Cal. 2022) (quoting *Kemp v. Wells Fargo Bank, N.A.*, 2017 WL 4805567, at *15 (N.D. Cal. Oct. 25, 2017)) (certifying class), *aff'd*, 2024 WL 615567 (9th Cir. Feb. 14, 2024).  Here, NG Defendants are liable as a matter of law under the UCL unlawful and unfair prongs.

**1.      NG Defendants are liable under Plaintiffs' "unlawful" count as a matter of law.**

"By proscribing 'any unlawful' business act or practice, the UCL 'borrows' violations of other laws and treats them as unlawful practices that the UCL makes independently actionable." *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019) (quoting *Rose v. Bank of Am., N.A.*, 57 Cal. 4th 390, 396 (2013)) (denying Federal Rule of Civil Procedure (b)(6) dismissal motion). "In borrowing requirements from other statutes, the UCL provides its own 'distinct and limited equitable remedies for unlawful business practices, using other laws only to define what is 'unlawful.'"" *Cappello*, 394 F. Supp. 3d at 1023 (quoting *Rose*, 57 Cal. 4th at 397).

As discussed, the uncontroverted facts show that NG Defendants, acting in concert, including through their jointly controlled agents and employees, violated section 1861.16(b). They engaged in a practice, pursuant to business activity, that was forbidden by law. Therefore, as a matter of law, they violated the UCL's unlawful prong.

**2.      As a matter of law, the uncontroverted facts establish an "unfair business practice" for violation of the balancing and public policy tests.**

"'California appellate courts disagree on how to define an 'unfair' . . . practice in the context of a UCL consumer action.'" *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015) (quoting *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010)). "The California courts have established at least three tests for determining whether a business practice is unfair." *Dallas & Lashmi, Inc. v. 7-Eleven, Inc.*, 112 F. Supp. 3d 1048, 1057 (C.D. Cal. 2015). First, there is "the 'FTC test.'" *Backus v. Gen. Mills*, 122 F. Supp. 3d at 929 (quoting *Camacho v. Automobile Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006)). Second, there is "the 'balancing test.'" *Backus*, 122 F. Supp. 3d at 929 (quoting *Rubio v. Capital One*, 613 F.3d at 1205). Third, there is "the 'public policy'

PLAINTIFFS' NOTICE OF MOTION AND                                        NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

test." *Id.* (quoting *Rubio v. Capital One*, 613 F.3d at 1205). "The Ninth Circuit has rejected the use of the FTC test in the consumer context, because the California Supreme Court discussion regarding that test 'clearly revolves around anti-competitive conduct, rather than anti-consumer conduct.'" *Id.* (quoting *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) (citing *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 186 (1999)). This is a consumer class action, so the FTC test does not apply. Plaintiffs assert the other two tests, the "balancing test" and the "public policy" test, which are both directly on point with the uncontroverted facts.  Under both, the law entitles Plaintiffs to judgment on liability.

"Under the 'balancing test,'" a practice is "unfair" if "the harm to the public from the business practice is greater than the utility of the practice." *Backus*, 122 F. Supp. 3d at 929 (quoting *Rubio*, 613 F.3d at 1205). NG Defendants' practice of uniformly failing to cross-offer (through their jointly appointed and controlled agents and representatives), and thereby charging excessive California GDD insurance premiums, creates harm to Plaintiffs and the Class that outweighs any utility of Defendant's conduct.

"[U]nder the 'public policy' test," a business practice is "unfair" if "that a practice 'violates public policy as declared by 'specific constitutional, statutory or regulatory provisions.'" *Backus*, 122 F. Supp. 3d at 929 (quoting *Rubio*, 613 F.3d at 1205). As discussed, the undisputed material facts establish as a matter of law that Defendants violated section 1861.16(b). Therefore, under the public policy test, the law also entitles Plaintiffs to judgment on liability as a matter of law.

### 3.    Plaintiffs have no adequate remedy at law.

Where restitution would "be more certain, prompt, and efficient than other legal remedies," legal remedies are inadequate. *Valiente v. Simpson Imports, Ltd.*, 717 F. Supp. 3d 888, 907 (N.D. Cal. 2024) (declining to dismiss equitable relief claims); S*ee also Murphy v. Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1129 (N.D. Cal. 2023) (declining to dismiss equitable claims where legal claim would require a showing that the product had no market value but no such showing was required for restitution).

Plaintiffs' UCL unlawful and unfair claims  are "more certain, prompt, and efficient" than their legal claim -- the implied covenant of good faith and fair dealing -- which requires Plaintiffs

PLAINTIFFS' NOTICE OF MOTION AND                                           NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT

to prove more than the former. For example, all the UCL unlawful claim requires is that NG violated section 1861.16(b). The implied covenant claim is more complicated and difficult and therefore less certain. "Unlike with the UCL, reliance can implicate the causation analysis" in that latter claim. Dkt. 480, 41:28–42:1; *see also id.* 40:11–42:1 (explaining that a UCL restitution claim does not require reliance, but an implied covenant claim does); *See also* Dkt. 165 at 7:18 (Dfts. MTD 4th Amended Complaint) ("[A] plaintiff cannot prove fraudulent intent by pointing to conduct that falls outside of the contract. . . . Under California law, the implied covenant 'does not require parties to negotiate in good faith prior to any agreement.' . . . There is no basis to allege the violation of the cross-offer statute as an implied term because the alleged violation would have to be before the contract was formed, not after. This is fatal to the claim.").

## V.  CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment on liability.

Dated: June 5, 2025      By:    */s/ Michael F. Ram*

Michael F. Ram, SBN 104805
mram@forthepeople.com
Marie N. Appel, SBN 187483
mappel@forthepeople.com
Colin G. Losey, SBN 352223
colin.losey@forthepeople.com
Abraham Barkhordar, SBN 359425
abarkhordar@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 846-3862
Facsimile: (415) 358-6923

Jeffrey B. Cereghino, SBN 99480
jbc@cereghinolaw.com
CEREGHINO LAW GROUP LLP
739 Bryant Street
San Francisco, CA 94107
Telephone: (415) 433-4949

W. Craig Bashein, Admitted Pro Hac Vice
John P. Hurst, Of Counsel,
Admitted Pro Hac Vice

BASHEIN & BASHEIN CO., L.P.A.
Terminal Tower
35th Floor, 50 Public Square
Cleveland, Ohio 44113
Telephone: (216) 771-3239

*Attorneys for Plaintiffs and the Class*

PLAINTIFFS' NOTICE OF MOTION AND                    NO.  4:15-CV-00313-DMR
MOTION FOR PARTIAL SUMMARY JUDGMENT